No. _____

# In The
# United States Court of Appeals for the Ninth Circuit

J.A. Thomas & Associates, Inc., Providence Health & Services, Providence Health System – Southern California, Providence Health and Services – Washington, Providence Health & Services – Oregon, Providence Saint John's Health Center, Providence Health & Services – Montana, Swedish Health Services, and Swedish Edmonds,

*Defendants-Petitioners*,

v.

United States of America ex rel. Integra Med Analytics LLC,

*Relator-Respondent.*

Interlocutory Appeal from the United States District Court
for the Central District of California, No. 17-CV-01694
District Judge Philip S. Gutierrez

## PETITION FOR PERMISSION TO APPEAL
## PURSUANT TO 28 U.S.C. § 1292(b)

Lloyd A. Bookman
HOOPER LUNDY & BOOKMAN PC
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
lbookman@health-law.com

*Counsel for Defendants-Petitioners
Providence Health & Services, et al.*

Michael M. Maddigan
David W. Skaar
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
michael.maddigan@hoganlovells.com
david.skaar@hoganlovells.com

*Counsel for Defendant-Petitioner J.A.
Thomas and Associates, Inc.*

5883804.1

*(Additional Counsel Listed on Inside Cover)*

Joseph R. LaMagna
HOOPER LUNDY & BOOKMAN PC
101 W. Broadway, Suite 1200
San Diego, California 92101
Telephone: (619) 744-7300
Facsimile: (619) 230-0987
jlamagna@health-law.com

Jordan C. Kearney
HOOPER LUNDY & BOOKMAN PC
575 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 875-8500
Facsimile: (415) 875-8519
jkearney@health-law.com

*Counsel for Defendants-Petitioners
Providence Health & Services,
Providence Health System – Southern
California, Providence Health and
Services – Washington, Providence
Health & Services – Oregon,
Providence Saint John's Health Center,
Providence Health & Services –
Montana, Swedish Health Services, and
Swedish Edmonds*

Jonathan L. Diesenhaus
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5886
Facsimile: (202) 637-5910
jonathan.diesenhaus@hoganlovells.com
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant-Petitioner J.A.
Thomas and Associates, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Petitioners J.A. Thomas and Associates, Inc. (JATA), Providence Health & Services, Providence Health System – Southern California, Providence Health and Services – Washington, Providence Health & Services – Oregon, Providence Saint John's Health Center, Providence Health & Services – Montana, Swedish Health Services, and Swedish Edmonds (Providence Defendants) state as follows:

1.    JATA is a wholly owned subsidiary of parent corporation Nuance Communications, Inc.  No other publicly held corporation owns 10% or more of JATA's stock.

2.    The Providence Defendants are nonprofit corporations that have no shareholders.  The Providence Defendants have no parent corporations or publicly held corporations that own more than 10% or more of their stock.  Their corporate membership is as follows:

    a. Providence St. Joseph Health is the sole member of Defendant Providence Health & Services.

    b. Defendant Providence Health & Services is the sole member of:

        i. Defendant Providence Health System – Southern California

        ii. Defendant Providence Health & Services – Washington

      iii.  Defendant Providence Health & Services – Oregon

      iv.  Defendant Providence Health & Services – Montana

c.  Defendant Providence Health System – Southern California is the sole member of Defendant Providence Saint John's Health Center.

d.  Western HealthConnect is the sole member of:

      i.  Defendant Swedish Health Services

      ii.  Defendant Swedish Edmonds

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................. 1

FACTS RELEVANT TO THE QUESTIONS PRESENTED ........................................ 4

QUESTIONS PRESENTED ............................................................................................ 8

RELIEF SOUGHT ........................................................................................................... 8

ARGUMENT .................................................................................................................... 9

I.    The District Court's Order Meets All The Requirements Of § 1292(b). ............... 9

    A.    The News Media Issue Warrants Interlocutory Appeal. ....................... 10

        1.    The Definition of "News Media" Under The FCA Is A Controlling Question Of Law, And An Immediate Appeal Would Materially Advance The Termination Of The Litigation. ......................................... 10

        2.    There Is Substantial Ground For Difference Of Opinion. ........................ 11

    B.    The Falsity Issue Warrants Interlocutory Appeal. ................................. 15

        1.    It Is Material To The Order, And An Immediate Appeal Would Materially Advance Termination Of This Litigation. ............................... 15

        2.    There Is Substantial Ground For Difference Of Opinion. ........................ 15

II.    These Important Issues Are Worthy Of This Court's Consideration. ................................. 18

CONCLUSION ................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*U.S. ex rel. Aflatooni v. Kitsap Physicians Servs.*,
    163 F.3d 516 (9th Cir. 1998) ...................................................8

*Bingham v. HCA, Inc*.,
    2019 U.S. App. LEXIS 22745 (11th Cir. July 31, 2019)................................ *passim*

*United States ex rel. Brown v. Walt Disney World Co.*,
    2008 WL 2561975 (M.D. Fla. June 24, 2008)........................12

*In re Cement Antitrust Litig.*,
    673 F.2d 1020 (9th Cir. 1981) ...................................7, 8, 16

*United States ex rel. Cervantes v. Deere & Co..*,
    No. CV-10-3034-RMP, 2011 U.S. Dist. LEXIS 127575
    (E.D. Wash. Nov. 3, 2011)........................................12

*Chen v. EMSL Analytical, Inc.*,
    966 F. Supp. 2d 282 (S.D.N.Y. 2013).................................11

*United States ex rel. Cherwenka v. Fastenal Co.*,
    2018 WL 2069026 (D. Minn. May 3, 2018)...........................11

*Couch v. Telescope Inc.*,
    611 F.3d 629 (9th Cir. 2010) .....................................10

*CVS Caremark*
    Corp.*, No. 13-cv-5930, 2015 U.S. Dist. LEXIS 83089 (N.D. Ill. June 26,
    2015) ...........................................................12

*United States ex rel. Davis v. Prince*,
    753 F. Supp. 2d 569 (E.D. Va. 2011) ................................11

*U.S. ex rel. Devlin v. State of Cal.*,
    84 F.3d 358 (9th Cir. 1996) ......................................17

*United States ex rel. Doe v. Staples Inc.*,
    932 F.Supp.2d 34 (D.D.C. 2013) ..................................11

*United States ex rel. Doyle v. Diversified Collection Servs.*,
    2:04-cv-053, 2006 WL 3834407 (S.D. Ohio Dec. 29, 2006)................12

*In re Fontem US, Inc. Consumer Class Action Litigation*,
    2017 WL 10402988 at *5 (C.D. Cal. Mar. 8, 2017) .....................13

Page(s)

*Green v. AmerisourceBergen Corp.*,
  2017 WL 1209909 (S.D. Tex. 2017) .....................................................................12

*United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*,
  843 F. Supp. 2d 20 (D.D.C. 2012) .......................................................................11

*United States ex rel. Harper v. Muskingum Watershed Conservancy District*,
  2015 WL 7575937 (N.D. Ohio Nov. 25, 2015) ....................................................12

*U.S. ex rel. Hill v. Harvard University*,
  2017 WL 7837306 (C.D. Cal. Aug. 31, 2017).................................................9, 10

*United States ex rel. Hirt v. Walgreen Co.*,
  2016 WL 815512 (M.D. Tenn. Mar. 2, 2016) ......................................................12

*United States ex rel. Integra Med Analytics LLC v. Baptist Memorial Health Care Corp.*,
  No. 2:17-cv-02489 (W.D. Tenn.)...........................................................................17

*United States ex rel. Integra Med Analytics LLC v. Baylor Scott & White Health et al.*,
  No. 5:2017-cv-00886 (W.D. Tex.)................................................................ *passim*

*United States ex rel. Integra Med Analytics LLC v. Creative Solutions in Healthcare, Inc.*,
  No. 17-CA-1249 (W.D. Tex.).................................................................................17

*United States ex rel. Integra Med Analytics LLC v. Longwood Mgmt Corp.*,
  No. 2:2017-cv-08309 (C.D. Cal.) ..........................................................................17

*United States ex rel. Integra Med Analytics LLC v. Mariner Health Care Inc.*,
  No. 3:18-CV-00653 ................................................................................................17

*Integra Med Analytics, LLC v. Murphy Med. Ctr.*,
  No. 3:17-CV-00553 ................................................................................................17

*United States ex rel. Integra Med Analytics LLC v. Signature HealthCARE, LLC et al.*,
  No. 3:2017-cv-01544 (M.D. Tenn.)........................................................................17

*United States ex rel. Kraxberger v. Kansas City Power & Light Co.*,
  756 F.3d 1075 (8th Cir. 2014) ..............................................................................11

*United States ex rel. McLean v. Cty. of Santa Clara*,
No. C05-01962 HRL, 2011 U.S. Dist. LEXIS 125713 (N.D. Cal. Oct. 31, 2011) ..........................................................................................................12

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
101 F. Supp. 3d 111, 124-25 (D.D.C. 2015) .........................................11

*United States ex rel. Osheroff v. HealthSpring Inc.*,
938 F. Supp.2d 724 (M.D. Tenn. 2013) .................................................11

*United States ex rel. Osheroff v. Humana, Inc.*,
776 F.3d 805 (11th Cir. 2015) ...............................................................11

*In re Plavix Mktg., Sales Practices & Prods. Liab. Litig. (No. II)*,
123 F.Supp.3d 584, 595–96 (D.N.J. 2015) ...........................................11

*United States ex rel. Radcliffe v. Purdue Pharma L.P.*,
582 F. Supp. 2d 766 (W.D. Va. 2008) ...................................................11

*Reese* v. *BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) ........................................................7, 9, 16

*United States ex rel. Repko v. Guthrie*,
2011 WL 3875987 (M.D. Pa. Sept. 1, 2011) .........................................12

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
563 U.S. 401 (2011)................................................................................18

*Steering Committee v. United States*,
6 F.3d 572, 576 (9th Cir. 1993) .............................................................13

*United States ex rel. Unite Here v. Cintas Corp.*,
2007 WL 4557788 (N.D. Cal. Dec. 21, 2007).......................................12

*United Health Servs., Inc. v. United States ex rel. Escobar*,
136 S.Ct. 1989 (2016)............................................................................13

*United States v. AseraCare, Inc.*,
2019 WL 4251875 (11th Cir. Sept. 9, 2019) .........................................15

*United States* v. *Woodbury*,
263 F. 2d 784 (9th Cir. 1959) ..................................................................7

# TABLE OF AUTHORITIES—Continued

**Page(s)**

**Statutes**

28 U.S.C. § 1292(b) .............................................................................................. 1, 6, 7

31 U.S.C. § 3730(3)(4)(B) ............................................................................................ 8

Clery Act ..................................................................................................................... 10

False Claims Act .................................................................................................. *passim*

**Other Authorities**

16 Charles Alan Wright et al., Federal Practice & Procedure § 3930 (3d ed. 2018 update) ............................................................................................................................. 7

Fed. R. Civ. Proc. 8 .................................................................................................... 13

Fed. R. Civ. Proc. 9(b) ............................................................................................... 13

# INTRODUCTION

The District Court in this case certified two critical questions for interlocutory review. These questions arise in a False Claims Act (FCA) case brought by a made-for-litigation data analytics shop that said it used a "unique" statistical analysis—drawn from literature on evaluating mutual and hedge funds— to accuse Defendants of defrauding Medicare by "falsifying patient diagnoses, complications, and comorbidities." The outfit obtained Medicare claims data from the government, scoured the internet, and proclaimed fraud was afoot. It admittedly has no knowledge of any patient's medical condition or medical record.

The District Court denied the Defendants' motion to dismiss on two grounds, both of which it certified for interlocutory appeal after finding that they met the requirements of 28 U.S.C. § 1292(b). First, the court created a brand new five-part test for analyzing whether materials on the internet have been publicly disclosed within the meaning of the "news media" prong of the FCA—expressly disagreeing with more than thirty courts that have interpreted the statute differently with respect to internet materials. And second, the court concluded that a statistical analysis of claims data from the Centers for Medicare and Medicaid Services (CMS)—an analysis that the Relator itself describes as "unique"—was sufficient under Rules 8(a) and 9(b) to plead a scheme to defraud Medicare, in contrast to a decision now pending appeal in the Fifth Circuit that reached the

exact opposite conclusion in a copycat case filed by the same Relator alleging nearly the same facts against another hospital system.

In exercising its discretion to authorize an interlocutory appeal, the District Court explained why these issues satisfy § 1292(b)'s three factors. First, both issues are "controlling" because a ruling in Defendants' favor on either issue would be dispositive. Addendum ("Add.") at 42-43, 46 (Certification Order).

Second, there are plainly "substantial grounds" for reasonable jurists to disagree on these issues. As the District Court acknowledged, its interpretation of the term "news media" "departs from what appears to be a general consensus in the federal courts." Add. at 21 (MTD Order). Under that general consensus—which includes the Eighth and Eleventh Circuits and dozens of district courts, including several within this Circuit—the internet materials here were publicly disclosed. With respect to the falsity issue, another court has rejected Integra's "statistics-equal-false-claims" theory and an appeal is pending in the Fifth Circuit on that issue. That case was filed by the Relator in this case—Integra Med Analytics (Integra)—and, like this one, it relied on Integra's statistical analysis rather than on any insider knowledge, medical records, or patient conditions in alleging that the defendants fraudulently claimed patients had medical complications they did not. But the District Court below and the *Baylor* court reached opposite results on motions to dismiss. *See United States ex rel. Integra Med Analytics LLC,* 2019

2

WL 3713756 (W.D. Tex. Aug. 5, 2019). Therefore, a substantial ground for disagreement exists as to the falsity issue, as well.

Third, an interlocutory appeal would "materially advance the termination of the litigation." It has "important implications for liability," and a ruling in Defendants' favor would obviate the "quite high" discovery burden that litigating a matter of this complexity will require. Add. at 44-45, 47.

In addition to satisfying the requirements of § 1292(b), this Court's immediate review of the certified questions is warranted for other reasons. The District Court's determination that Integra's claims may proceed effectively creates a new business model for non-insider, opportunistic relators, as anyone with a statistical background and access to the internet could troll for what appear to be statistical outliers and state a case that survives a motion to dismiss. If, as Defendants vigorously contend, the District Court was wrong and this case should have been dismissed either under the public disclosure bar or for failure to plead falsity, it is critical for this Court to render its decision as quickly as possible to avoid the potential explosion of cases that wrongly would put these and other defendants through the type of onerous fishing expedition that Relator seeks to pursue here, to avoid the possibility of coercive settlements due to the extraordinary damages and penalties available under the FCA, to avoid the damage to an organization's reputation that may arise from even an unmeritorious FCA

claim, and to avoid unnecessarily burdening the courts with complex, intensive, and time-consuming litigation. *See Bingham v. HCA, Inc.*, 2019 U.S. App. LEXIS 22745, at *18 (11th Cir. July 31, 2019). Furthermore, if this appeal is not accepted now, the issues here will almost certainly be presented to this Court in either a later stage in this or in another case.

## FACTS RELEVANT TO THE QUESTIONS PRESENTED

Integra filed this FCA suit against Defendants,[1] alleging that Providence hospitals submitted Medicare claims with false diagnoses of complications and comorbidities. In some circumstances, the addition of a complication or comorbidity can increase the amount Medicare pays for a patient's treatment. Some hospitals, like Providence, have a "clinical documentation improvement" (CDI) program to ensure that patients' medical records and the hospital's resulting claim for payment are consistent and reflect the full scope of a patient's diagnosis and treatment. Add. at 2-3. Integra's suit is based on its assumption and assertion that this process is nefarious, even though CMS expressly says otherwise.

Unlike a typical *qui tam* claimant, Integra is a data analytics company with no connection to any Defendant and no first-hand knowledge of any wrongdoing.

---

[1] Defendants are Providence Health & Services, Providence Health System – Southern California, Providence Health & Services – Washington, Providence Health & Services – Oregon, Providence Saint John's Health Center, Providence Health & Services – Montana, Swedish Health Services, and Swedish Edmonds (together, "Providence"), and J.A. Thomas and Associates, Inc. ("JATA").

*Id.* at 3.  Knowing nothing about any patient's diagnosis or treatment, or the clinical decision-making of the physicians solely responsible for establishing them, Integra claimed that the Defendants fraudulently added false diagnoses to medical records and to Medicare claims.  Integra made this serious allegation based on its purported analysis of data that that CMS makes available to researchers and materials that it found on the internet.[2]

Defendants moved to dismiss based on the FCA's public disclosure bar and for failure to sufficiently plead a claim for relief.  The public disclosure bar, which is designed to preclude opportunistic litigation, is triggered when a suit's allegations are drawn from the "news media" and other public sources.  That fit Integra's suit, as Defendants explained, because the suit was based on internet searches of Defendants' own websites and industry and trade association websites, as well as claims data that CMS discloses to those who apply for it.  In addition, Defendants explained that Integra had failed to plausibly or specifically allege that any medical record for any patient contained any false medical diagnosis or sought payment for any medical condition that was known to be false.  The District Court rejected both of these arguments in ruling on the motions to dismiss.

---

[2]     Integra also filed a declaration, seeking to avoid dismissal, stating that it has interviewed unidentified employees of Defendants, though it subsequently declined an opportunity to amend its complaint.  It did not allege it has any information from physicians, who are solely responsible for establishing the diagnoses, here.

The District Court acknowledged that "[c]ourts have generally taken a broad view of the term 'news media,'" and it recognized "a general consensus in the federal courts"—evidenced by over thirty cases cited by Defendants—that "the news media provision of the public disclosure bar encompasses information from at least some types of online sources that might not traditionally be described as news media." Add. at 16, 21. The District Court rejected that view, holding instead that "the news media provision cannot be read to encompass all publicly available online information." *Id.* at 22.

Not only did the District Court admittedly depart from the general consensus, but it created a new, five-factor test comprised of what it viewed as "useful guideposts" for the "impossible task" of determining what online material qualifies as "news media" under the public disclosure bar. *Id.* at 22. Under this five-factor test, a court must consider the following to determine if online information constitutes "news media":

(1)    "[T]he extent to which the information typically conveyed by a source would be considered newsworthy";

(2)    Whether the source "collects information from outside sources, exercises some editorial judgment in deciding what to publish, and then transmits the published information to an audience";

(3)    Whether the source "inten[ds] to disseminate information widely, as opposed to only to a few individuals";

(4)    "[T]he extent to which the conveyance of newsworthy information is the primary purpose of [the] entity publishing the online source or

whether the dissemination of such information is merely ancillary to some other purpose"; and

(5)     Whether the source "could reasonably be described as 'news media' as at least some people would [use] that term in everyday speech."

Add. at 22-24. The District Court held that it could not tell without discovery whether the material from Defendants' own websites and from the industry and trade association websites that Integra's complaint had found, quoted, and copied should be considered qualifying public disclosures. *Id.* at 24-25.

The District Court also rejected Defendants' falsity arguments. It held that, on a motion to dismiss, it "must credit" Integra's allegations that Defendants' rates of certain diagnoses were too high, and that those rates coupled with the internet materials discussing clinical documentation, created a "plausible inference" of wrongdoing. *Id.* at 30-31. The District Court acknowledged that Integra's attempt to show fraud through correlation and statistics was "novel." *Id.* at 30.

Three weeks later, in the Western District of Texas, a District Court faced with a motion to dismiss nearly identical allegations brought by Integra against a different hospital defendant reached the opposite result. *See Baylor*, 2019 WL 3713756. The court concluded that, although Integra alleged a scheme to capture more complications and comorbidities in coding, that "scheme" did not equate to a scheme "to submit *false* claims." *Id.* at *4 (emphasis in original). "[T]he mere fact that Defendants took targeted steps to increase their coding of [complications and

7

comorbidities] to increase hospitals revenues is neither fraudulent, nor improper per se." *Id.* Because Integra could not allege that any diagnosis were false—i.e., inconsistent with a patient's actual medical condition—and being an outlier is equally consistent with legal conduct to capture all diagnoses and treatment provided, the court dismissed the case. *Id.* at *5-6.

The District Court granted Defendants' motion for interlocutory appeal of both its "news media" and falsity rulings. It also stayed the underlying case pending this Court's resolution of this petition and any subsequent appeal.

## QUESTIONS PRESENTED

1.      Whether internet disclosures, such as those from Defendants' own websites and industry and trade group websites, qualify as "news media" within the meaning of the public disclosure bar of the False Claims Act.

2.      Whether Integra adequately alleged the falsity of any Medicare claim by alleging that its statistical analyses show Providence used certain complication and comorbidity codes at higher rates than other hospitals.

## RELIEF SOUGHT

Defendants respectfully request that this Court grant this petition for permission to appeal pursuant to 28 U.S.C. § 1292(b), and, on appeal, reverse the District Court's conclusions that (i) Integra's complaint was not subject to

dismissal under the public disclosure bar and (ii) Integra adequately plead the "falsity" element of its FCA causes of action.

## ARGUMENT

## I. THE DISTRICT COURT'S ORDER MEETS ALL THE REQUIREMENTS OF § 1292(B).

Interlocutory review of a district court's non-final order is appropriate when the order "[(1)] involves a controlling question of law," (2) as to which there is "substantial ground for difference of opinion" and (3) where "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Reese* v. *BP Expl. (Alaska) Inc.*, 643 F.3d 681, 687-88 (9th Cir. 2011); *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981). The first and third § 1292(b) factors effectively merge where, as here, reversal on the question would dispose of one or more claims. *See Reese*, 643 F.3d at 687-88; *In re Cement Antitrust Litig.*, 673 F.2d at 1026 (holding that a question is "controlling" where its resolution "on appeal could materially affect the outcome of litigation in the district court"); *accord* 16 Charles Alan Wright et al., Federal Practice & Procedure § 3930 (3d ed. 2018 update).

Here, the District Court found that all three requirements were met with respect to both of the certified questions. The District Court's determination warrants "careful consideration," *United States* v. *Woodbury*, 263 F. 2d 784, 786 (9th Cir. 1959), and this Court should reach the same conclusion.

## A. The News Media Issue Warrants Interlocutory Appeal.

### 1. The Definition of "News Media" Under The FCA Is A Controlling Question Of Law, And An Immediate Appeal Would Materially Advance The Termination Of The Litigation.

The meaning of the term "news media" as used in the FCA is a controlling question of law. First, it presents a pure "question of statutory construction that an appellate court would review de novo." Add. at 43. Second, resolution of this question "would materially advance the termination of the litigation." *Id.* (citing *In re Cement Antitrust Litig.*, 673 F.2d at 1026). If this Court "answered the question in Defendants' favor, it would advance the case because the public disclosure bar would apply to [Integra's] claims." *Id.*[3]

An interlocutory appeal here will also "avoid protracted and expensive (but ultimately unnecessary) litigation and the burdens on the court system." *Id.* at 45 (citation omitted). Discovery here will be complex, time-consuming, and expensive. To prove its case, Integra will have to seek to review individual medical records related to specific claims submitted to Medicare, to compare the

---

[3] Integra argued below that the news media issue was not controlling because there is a potential statutory exception in the public disclosure bar for an "original source." The District Court explained why the exception does not change whether application of the bar is a controlling question of law. *Id.* Nor could Integra meet the standard anyway. An original source must have independent knowledge of the allegations, among other things. *See* 31 U.S.C. § 3730(3)(4)(B). But Integra's complaint admits that it had no knowledge before CMS publicly disclosed the data. Add. at 70 (Second Am. Compl. ¶ 49); *see U.S. ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 525 (9th Cir. 1998) (independent knowledge means knowledge that precedes the public disclosure).

diagnoses included in those Medicare claims to the diagnoses that Integra thinks should have been included, to investigate each hospital's CDI policies and practices in order to determine if CDI played a role in the claim's submission, and to determine JATA's relationship, if any, to each hospital and claim. All of this may be avoided with a ruling in Defendants' favor on an interlocutory appeal. The potential time and costs savings, for both the parties and the District Court, weigh heavily in favor of granting review, as does the fact the news media question has "important implications for assigning liability." *Id.*; *see Reese*, 643 F.3d at 688.

## 2. There Is Substantial Ground For Difference Of Opinion.

The District Court acknowledged that the five-part test it created was a "departure from what appears to be a general consensus in the federal courts" about the meaning of "news media" under the FCA. Add. at 21. Two other district courts within this Circuit previously have followed that consensus, giving the term a broader—and easier to apply—interpretation. In *United States ex rel. Hong v. Newport Sensors, Inc.*, the court held that faculty profiles on a university website qualified as "news media" because "[i]nformation publicly available on the Internet generally qualifies as 'news media.'" 2016 WL 8929246, at *5 (C.D. Cal. May 19, 2016), *aff'd* 728 F. App'x 660 (9th Cir. 2018). And in *U.S. ex rel. Hill v. Harvard University*, 2017 WL 7837306, at *1 (C.D. Cal. Aug. 31, 2017), the court

held that the government's Clery Act website (as well as a book and a movie) constituted "news media."

The internet material that the courts held were news media in *Hong* and *Hill* would fail the District Court's five-part test, for multiple reasons. Neither a university nor the government's Clery Act website is a source that "collects information from outside sources, exercises some editorial judgment in deciding what to publish," or "curates information." Add. at 23. Neither is "news media as at least some people would use that term in everyday speech." *Id.* It is not clear that either is a source that "typically convey[s]" information considered newsworthy or that has "the conveyance of newsworthy information" as its primary purpose, as opposed to an "ancillary purpose." *Id.* Although the relator-plaintiff appealed the dismissal in *Hong*, he did not challenge the district court's news media holding. This Court therefore had no reason to address the news media issue. *Hong*, 728 F. App'x at 663; *Couch v. Telescope Inc*., 611 F.3d 629, 633 (9th Cir. 2010) ("Courts traditionally will find that a substantial ground for difference of opinion exists where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point…").

Decisions from around the country underscore the divergence between the five-part test adopted below and other courts' interpretation of "news media." Courts have held all of the following constitute news media under the FCA:

- *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 813 (11th Cir. 2015) (defendant medical clinics' websites).

- *United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014) (hearing testimony available on the state Public Service Commission's website).

- *United States ex rel. Oliver v. Philip Morris USA Inc.*, 101 F. Supp. 3d 111, 124-25 (D.D.C. 2015) (memo posted in a searchable online database and websites for NEXCOM and AAFES).

- *In re Plavix Mktg., Sales Practices & Prods. Liab. Litig. (No. II)*, 123 F.Supp.3d 584, 595–96 (D.N.J. 2015) (report published online by the American Association for Justice).

- *United States ex rel. Doe v. Staples Inc.*, 932 F.Supp.2d 34, 40 (D.D.C. 2013) (shipping data available on private company's website).

- *Chen v. EMSL Analytical, Inc.,* 966 F. Supp. 2d 282 (S.D.N.Y. 2013) (online press release by the U.S. Attorney for the Northern District of New York).

- *United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*, 843 F. Supp. 2d 20, 32 (D.D.C. 2012) (promotional page on defendant's website).

- *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 593 n.34 (E.D. Va. 2011) (contract disclosed on United Press International's website).

- *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 582 F. Supp. 2d 766, 772 (W.D. Va. 2008) (drug package insert posted on manufacturer's website).

- *United States ex rel. Osheroff v. HealthSpring Inc.*, 938 F. Supp.2d 724, 732–33 (M.D. Tenn. 2013) (medical clinics' website).

- *United States ex rel. Cherwenka v. Fastenal Co.*, 2018 WL 2069026, at *7 (D. Minn. May 3, 2018) (company's own website, even though it did "not function as a news outlet.").

- *Green v. AmerisourceBergen Corp.*, 2017 WL 1209909, at *6 (S.D. Tex. 2017) (blog posts and newsletters published online by IDC Health).

- *United States ex rel. Hirt v. Walgreen Co.*, 2016 WL 815512, at *5 (M.D. Tenn.  Mar. 2, 2016) (press release on government website).

- *CVS Caremark Corp.*, No. 13 C 5930, 2015 U.S. Dist. LEXIS 83089 (N.D. Ill. June 26, 2015) (CVS's website).

- *United States ex rel. Harper v. Muskingum Watershed Conservancy District*, 2015 WL 7575937, at *7 (N.D. Ohio Nov. 25, 2015) (press releases on defendant's website).

- *United States ex rel. Cervantes v. Deere & Co..*, No. CV-10-3034-RMP, 2011 U.S. Dist. LEXIS 127575 (E.D. Wash. Nov. 3, 2011) ("press releases, financial disclosures, an uncompleted form 'Master Agreement'…and other information retrieved from the Internet.")

- *United States ex rel. McLean v. Cty. of Santa Clara*, No. C05-01962 HRL, 2011 U.S. Dist. LEXIS 125713 (N.D. Cal. Oct. 31, 2011) ("various internet materials").

- *United States ex rel. Repko v. Guthrie*, 2011 WL 3875987, at *7-8 (M.D. Pa. Sept. 1, 2011) (websites for GuideStar and the Foundation Center, Standard & Poor's, and Bloomberg Professional).

- *United States ex rel. Brown v. Walt Disney World Co.*, 2008 WL 2561975, at *4 (M.D. Fla. June 24, 2008) (Wikipedia).

- *United States ex rel. Unite Here v. Cintas Corp.*, 2007 WL 4557788, at *14 (N.D. Cal. Dec. 21, 2007) (government contract that was posted online).

- *United States ex rel. Doyle v. Diversified Collection Servs.,* 2:04-cv-053, 2006 WL 3834407, at *3 (S.D. Ohio Dec. 29, 2006) ("Internet web page").

As the District Court has recognized, its definition of "news media" departs from the "general consensus" among courts.  The dismissal order should be accepted for interlocutory appeal to resolve the news media question.

## B. The Falsity Issue Warrants Interlocutory Appeal.

### 1. It Is Material To The Order, And An Immediate Appeal Would Materially Advance Termination Of This Litigation.

To survive dismissal in an FCA case, the plaintiff must plead the "falsity" of a claim plausibly under Rule 8, and with particularity under Rule 9(b). *United Health Servs., Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2004 n.6 (2016). The District Court concluded that Integra had done so. Although it viewed this as an application of settled law to the facts alleged in the complaint, it recognized that "mixed questions of law and fact are suited for certification when there is at least one legal question and the mixed question is 'material to the order.'" Certification Order at 8 (citing *Steering Committee v. United States*, 6 F.3d 572, 576 (9th Cir. 1993)). That is the situation here: The news media question involves pure statutory interpretation, *supra* at p.10, and the falsity question "is material to the [underlying] order because it is dispositive." *Id.* (citing *In re Fontem US, Inc. Consumer Class Action Litigation*, 2017 WL 10402988 at *5 (C.D. Cal. Mar. 8, 2017) (holding that a mixed question was "material to the order" because the question was dispositive).) Because it is dispositive, an immediate appeal of the falsity issue would materially advance the termination of the litigation. *Id.* at 9.

### 2. There Is Substantial Ground For Difference Of Opinion.

Substantial ground for difference of opinion exists on the falsity issue. There is no controlling authority from this Court on the validity of FCA allegations supported only by a non-insider's statistical analysis, and the other courts that have

squarely addressed this question have reached conflicting conclusions. Add. at 47 ("the Ninth Circuit has not weighed in on this issue and other courts have come to different conclusions").

The District Court's holding stands in stark contrast to the outcome in *Baylor*, 2019 WL 3713756, where the court dismissed substantially similar allegations against another hospital Integra thinks is a statistical outlier. That case is currently before the Fifth Circuit. In both cases, Integra alleged the same purported "scheme" based on the same alleged "methodology":

- The defendants allegedly "routinely used unwarranted Major Complication and Comorbidity secondary codes, which falsely inflated claims submitted to Medicare." Add. 54 (¶ 1), 153 (¶ 1).

- The defendants allegedly used improper "leading queries" to encourage providers to code MCCs. Add. 63 (¶ 33), 162 (¶ 27).

- The defendants allegedly used documentation tips to influence providers to code for CCs and MCCs. Add. 59-60 (¶ 26), 163 (¶ 28).

- Integra's "unique algorithms and statistical processes" showed allegedly fraudulent claims. Add. 70-72 (¶¶ 49-54), 171-73 (¶¶ 40-45).

- Integra's purported analysis showed that defendants used codes for encephalopathy, respiratory failure, and severe malnutrition, at a greater rate than the national average. Add. 73 (¶ 55), 173 (¶ 46).

- Integra's statistical analysis eliminates all potential explanations for the statistical aberrations besides fraud. Add. 143 (¶ 121), 235-36 (¶ 103).

Integra's accusation of fraud, in both cases, was not based on any insider knowledge, a review of any medical records, or any knowledge that any patient's actual medical condition was other than what was reflected in a Medicare claim.

Here, the District Court found it sufficient to state a claim that Integra alleged "the Hospital Defendants' high rates of coding for encephalopathy, respiratory failure, and severe malnutrition are highly unlikely to be caused by chance." Add. at 30. The *Baylor* court reached the opposite conclusion: "Plaintiff's statistical analysis allegedly demonstrating that no other explanation but fraud accounts for the data it analyzed overlooks one major alternative hypothesis: Defendants were simply better than their peers in their efforts to ensure their medical documentation and coding maximized the opportunities for legitimate reimbursement from CMS." 2019 WL 3713756 at *6. The court noted that, "[u]ltimately, Plaintiff's allegations are not only compatible with but more likely explained by lawful conduct." *Id.* Further, the complaint failed because, although physicians are solely responsible for making the diagnoses at issue, there was no allegation "that any doctors were told, ordered, or even encouraged to provide…treatment in contradiction to their own independent medical judgments." *Id.* As the *Baylor* court explained, medical diagnoses are "expressions of opinion…about which reasonable minds may differ," but diagnoses that are merely erroneous (and are not lies) are not actionable. *Id.*; *see also United States v.*

*AseraCare, Inc.*, 2019 WL 4251875 at *14-15 (11th Cir. Sept. 9, 2019) (a claim certifying a provider's medical judgment cannot be false if it does not "reflect an objective falsehood," such as a diagnosis that the "physician did not, in fact, subjectively believe," or that "no reasonable physician" could have reached).

The District Court, faced with these conflicting opinions, correctly concluded that "there is substantial ground for difference of opinion" because "reasonable jurists could disagree here." Add. at 47. The Court should make the same finding here. *See Reese*, 643 F.3d at 688 (key question is whether "reasonable jurists might disagree on an issue's resolution," especially when addressing "novel and difficult questions of first impression").

## II. THESE IMPORTANT ISSUES ARE WORTHY OF THIS COURT'S CONSIDERATION.

There are other reasons the Court should grant review here. *See In re Cement Antitrust Litig.*, 673 F.2d at 1026 (explaining court should analyze as a "second step" whether "we want to accept jurisdiction"). The extent to which a relator can use material from the internet without triggering the "news media" provision, and whether falsity can be inferred from an algorithmic analysis of public data, are questions on the cutting edge of FCA litigation. They also are open questions that this Circuit has not yet addressed.

The Court should address these questions for at least three reasons. First, providing guidance to the district courts on these issues would be very helpful and

would equip the district courts to appropriately address these issues in a quickly developing area of the law. The internet question has come up repeatedly in district courts within this Circuit; the Court did not address it in *Hong* because the relator there did not challenge on appeal that portion of the district court's ruling. 728 F. App'x at 662-63. And Integra has filed numerous cases around the country against health care providers whom its statistical analysis says are outliers.[4] Other would-be Relators and data miners will not fail to notice if courts are allowing fraud claims to survive to discovery based on a statistical correlation.

Second, the FCA's *qui tam* provisions are designed for those who have knowledge of fraud against the government to litigate on the government's behalf. By not putting a stop to cases like this one, courts encourage "entrepreneurs" with no insider knowledge to build a cottage industry of cases built on CMS data and internet sources against anyone they call a statistical outlier. The FCA is a whistleblower statute, not a bounty-hunter statute. *U.S. ex rel. Devlin v. State of Cal.*, 84 F.3d 358, 362 (9th Cir. 1996) (The FCA "aims at ferreting out fraud by

---

[4]    *United States ex rel. Integra Med Analytics LLC v. Baylor Scott & White Health et al.*, No. 5:2017-cv-00886 (W.D. Tex.); *United States ex rel. Integra Med Analytics LLC v. Baptist Memorial Health Care Corp.*, No. 2:17-cv-02489 (W.D. Tenn.); *Integra Med Analytics, LLC v. Murphy Med. Ctr.*, No. 3:17-CV-00553; *United States ex rel. Integra Med Analytics LLC v. Creative Solutions in Healthcare, Inc.*, No. 17-CA-1249 (W.D. Tex.); *United States ex rel. Integra Med Analytics LLC v. Signature HealthCARE, LLC et al.*, No. 3:2017-cv-01544 (M.D. Tenn.); *United States ex rel. Integra Med Analytics LLC v. Longwood Mgmt Corp.*, No. 2:2017-cv-08309 (C.D. Cal.); *United States ex rel. Integra Med Analytics LLC v. Mariner Health Care Inc.*, No. 3:18-CV-00653.

encouraging persons with firsthand knowledge of alleged wrongdoing to come forward"); *see Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 413 (2011) (the public disclosure bar is aimed at "stifling parasitic lawsuits").  It also imposes a tremendous burden on non-profit hospitals like the Providence Defendants, at next to no cost to the opportunistic relator hoping for a pay day.

Third, Integra has not added anything to CMS's existing fraud-detection practices.  CMS already employs auditors in to perform a validated version of whatever "unique" version of a statistical analysis Integra claims to have done. The Medicare Recovery Audit Program, for instance, specifically focuses on the precise issue that Integra claims to have analyzed.  *See* ECF No. 59-5, RJN Ex. 4 at 141, 142 (Approved Recovery Audit Contractor Topics).  Because Integra's purported "discoveries" are all drawn from the government's own claims data, which the government itself can, and does, regularly monitor and audit for outliers using validated statistical analyses, there is every reason to give close scrutiny to a decision allowing a suit like this one to proceed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant this petition for permission to appeal.

Respectfully submitted,

| /S/ Lloyd A. Bookman | /S/ David W. Skaar |
|---|---|

Lloyd A. Bookman
HOOPER LUNDY & BOOKMAN PC
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
lbookman@health-law.com

Joseph R. LaMagna
HOOPER LUNDY & BOOKMAN PC
101 W. Broadway, Suite 1200
San Diego, California 92101
Telephone: (619) 744-7300
Facsimile: (619) 230-0987
jlamagna@health-law.com

Jordan C. Kearney
HOOPER LUNDY & BOOKMAN PC
575 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 875-8500
Facsimile: (415) 875-8519
jkearney@health-law.com

*Counsel for Defendants-Petitioners
Providence Health & Services,
Providence Health System – Southern
California, Providence Health and
Services – Washington, Providence
Health & Services – Oregon,
Providence Saint John's Health
Center, Providence Health & Services
– Montana, Swedish Health Services,
and Swedish Edmonds*

Michael M. Maddigan
David W. Skaar
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
michael.maddigan@hoganlovells.com
david.skaar@hoganlovells.com

Jonathan L. Diesenhaus
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5886
Facsimile: (202) 637-5910
jonathan.diesenhaus@hoganlovells.com
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant-Petitioner J.A.
Thomas and Associates, Inc.*

# CERTIFICATE OF COMPLIANCE

1.      This petition complies with the length limitations of Circuit Rule 5-2(b) because it does not exceed 20 pages in length, excluding the parts of the petition exempted by Federal Rules of Appellate Procedure 5(b)(1)(E) and 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/S/ David W. Skaar
David W. Skaar

# ADDENDUM

# TABLE OF CONTENTS

**Page**

Order Granting in Part and Denying in Part Defendants' Motion
    to Dismiss (ECF 82) ..................................................................Add. 1

Order Granting Defendants' Motion to Certify the Order for
    Interlocutory Appeal, Granting Defendants' Motion to Stay,
    and Denying the Motion to Phase Discovery (ECF 100) ..........................Add. 39

Second Amended Complaint (Redacted) (ECF 38)…………………………Add. 51

Second Amended Complaint, *United States ex rel. Integra
    Med Analytics LLC*, No. 17-CV-0886-DAE (W.D. Tex.
    Aug. 8, 2018) (ECF 15)…………………………………………………...Add. 151

Screenshot of CMS.gov "Inpatient Hospital MS – DRG
    Coding Validation"…………………………………………………………Add. 241

i

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge | |
|---|---|---|
| Wendy Hernandez | | Not Reported |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiff(s): | | Attorneys Present for Defendant(s): |
| Not Present | | Not Present |

**Proceedings (In Chambers):**   **Order GRANTING in part and DENYING in part Defendants' motions to dismiss**

Before the Court are a motion to dismiss filed by Defendant Providence Health & Services ("Providence" or "Providence H&S") and its affiliate hospitals[1] (collectively the "Hospital Defendants"), *see* Dkt. # 56 ("*Hosp. Mot.*"), and a motion to dismiss filed by Defendant J.A. Thomas and Associates, Inc. ("JATA"), *see* Dkt. # 57 ("*JATA Mot.*"). Relator Integra Med Analytics LLC ("Relator" or "Integra") has opposed both motions. *See* Dkts. # 61 ("*Hosp. Opp.*"), #62 ("*JATA Opp.*"). Defendants have filed replies. *See* Dkts. # 67 ("*JATA Reply*"), # 68 ("*Hosp. Reply*"). The Court held a hearing on this matter on February 13, 2019. Following the hearing, the parties submitted supplemental briefs at the Court's request. *See* Dkt. # 77 ("*Def. Supp.*"); #78 ("*Integra Supp.*"). The Court then held a second hearing on July 1, 2019. Having considered the moving papers and the arguments made at the hearings, the Court **GRANTS** the motions in part and **DENIES** them in part.

I.   Background

In this case, Relator Integra alleges that Defendants conspired to submit, and did submit, false claims to Medicare in violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq.

---

[1] The affiliate Hospital Defendants joining this motion are Providence Health System—Southern California, Providence Health & Services—Washington, Providence Health & Services—Oregon, Providence Saint John's Health Center, Providence Health & Services—Montana, Swedish Health Services, and Swedish Edmonds.

ADDENDUM 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

A.   Factual Background

Defendant Providence H&S is "one of the nation's largest health systems, operating 34 hospitals and 600 clinics across five states." *Second Amended Complaint*, Dkt. # 39 ("*SAC*"), ¶ 2. The seven other Hospital Defendants are affiliates of Providence H&S. *Id.* Providence H&S's business relies in large part on reimbursements from Medicare. For example, of Providence H&S's $14.4 billion in revenue in 2015, approximately $6.2 billion came from Medicare reimbursements. *Id.*

Medicare pays hospitals on a "per-discharge" basis—that is, it makes a single payment for each inpatient hospital stay. *Id.* ¶ 21. This payment is "designed to cover the average cost of resources needed to treat each patient's needs." *Id.* As part of the payment calculation, Medicare assigns each hospital discharge to a "diagnosis related group" ("DRG"). *Id.* According to Relator, the DRG "is the single most impactful factor in determining the average payment for a claim." *Id.* The DRG is primarily determined by three types of codes: (1) the principal diagnosis code (defined as the "condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care"), (2) the surgical procedure code (representing any surgical procedures performed), and (3) secondary diagnosis codes (which represent "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or the length of the stay"). *Id.* ¶ 22.

These codes produce more than 330 base DRGs. *Id.* ¶ 23. Adding another level of complexity, each DRG can have up to three severity levels: (1) "without Complication or Major Complication," (2) "with Complication," or (3) "with Major Complication." *Id.* The severity level of a DRG is determined by the secondary diagnoses present. *Id.* Each year, the Centers for Medicare and Medicaid Services ("CMS"), the federal agency that administers the Medicare program, publishes a list of codes that, when added to a claim, result in the claim being considered a Complication or Comorbidity (a "CC") or a Major Complication or Comorbidity ("MCC"). *Id.* Adding a CC or MCC code to a claim can increase the severity level of the DRG from the base level of "without Complication or Major Complication" to the higher levels of "with Complication" or "with Major Complication." *Id.* Importantly, increasing the severity level can increase the amount of the reimbursement that the hospital receives from Medicare. For example, Relator alleges that adding a CC secondary code can increase the value of the reimbursement by $1,000 to $10,000 and adding an MCC secondary code can increase the value by $1,000 to $25,000. *Id.*

ADDENDUM 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

To translate the clinical language that medical professionals use during treatment into codes that satisfy Medicare's coding standards, the Hospital Defendants, like many hospitals, have a "clinical documentation improvement" ("CDI") program.  *Id.* ¶ 24.  The Hospital Defendants retained Defendant JATA to assist with that program.  *Id.*  JATA is a company that provides CDI consulting services, purporting to help hospitals "ensure the accuracy of clinical documentation reflecting the appropriate severity of illness."  *Id.*

Relator alleges that JATA and the Hospital Defendants worked together to train doctors to describe medical conditions with language that would support adding secondary CCs and MCCs, thereby allowing the Hospital Defendants to increase the severity level of the DRGs they reported to Medicare, leading to larger reimbursements.  *Id.*  Because the "documentation tips" that JATA provided to Providence doctors "often bore no relation to the clinical realities," Relator alleges that they resulted in "upcoding" of CCs and MCCs—in other words, adding CCs and MCCs to claims when the clinical circumstances did not merit such designations—leading to Defendants receiving more money from Medicare than they were entitled to.

Integra is not a prototypical False Claims Act relator.  Parties bringing *qui tam* cases under the FCA are often insiders who claim knowledge of false claims from their previous relationships and/or interactions with the defendant.  *See United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 119 (D.D.C. 2003).  Integra was not an insider of Defendants or the Government and has no first-hand knowledge of the upcoding that it alleges.  Instead, it bases its claims on analysis it performed on data it received from CMS regarding inpatient claims from short term acute care hospitals as well as information it has gathered about JATA's business practices.  *See SAC* ¶ 49.

Integra's analysis compared the rate at which the Hospital Defendants submitted claims with certain MCCs accompanying certain diagnoses to the rates at which those MCCs accompanied the same diagnoses in claims submitted by other hospitals.  *See id.*  Integra describes its methodology as follows.  It first formed groupings corresponding to 312 specific principal diagnosis codes.  *Id.* ¶ 50.  For each of these diagnosis codes—what Integra refers to as comparative "bins"—it compared the rates at which specific MCCs were used at hospitals in the Providence system to the usage rates in other acute care inpatient hospitals.  *Id.*  "To ensure that only the truly fraudulent claims were analyzed," Integra excluded any diagnosis codes for which adding an MCC did not increase the value of the Medicare reimbursement.[2]  *See id.* ¶ 50 and n.8.

---

[2] Integra also excluded claims involving patients who died during treatment as it alleges that "these claims tend to involve patients that are sicker and have higher rates of MCCs."  *SAC* ¶ 50.

ADDENDUM 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|----------|----------------------|------|---------------|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

To account for natural variation in usage among hospitals and to "further ensure that it identified truly abnormal usage" of MCCs, Integra labeled the use of a particular MCC a false claim only when it was either (1) used at more than twice the national rate or (2) at a rate three percentage points higher than in other hospitals. *Id.* ¶ 51.

Using this methodology, Integra alleges that it "identified 271 combinations of principal diagnosis codes and Misstated MCCs in which Providence excessively upcodes." *Id.* Its claims in this case focus on three categories of secondary MCC codes that it alleges the Hospital Defendants, in consultation with JATA, used to increase the value of their claims: (1) encephalopathy[3] (including toxic encephalopathy), (2) respiratory failure (including pulmonary insufficiency), and (3) severe malnutrition. *Id.* ¶ 55. As one example of the disparity Relator alleges between Providence's claims and the claims of other hospitals, among Providence's more than 11,000 claims involving a "Fracture of the Neck of the Femur" (i.e. the hip), 12.34 percent of them were coded with a secondary MCC of encephalopathy. *Id.* ¶ 52. In contrast, of the more than 1.1 million femoral neck fracture claims submitted by other hospitals, only 4.46 percent of them were coded with a secondary MCC of encephalopathy. *Id.* In other words, Integra alleges that the Hospital Defendants coded encephalopathy in conjunction with femoral neck fracture claims at a rate 2.77 times higher than comparable hospitals and "profited nearly $7,500 each time it did so." *Id.*

Relator alleges that this upcoding was driven in part by tip sheets created by Defendant JATA, which trained Providence doctors on how to document conditions so that the medical records would support adding an MCC to the diagnosis code. *Id.* ¶ 29. For example, one tip sheet informed doctors that encephalopathy is an MCC, whereas "delirium" is not a CC unless specified as a certain type, and "altered MS [mental state] is a *symptom*—not even a CC." *Id.* The same sheet also informed doctors that "acute respiratory failure" is an MCC, whereas "respiratory distress" is "low severity." *Id.* And another tip sheet instructed doctors to "document *severe malnutrition*—it not only adds severity as an MCC, it will likely prolong the post-op course thereby aligning the illness severity with length of stay." *Id.* ¶ 30. In short, these tip sheets informed Providence doctors of the diagnoses that would support adding CCs and

---

[3] According to the allegations in the complaint, "[e]ncephalopathy is a term for brain disease or damage to the brain where the brain is regarded as 'altered in its structure or function.' The telltale symptom is an altered mental state, but altered mental state alone is insufficient for diagnosing encephalopathy . . . . [Encephalopathy] commonly manifests as confusion, agitation, or lethargy, but may include aphasia (altered speech), ataxia (altered gait) and memory loss." *SAC* ¶ 59.

ADDENDUM 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

MCCs, and therefore potentially increase the hospitals' reimbursements. Relator alleges that the physicians then went on to use the MCCs emphasized in the JATA tips sheets at a rate disproportionate to comparable hospitals. *See id.* ¶ 41.

Relator also alleges that Defendants' practice of using "leading queries" led to miscoding of these MCCs. Hospitals may only add CCs or MCCs to a claim when information supporting them is sufficiently documented in the patient's medical files. *Id.* ¶ 32. Relator alleges that Providence's CDI specialists sent "queries" to doctors that were phrased in a manner "designed to push them to change their initial assessments in ways that would justify coding of a CC or MCC." *Id.* The practice of querying doctors in a way that directs them to specific diagnoses allegedly failed to conform to industry standards. *Id.* ¶ 33 n.6. Relator also alleges that Defendants pressured doctors "to document for higher severity to the point of acquiescence." *Id.* ¶ 38. JATA's regional director allegedly taught Providence doctors that the only way to avoid being queried would be to initially document an MCC. *Id.* This sometimes led to contradictory medical records as doctors initially documented a less severe condition before "hastily adding [an MCC] to the bottom of the chart." *Id.* ¶ 38. Relator alleges that the pressure Defendants put on doctors predictably led them to code MCCs at excessive rates. *Id.* ¶ 39.

B.   Procedural History

Relator brings this case under the FCA, which allows individuals having knowledge of false claims submitted to the federal government to bring suit on behalf of the government, and, if successful, to receive a percentage of the money recovered. *See* 31 U.S.C. § 3730(b). It asserts two causes of action, both against all Defendants:

First Cause of Action: Violation of the FCA, arising from falsifying patient diagnoses, complications, and comorbidities. This also contains allegations of a "reverse" FCA claim and a claim of a conspiracy to violate the FCA. *SAC* ¶¶ 129–33.

Second Cause of Action: Violation of the FCA, arising from the Defendants' violations of the Anti-Kickback Statute. *Id.* ¶¶ 134–42.

The United States declined to exercise its statutory right to intervene and prosecute the action. *See* Dkt. # 28; 31 U.S.C. § 3730(b)(4). Defendants now move to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the allegations in the Second Amended Complaint ("SAC") fail to state a claim upon which relief can be granted. *See generally Hosp. Mot.*; *JATA Mot.*

ADDENDUM 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

## II.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the pleader must state the time, place, and specific content of the false representations. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In essence, the defendant must be able to prepare an adequate answer to the allegations of fraud.

## III.   Judicial Notice

JATA has asked the Court to take judicial notice of thirty-three exhibits it has proffered with its motion to dismiss. *JATA Request for Judicial Notice*, Dkt. # 59 ("*RJN*").

"Generally, the scope of review on a motion to dismiss . . . is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see also Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."). Courts may also, however, consider "attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014).

ADDENDUM 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

Under Federal Rule of Evidence 201, the court "can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (quoting *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG (POR), 2009 WL 6598891, at *2 (S.D. Cal. Dec. 23, 2009)); *see also L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 937–38 (C.D. Cal. 2011) (noting that public records from the internet are "generally considered not to be subject to reasonable dispute") (internal quotation marks omitted).

The documents for which JATA seeks judicial notice fall into three categories: (1) documents incorporated by reference into the SAC, (2) government documents available from reliable sources, and (3) other documents available on the internet for which JATA asks the Court only to take judicial notice of the fact that they are publicly available. *See RJN*, Addendum A.

The Court will discuss the online sources in the third category further below. As for the other two categories, Relator has not opposed JATA's request. In light of this non-opposition and the fact that many of the documents are not helpful in deciding the current motions, the Court does not analyze here whether each document is a proper subject for judicial notice. Rather, to the extent the Court relies on a document, it finds that judicial notice is proper and therefore **GRANTS** judicial notice as to that document.

IV.   Discussion

Defendants' arguments for dismissal fall into five categories: (1) Relator's suit is barred by the FCA's "public disclosure bar"; (2) Relator has failed to adequately allege elements of its FCA claim (falsity, materiality, and scienter) under Federal Rules of Civil Procedure 9(b) and 12(b)(6); (3) Relator has not adequately pleaded a "reverse FCA" claim; (4) Relator has not adequately pleaded a conspiracy to violate the FCA; and (5) Relator has not adequately pleaded an FCA claim based on violation of the Anti-Kickback Statute. *See generally Hosp. Mot.*; *JATA Mot.*[4]   The Court addresses each in turn.

---

[4] For sake of brevity, where both motions address the same issue, the Court cites to only one of the motions.

ADDENDUM 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

A.   Public Disclosure Bar

As explained above, Integra is not a prototypical FCA relator in that it had no insider relationship with Defendants. This on its own, however, is not enough to bar its suit. While "[i]t is generally contemplated than an FCA relator will be an insider . . . the statute contains no such requirement." *McGready*, 251 F. Supp. at 119. Instead, "[a]ny person who can muster significant evidence of fraud, that is not publicly disclosed, and be the first to file a complaint alleging that fraud, may maintain a *qui tam* suit." *Id.*

Whether information has previously been publicly disclosed is a key factor in determining whether a relator may bring suit under the FCA. If there has been a public disclosure, the suit may be maintained only if the relator was the "original source" of the information. *See* 31 U.S.C. § 3730(e)(4)(A) ("The court shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as in the action or claim were publicly disclosed [through specified channels]."); *United States ex rel. Lee v. Corinthian Colls.*, No. CV 07-1984 PSG (MANx), 2013 WL 12114015, at *3 (C.D. Cal. Mar. 15, 2013). "This public disclosure bar is based on the proposition that, where the government is already in possession of information regarding allegations or transactions that would put it on notice that some person is obtaining government funds through fraud or false pretenses, no public benefit is derived from permitting the private party to proceed with the case unless that party was the source of the information." *Lee*, 2013 WL 12114015, at *3.

The FCA's public disclosure bar is triggered only if three conditions are met: (1) the disclosure occurred through one of the channels specified in the statute, (2) the disclosure was "public," and (3) the lawsuit is "based upon" the allegations or transactions publicly disclosed. *United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 626 (9th Cir. 2018). The public disclosure bar is an affirmative defense. *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1103 (9th Cir. 2017). The Court may consider it on a motion to dismiss only when the allegations in the complaint or materials that are subject to judicial notice are sufficient to establish the defense. *See Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013).

Defendants argue that Relator's claims are barred by the public disclosure bar because they are based on information gleaned from three categories of public disclosures: (1) the Medicare claims data that CMS provided to Relator, (2) information about JATA's business practices, which was available from online sources, and (3) reports issued by the Department of Health and Human Services Office of the Inspector General ("HHS OIG") relating to improper use of the diagnosis code of kwashiorkor, a form of malnutrition. *See JATA Mot.* 26:15–30:23.

ADDENDUM 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

The Court first addresses whether each of the three categories of information were publicly disclosed through a channel specified in the FCA before turning to the question of whether Plaintiff's complaint was based upon publicly disclosed information such that it is precluded by the public disclosure bar.

        *i.*     *Public Disclosure*

        *a.*     *Medicare Claims Data*

The public disclosure bar applies to, among other things, lawsuits based upon information publicly disclosed in a "Federal report." 31 U.S.C. § 3730(e)(4)(A)(ii). Defendants argue that the claims data Relator received from Medicare falls within this provision. *See JATA Mot.* 26:15–28:2. The Court will first analyze whether the claims data was a "Federal report" within the meaning of the statute before determining whether it was publicly disclosed.

        *1.*     *Federal Report*

The Court's analysis of whether the Medicare claims data was disclosed in a "Federal report" is guided by the Supreme Court's decision in *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011), which construed that term in the FCA. The relator in *Schindler Elevator* alleged that the defendant submitted false claims by failing to file required reports with its claims and including false information in the reports it did file. *See id.* at 405. To support his allegations, the relator relied on information that his wife had received from the relevant government agency via Freedom of Information Act ("FOIA") requests, which had been used to obtain copies of the reports at issue as well as information about the years in which the defendant failed to file the required reports. *See id.* at 406. The case presented the question of whether the responses to the FOIA requests were "reports" within the meaning of the FCA's public disclosure bar. *Id.*

As the term "report" is not defined in the FCA, the Supreme Court first looked to its ordinary meaning, finding that a "report" is "something that gives information" or a "notification," or is "an official or formal statement of facts or proceedings." *See id.* at 407–08 (cleaned up) (quoting Webster's Third New International Dictionary (1986) and Black's Law Dictionary (6th ed. 1990)). The Court noted that this definition, which it acknowledged was "broad," was "consistent with the generally broad scope of the FCA's public disclosure bar." *Id.* at 408. Relying on this definition, the Court held that the FOIA responses were "reports,"

ADDENDUM 9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

because "[e]ach response was an 'official or formal statement' that 'gave information' and 'notified [the requestor]' of the agency's resolution of [the] FOIA request." *Id.* at 410–11.

With *Schindler Elevator* as a guide, the Court now turns to the question of whether the Medicare data Relator received from CMS was disclosed through a federal report because it "gave information" or was "an official or formal statement of facts or proceedings." *See id.* at 407–08. There are many similarities between the relator's actions in *Schindler Elevator* and Integra's actions here. As in that case, Integra had no previous relationship with Defendants and received the information underlying its claims via a request to a government agency. In arguing that the Medicare data should not be considered a federal report, Integra focuses heavily on the fact that unlike information discovered through a FOIA request, the Medicare data was released only to researchers who intend to "improve the quality of life for Medicare beneficiaries or improve the administration of the Medicare program" and was subject to various restrictions designed to preserve the confidentiality of Medicare beneficiaries. *See Hosp. Opp.* 12:9–22 (citing Ctrs. for Medicare & Medicaid Servs., Instructions for Completing the Limited Data Set Data Use Agreement, *available at* https://goo.gl/HJMiro; *CMS Cell Size Suppression Policy*, Ctrs. for Medicare & Medicaid Servs., Research Data Assistance Ctr., https://www.resdac.org/articles/cms-cell-size-suppression-policy (last updated May 8, 2017)).[5] But this conflates two separate elements of the public disclosure bar analysis: whether the data was disclosed in a federal report and whether the disclosure was "public." *See Solis*, 885 F.3d at 626. The restrictions placed on the Medicare data will be discussed further below in the context of determining whether it was publicly disclosed, but they say nothing about whether the data was disclosed through a means that "gave information" or was "an official or formal statement of facts or proceedings." *See Schindler Elevator*, 563 U.S. at 407–08.

Relator additionally argues that "[t]he data [it] obtained from CMS was not part of any kind of report . . . [but] was simply confidential, raw data provided to researchers." *See Hosp. Opp.* 14:9–11. This argument is similar to the position taken by the dissent in *Schindler Elevator*. *See* 563 U.S. at 419 (Ginsburg, J., dissenting) (favorably citing the Court of Appeals's conclusion that the FOIA responses were not reports because they "merely assembled and duplicated records, or noted the absence of records" and did not "synthesize the documents or their contents with the aim of . . . gleaning any insight or information"). But the majority rejected this proposition, instead taking the broad view that a report is "something that gives information" or is "an official or formal statement of facts or proceedings." *Id.* at 407–08

---

[5] The Court takes judicial notice of these government documents, which are publicly available on the agencies' websites.

ADDENDUM 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

(cleaned up). Just as the FOIA responses in *Schindler Elevator* disclosed the contents of reports filed with the government, the Medicare data that CMS provided to Integra disclosed the contents of Medicare claims filed with the government. As the disclosure gave Integra information about Medicare claims and was an official statement of the claims that had been filed, the Court concludes that it constituted a federal report within the meaning of the public disclosure bar. *See id.*

2.     *Public Disclosure*

Having concluded that the Medicare claims data was disclosed to Relator in a federal report, the Court now turns to the question of whether that disclosure was "public." *See* 31 U.S.C. § 3730(e)(4)(A); *Solis*, 885 F.3d at 626. As detailed above, Relator argues that Medicare claims data was not disclosed publicly because it was given only to researchers seeking to improve the life of Medicare beneficiaries or the administration of the Medicare system and was subject to various privacy provisions. *See Hosp. Opp.* 12:9–22

In this Circuit, "a disclosure need not be made to the public at large to qualify as 'public'" under the FCA. *Malhotra v. Steinberg*, 770 F.3d 853, 858 (9th Cir. 2014) (citing *Seal 1 v. Seal A*, 255 F.3d 1154, 1161–62 (9th Cir. 2001)). To evaluate whether information was publicly disclosed, the Ninth Circuit has looked to whether the individual receiving the disclosure was an "insider" or "outsider" with regard to the information's subject matter. *See Malhotra*, 770 F.3d at 858–60; *Seal 1*, 255 F.3d at 1161–62.

For example, in *Seal 1*, the relator developed a relationship with lawyers from the U.S. Attorney's Office who were investigating fraud committed by his former employer. *See* 255 F.3d at 1156. Over the course of this relationship, the government lawyers allowed the relator to view internal documents that revealed that one of his employer's competitors, Zenith, was likely committing the same type of fraud. *See id.* The court concluded that this sharing of information was a public disclosure because the relator "was an outsider to the Zenith investigation at the time he received the information [from] the U.S. Attorney's office." *Id.* at 1161. It rejected the relator's contention that the disclosure was not public because he had signed a declaration requiring him to keep the information confidential, finding that a determination that the disclosure was public was "consistent with Congress' intent that the FCA not be used by people attempting to 'free ride' in information obtained from the government." *Id.* at 1161–62.

The Ninth Circuit elaborated on this insider/outsider distinction in *Malhotra*. *See* 770 F.3d at 858–61. The relators in that case believed that the trustee appointed to administer their

ADDENDUM 11

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

bankruptcy, named Steinberg, was engaging in fraudulent conduct.  *See id.* at 855.  They began conducting their own investigation into his conduct, reviewing thousands of pages of bankruptcy court and county assessor records.  *Id.*  The relators shared the fruits of their investigation with the Office of the United States Trustee, which eventually decided to depose an associate of Steinberg's.  *Id.* at 856.  At the deposition, which the relators attended, the associate revealed information that led the relators to believe that Steinberg had engaged in fraudulent conduct with regard to several other bankruptcies.  *Id.*  On the basis of this information, they filed an FCA case against Steinberg.  *Id.*  The Ninth Circuit determined that the information the relators had received at the deposition was a public disclosure.  While recognizing that the relators had conducted their own investigation into Steinberg's actions and that they might be considered insiders with regard to their *own* bankruptcy, the court held that they were outsiders with regard to the U.S. Trustee's investigation into Steinberg's conduct *in other bankruptcies* and therefore could not rely on the information as the basis for their FCA claims.[6]  *Id.* at 860.

    The Court believes that it is clear under *Seal 1* and *Malhotra* that Integra was an outsider for purposes of the allegations against Defendants, and therefore CMS's disclosure of Medicare claims data to Integra was a public disclosure.  Integra was neither an employee of Defendants nor an employee of the government.  *See id.* at 859.  Nor was it in anyway deputized by the government to conduct an investigation into Medicare fraud.  Integra's contention that the data would not have been released to just anyone is therefore beside the point.  *See Hosp. Opp.* 12:9–14:11.  The Ninth Circuit has expressly held that "[d]isclosure of information to one member of the public, when that person seeks to take advantage of that information by filing an FCA action, is public disclosure" because Congress did not intend for the FCA to be "used by people attempting to 'free ride' on information obtained from the government."  *Seal 1*, 255 F.3d

---

[6] In *Malhotra*, the Ninth Circuit appears to have held that only employees of the target of an investigation or employees of the government can be considered "insiders," such that a disclosure of information to them is not a public disclosure.  *See* 770 F.3d at 859 ("In *Seal 1*, we had no occasion to define with precision the meaning of 'outsider.'  [The relator in that case] was neither an employee of the target of the investigation (Zenith) nor an employee of the government—the two categories of individuals who, even under the broadest reading of our precedents, could be considered insiders.  That made it easy to conclude that [the relator] was an 'outsider' to the Zenith investigation.")  It is not clear, however, whether the Ninth Circuit was contemplating situations in which there is no existing government investigation into the defendant in the FCA case.  Ultimately, the Court does not need to decide if insider status is limited to employees of targets of investigations or the government because it concludes that Integra was an outsider under any definition.

ADDENDUM 12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

at 1162.  As for Integra's argument that the privacy and confidentiality restrictions render the disclosure private, the Ninth Circuit rejected an essentially identical argument in *Seal 1*.  *See Seal 1*, 255 F.3d at 1162 ("[The relator] signed a 'Declaration' requiring him to keep confidential the information he obtained from the USAO, but this does not undermine our conclusion that [he] is a member of the public for purposes of his suit.").

Relator largely ignores *Seal 1* and *Malhotra*, instead arguing that the Ninth Circuit's decision in *Berg v. Honeywell Int'l, Inc.*, 502 F. App'x 674 (9th Cir. 2012), "expressly limited the holding" in *Seal 1*.  *See Hosp. Opp.* 13 n.6.  However, as an unpublished memorandum disposition, *Berg* cannot limit *Seal 1*, a published decision.  It certainly cannot limit *Malhotra*, a published precedential decision *that postdated it*.  But even taking Relator's argument at face value, the Court finds it unconvincing.

In *Berg*, the Ninth Circuit found that a government report was not publicly disclosed when it was given to a private company hired by the government to conduct an audit.  502 F. App'x at 676.  The court reached this conclusion because the recipient of the report "was not an 'outsider' to the investigation, but rather was acting on behalf of the government and had an incentive to keep confidential the information learned during its audit."  *Id.*  In contrast, Integra was not hired by the government or otherwise acting on its behalf.  Instead, it was given the information for its own purposes.  And beyond complying with the confidentiality provisions designed to protect the privacy of Medicare beneficiaries, Integra had no incentive to keep the information it learned during its analysis confidential.  Indeed, it turned around and used that information as the basis of this suit.

Relator relies heavily on the decision in *United States ex rel. Spey v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012), *see Hosp. Opp.* 12:23–13:9, but *Spey* addressed an entirely different issue.  In that case, the defendants argued that various reports should be considered publicly disclosed because the defendants themselves had submitted them to the government, at which point members of the public theoretically could have obtained them by making a request.  *Spey*, 913 F. Supp. at 182–84.  The court rejected this argument, finding that it would be tantamount to saying that the mere act of submitting a false claim via the reports would immunize the defendant from liability.  *Id.* at 183.  The argument made by the *Spey* defendants is quite different than the one Defendants make here.  An analogous scenario in this case would be if Defendants were arguing that the mere act of filing (allegedly) false Medicare claims constituted a public disclosure because claim data could later be obtained by researchers like Integra.  But that is not the argument before the Court.  Instead, Defendants argue that the

ADDENDUM 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

data became publicly disclosed only when the CMS *actually* provided it to Integra, an outsider. *Spey* is simply inapposite.

For the foregoing reasons, the Court concludes that the Medicare claims data was publicly disclosed in a federal report within the meaning of the FCA.

        *b.*     *HHS OIG Reports*

Relator does not dispute that information in the HHS OIG reports regarding the improper coding of kwashiorkor was publicly disclosed in a federal report. Accordingly, the Court concludes that this information was publicly disclosed within the meaning of the public disclosure bar.

        *c.*     *The JATA Business Practice Information*

The public disclosure bar applies to information "publicly disclosed . . . from the news media." 31 U.S.C. § 3730(e)(4)(A)(iii). Defendants argue that seven categories of information regarding JATA's business practices were publicly disclosed from the news media by virtue of being available on the internet:

**Case Mix Guarantee**—In the SAC, Relator alleges that JATA "guaranteed an increase in its clients' Case Mix Index ("CMI"), which is influenced by a hospital's CC and MCC rates." *SAC* ¶ 24. In support, it includes a screenshot of text from JATA's website that reads "**Guaranteed to increase CMI** . . . . See how we're helping hospitals achieve a 4–8% increase in their Case Mix Index through better documentation." *Id.*; *Exhibit 13 to RJN*, Dkt. # 59-14, at 202–03.

**Return on Investment Sales Pitch**—Relator alleges that JATA gave a sales pitch promising "guaranteed return on investment if [the hospital] followed [JATA]'s process." *SAC* ¶ 25. This quote was taken from a case study put together by JATA and another hospital that is publicly available on the website of Becker Hospital Review, a hospital industry trade publication. *Exhibit 14 to RJN*, Dkt. # 59-15, at 227.

**Documentation Tip Sheets**—The documentation tip sheets cited in the SAC—which, as explained above, informed Providence doctors about clinical language that would and would not support adding MCCs and CCs to diagnoses—are available on the website of

ADDENDUM 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

Providence Health & Services Southern California. *See SAC* ¶¶ 26–27, 29–30; *Exhibits 15–18 to RJN*, Dkts. # 59-16–59-19.

**Newsletter**—A monthly hospital newsletter that Relator alleges is evidence that "Providence gave CDI and doctors financial incentives for successful queries and . . . made clear to doctors and staff that it closely tracked their responsiveness," *SAC* ¶ 41, is available on the website of Defendant Swedish/Edmonds. *Exhibit 19 to RJN*, Dkt. # 59-20.

**Training Video**—A JATA training video described in the complaint is publicly available on YouTube. *See SAC* ¶ 31; *Exhibit 20 to RJN*, Dkt. # 59-21.

**Message Board Posts**—The complaint quotes several statements made by CDI specialists, questioning JATA's coding practices. *See SAC* ¶¶ 36–37, 45. These statements were taken verbatim from discussions on a message board that is hosted on the website of the Association of Clinical Documentation Improvement Specialists ("ACDIS"), a trade organization. *See Exhibits 21–25 to RJN*, Dkts. #59-22–59-26.

**JATA Audit Presentation**—The SAC references a presentation in which JATA staff "coached hospitals to avoid being audited." *SAC* ¶ 40. This presentation is available on the ACDIS website. *See Exhibit 26 to RJN*, Dkt. # 59-27, at 304–05.

*See JATA Mot.* 28:3–29:3.

Relator does not dispute that this information was publicly available on the internet. Instead, it argues that the websites containing this information are not "news media" within the meaning of the FCA. *See Hosp. Opp.* 14:14–15:23; *JATA Opp.* 28:10–29:17.

The public disclosure bar, read as a whole, provides context for the Court's discussion of whether the online information in this case was publicly disclosed "from the news media." The bar applies if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

(i) in a Federal criminal, civil, or administrative hearing in which the Government  or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report,

---

**CIVIL MINUTES - GENERAL**

ADDENDUM 15

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

hearing, audit, or investigation; or

(iii) from the news media."

31 U.S.C. § 3730(e)(4)(A).  This framework does not capture all information that could be described as "public" in common parlance.  Instead, "[b]y its plain terms, the public disclosure bar applies to some methods of public disclosure and not to others."  *Schindler Elevator*, 563 U.S. at 414.

As described above, the information about JATA's business practices comes from websites operated by industry groups, websites operated by Defendants, and an online message board.  None of these would traditionally be described as "news media."  But this is not necessarily dispositive.  Courts have generally taken a broad view of the term "news media."  For example, the Eleventh Circuit has held that a health clinic's publicly available websites qualified as news media because they were "intended to disseminate information about the clinics' programs."  *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 813 (11th Cir. 2015).  And applying differing but related standards, numerous other decisions cited by Defendants have held that various online sources were "news media."  *See United States ex rel. Carter v. Bridgeport Educ., Inc.*, No. 10-CV-1401 JLS (WVG), 2015 WL 4892259, at *6 n.4 (S.D. Cal. Aug. 17, 2015) (holding that an online comment on the San Diego Reader website was disclosed from the news media because the site was a "well-established website designed to convey news to the public"); *United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*, 843 F. Supp. 2d 20, 32 (D.D.C. 2012) (concluding that the term includes "readily accessible websites"); *United States ex rel. Brown v. Walt Disney World Co.*, No. 6:06-cv-1943-Orl-22KRS, 2008 WL 2561975, at *4 (M.D. Fla. June 24, 2008) (finding that Wikipedia is a news media outlet); *United States ex rel. Unite Here v. Cintas Corp.*, No. C 06-2413 PJH, 2007 WL 4557788, at *14 (N.D. Cal. Dec. 21, 2007) (holding that information about contracts between the defendant and the government was publicly disclosed because it "was available on the Internet"); *see also United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 43 n.6 (4th Cir. 2016) (stating in dicta that "[c]ourts have unanimously construed the term 'public disclosure' to include websites and online articles").

In particular, Defendants ask the Court to adopt the holding of a case from this District that stated, without further elaboration, that "[i]nformation publicly available on the Internet generally qualifies as 'news media.'"  *United States ex rel. Hong v. Newport Sensors Inc.*, No. SACV 13-1164 JLS (JPRx), 2016 WL 8929246, at *5 (C.D. Cal. May 19, 2016) ("*Hong I*").  But in affirming *Hong* on other grounds, the Ninth Circuit explicitly noted that it was not

ADDENDUM 16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

adopting "the district court's broad holding that most public webpages . . . generally fall within the category of 'news media.'" *United States ex rel. Hong v. Newport Sensors, Inc.*, 728 F. App'x 660, 662–63 (9th Cir. 2018) ("*Hong II*"). And the Court finds *Hong I*'s holding unpersuasive.

"News media" is not defined in the FCA. The courts that have interpreted the term to include all, or substantially all, information available online appear to have extrapolated their holdings from the Supreme Court's description of the public disclosure bar as having a "generally broad scope." *See Schindler Elevator*, 563 U.S. at 408; *see also, e.g.*, *Green*, 843 F. Supp. 2d at 32. Notably, none attempted to analyze whether the online sources at issue fell within the ordinary meaning of the term "news media." As the Court informed the parties at both hearings, it believes that an analysis of whether the information about JATA's business practices was "publicly disclosed . . . from the news media" must start with the statute's text. *See Schindler Elevator*, 563 U.S. at 407 ("Because the [FCA] does not define 'report,' we look first to the word's ordinary meaning."). After the first hearing, the Court invited the parties to submit supplemental briefs providing their views on the ordinary meaning of the term "news media," and both have done so. With the issue fully briefed, the Court now turns to the question of whether the online information about JATA's business practices was publicly disclosed from the news media.

> 1.    *Whether* All *Online Information Is Disclosed From the News Media*

The Court first addresses Defendants' argument that *all* publicly available online information has been publicly disclosed "from the news media." As explained above, the analysis must begin with the statute's text. While the compound term "news media" is not commonly defined in dictionaries, its component parts give some indication of its scope. "News" is a "report of a recent event," "what is reported in a newspaper, news periodical, or news broadcast," or "matter that is interesting to newspaper readers or news broadcast audiences . . . or is suitable for news copy." Webster's Third New International Dictionary 1524 (1986). "Medium," the singular of "media," can be defined as a "channel, method, or system of communication, information, or entertainment" or "a vehicle (such as a radio or television program or a newspaper) used to carry advertising." *Id.* at 1403. Read together, these definitions suggest that "news media" includes methods of communication that are used to convey a particular type of information: information about recent events or that would otherwise commonly be found in a newspaper, news broadcast, or other news source. It follows, then, that

ADDENDUM 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

the term cannot refer to the internet in general, a channel that is designed to be able to convey essentially anything.

That "news media" cannot encompass *all* online information is also clear as a matter of common sense. Nobody would use the term this way in everyday speech. Information is available on the internet from innumerable sources. A person might go to a restaurant's website to look at its menu. Or the Dodgers' website to find out the ticket prices for the upcoming series. Or, closer to this case, a doctor's website to determine the next available appointment. In none of these circumstances would it be natural, or really conceivable, to say that the information had been learned by consulting the news media.

Defendants' unbounded reading of the news media provision also seems likely to swallow limitations that Congress specifically placed on the scope of the public disclosure bar. For example, the bar applies to suits based on information disclosed "in a Federal criminal, civil, or administrative hearing *in which the Government or its agent is a party*." 31 U.S.C. § 3730(e)(4)(A)(i). This provision evinces Congress's intent to exclude from the public disclosure bar information disclosed at hearings in cases in which the Government is *not* a party, conceivably in part based on a presumption that the Government is less likely to learn about events that transpire in cases it is not involved with. But transcripts of hearings in cases where the Government is not a party are commonly made available to the public for a small fee through the federal courts' PACER website. And many hearings are open to the public, such that a private citizen could attend and tweet his observations afterwards.

Under Defendants' view, the mere posting of the transcript on PACER or a tweet sent to a small handful of followers could render the information from the hearing publicly disclosed under the FCA, even though it otherwise would not be. This would run contrary to the purposes underlying the public disclosure bar, and indeed the FCA itself. *See Schindler Elevator*, 563 U.S. at 412 (describing the public disclosure bar as "narrower" than its predecessor, the Government knowledge bar, which was intended to preclude "parasitic *qui tam* actions based on evidence or information in the possession of the United States at the time such suit was brought") (cleaned up); *United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 742 (9th Cir. 1995) ("[T]he purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.") (cleaned up).

In short, the Court concludes that applying the news media provision to anything ever published publicly on the internet is contrary to the ordinary meaning of the term "news media"

ADDENDUM 18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

and has the potential to eviscerate the balance Congress struck between encouraging private parties to bring forth evidence of fraud and preventing parasitic suits.  Accordingly, the Court declines to adopt Defendants' interpretation.

Defendants make several arguments to the contrary, none of which are persuasive.  First, they contend that the ordinary meaning of the term "news media" must encompass all websites because "93 percent of adults get news online" and several news publishers, such as Slate.com and Vox.com, were founded on the internet.  *See Def. Supp.* 10:6–23.  But this fallaciously conflates the indisputable proposition that *some* websites are news media sources with a conclusion that *all* must be.  Just as the fact that 93 percent of Americans may get their milk from the supermarket does not make everything in the supermarket milk, the fact that 93 percent of adults get their news online does not make everything on the internet a news media source.

Second, Defendants assert that Congress implicitly ratified previous judicial decisions holding that everything available on the internet is disclosed through the news media when it amended the public disclosure bar in 2010 but did not alter the news media provision.  *See id.* 11:7–12:25.  This argument invokes the so-called "prior-construction canon," under which "[i]f a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort, or even uniform construction by inferior courts . . . they are to be understood according to that construction."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012); *see also Merck & Co. v. Reynolds*, 559 U.S. at 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."); *United States v. Male Juvenile*, 280 F.3d 1008, 1016 (9th Cir. 2002) (similar).

There are two problems with Defendants' argument.  First, Defendants emphasize that Congress failed to alter the news media provision when amending *other* provisions of the public disclosure bar in 2010.  *See Def. Supp.* 11:7–12:25.  But a mere failure to *correct* previous judicial constructions of a statute is generally not viewed as "a sound basis for believing that the legislature has 'adopted' them."  Scalia & Garner, *Reading Law* 326.  Even viewed in the light most favorable to Defendants, that is all Congress did here.

Further, the vast majority of decisions adopting Defendants' preferred rule—including all relevant decisions from the Courts of Appeals—were not issued until *after* the 2010 amendment.  As evidence that the law was settled in their favor at the time of the amendment, Defendants point only to four pre-2010 district court decisions from the Northern District of California, Middle District of Florida, Southern District of Ohio, and Western District of Virginia.  *See Def.*

ADDENDUM 19

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|

| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. |
|---|---|

*Supp.* 12:8–16 (citing *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 582 F. Supp. 2d 766, 772 (W.D. Va. 2008), *rev'd on other grounds*, 600 F.3d 319 (4th Cir. 2010); *United States ex rel. Brown v. Walt Disney World Co.*, No. 6:06-cv-1943-Orl-22KRS, 2008 WL 2561975 (M.D. Fla. Jun. 24, 2008); *United States ex rel. Unite Here v. Cintas Corp.*, No. C 06-2413 PJH, 2007 WL 4557788 (N.D. Cal. Dec. 21, 2007); *United States ex rel. Doyle v. Diversified Collection Servs., Inc.*, No. 2:04 CV 053, 2006 WL 3834407 (S.D. Ohio Dec. 29, 2006)).  Even putting aside the fact that some of these decisions did not go as far as adopting Defendants' rule that everything on the internet has been publicly disclosed through the news media—and indeed one explicitly declined to do so[7]—the central question in applying the prior-construction canon is whether the weight of authority is such that the construction of the statutory term can be considered "settled law."  *See* Scalia & Garner, *Reading Law* 325.  The Court does not believe that four scattered district court decisions sufficiently settled the law such that Congress should be presumed to have adopted their constructions of the term "news media" when it amended some provisions of the public disclosure bar but not others.  *See United States v. Davis*, 139 S. Ct. 2319, 2331 (2019) ("[I]nterpretations of three courts of appeals 'may not have 'settled' the meaning" of a statute . . . .") (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.*, 559 U.S. 573, 590 (2010)).  Accordingly, the prior-construction canon has little to no persuasive value in this case.

Finally, Defendants point to more than thirty cases that held that various forms of online information were publicly disclosed through the news media.  *See Def. Supp.* 12:27–16:25.  These decisions applied differing rationales to reach their conclusions.  Some looked to the extent to which the purpose of an online source was to disseminate information.  *See, e.g.*, *Osheroff*, 776 F.3d at 813 (information on a clinic's websites was disclosed through the news media because the websites were "intended to disseminate information about the clinics' programs"); *United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 125 (D.D.C. 2015) (information on the websites of two military entities was disclosed through the news media notwithstanding the fact that the websites did not contain a "news header," because the purpose of the pages "was clearly to give the public an accurate account of those entities' contracting requirements").  Others looked at the number of visitors to the website.  *Green*, 843 F. Supp. 2d at 33 (information was disclosed through the news media when "thousands" of visitors would have come across it during the relevant time period).  Still others have focused upon the ease with which an online source can be accessed.  *See United States ex rel. Liotine v.*

---

[7] *See Radcliffe*, 582 F. Supp. 2d at 772 ("I am not ready to conclude that anything posted online would automatically constitute a public disclosure within the meaning of [the public disclosure bar].")

ADDENDUM 20

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

*CDW Gov't, Inc.*, No. 05-33-DRH, 2009 WL 3156704, at *6 n.5 (S.D. Ill. Sept. 29, 2009) (information in an internal employee newsletter posted online was *not* disclosed through the news media in part because several steps needed to be taken before it could be located on the organization's website). And some have adopted the broad position that Defendants urge here, that all publicly available information on the internet has been disclosed through the news media within the meaning of the FCA. *See Hong I*, 2016 WL 8929246, at *5; *United States v. Honeywell Int'l, Inc.*, No. CV 12-2214 JAK (JCGx), 2013 WL 12122693, at *9 (C.D. Cal. Nov. 8, 2013) ("Documents that are publicly available on the internet generally qualify as 'publicly disclosed' documents under [the public disclosure bar].").

The Court does not lightly depart from what appears to be a general consensus in the federal courts that the news media provision of the public disclosure bar encompasses information from at least some types of online sources that might not traditionally be described as news media. But none of these decisions are binding on this Court. And their persuasive value is diminished by two factors.

First, most of the cases Defendants cite did not undertake their own independent analysis of the meaning and scope of the news media provision and instead simply cited to previous decisions of other courts (that themselves often contained sparse analysis) with little additional explanation. *See, e.g.*, *United States ex rel. Cherwenka v. Fastenal Co.*, Civ. No. 15-187 (PAM/BRT), 2018 WL 2069026, at *7 (D. Minn. May 6, 2018); *Hong I*, 2016 WL 8929246, at *5. Second, and more importantly, none of the decisions Defendants cite attempted to define the ordinary meaning of the term "news media" or to otherwise ground their interpretation in the statutory text. Most began their analysis with the Supreme Court's description of the news media provision as having a "broad[] sweep," *Graham Cty.*, 559 U.S. at 290, and proceeded to interpret it to encompass information from a broad swath of online sources without pausing to consider whether those sources could reasonably be defined as "news media" within any ordinary meaning of the term. *See, e.g.*, *Osheroff*, 776 F.3d at 813. Some appear to have gone so far as to suggest that information falls within the scope of the news media provision simply because it is publicly known, *see United States ex rel. Cervantes v. Deere & Co.*, No. CV-10-3034-RMP, 2011 WL 5325466, at *5 (E.D. Wash. Nov. 3, 2011), a conclusion that is at odds with the Supreme Court's description of the public disclosure bar as applying "to some methods of public disclosure and not to others," *see Schindler Elevator*, 563 U.S. at 402.

The Court believes that this approach improperly strays from the Supreme Court's instruction that interpretation of the undefined term "news media" must begin with its ordinary meaning. *See id.* at 407. While the Court in *Schindler Elevator* acknowledged the "generally

ADDENDUM 21

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

broad scope" of the public disclosure bar in giving the term "report" a broad construction, the documents in that case—written letters and emails from the Department of Labor containing information about records the agency found in response to FOIA requests—could still be considered "reports" within some ordinary meaning of the term because they were official government communications that conveyed information.  *See id.* at 406–07.  In contrast, as the Court illustrated above, there are many types of sources on the internet that cannot be realistically described as "news media."

A desire to carry out what may appear to the purposes of the public disclosure bar or to update the statute for the Internet Age, while perhaps understandable, does not provide the judiciary with a license to jettison the actual text that Congress enacted.  Because many types of online sources clearly fall outside the ordinary meaning of the term news media, the news media provision cannot be read to encompass all publicly available online information.

Having reached this conclusion, the Court turns to the question of what the news media provision *does* encompass.

### 2.     *Scope of the News Media Provision*

In a world where the line between what is and is not considered news media has become increasingly blurred, attempting to set forth a single conclusive definition of the term may be an impossible task.[8]  Nevertheless, the Court believes that several factors provide useful guideposts in determining whether information from an online source has been disclosed "from the news media" within the meaning of the FCA's public disclosure bar.

*First*, as explained above, combining the dictionary definitions of the terms "news" and "media" suggests that the compound term "news media" describes methods of communication

---

[8] Citing this difficulty, Defendants suggested at the second hearing that the Court could avoid attempting to determine the ordinary meaning of the term news media and instead simply analyze the websites in this case by comparing them to online sources in other cases.  But the Court believes that it is important to provide an ordinary meaning definition.  As discussed above, none of the dozens of cases cited by both sides conducted an analysis that was anchored in the statutory text.  While there may be room to disagree with the contours of the "news media" analysis that the Court sets forth below, perhaps this attempt to fashion an ordinary meaning definition of the term will lead others to attempt the same.  *See Schindler Elevator*, 563 U.S. at 407.

---

ADDENDUM 22

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

that are used to convey information about recent events or other information that would commonly be found in a newspaper, news broadcast, or other news source. Accordingly, the extent to which the information typically conveyed by a source would be considered newsworthy is relevant to whether it is a news media source.

*Second*, the term "news media" generally carries with it a connotation of editorial independence, or at least some separation, between the original source of information and the medium that conveys it. Along these lines, Relator points to FOIA, which defines "a representative of the news media" for purposes of that statute as "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *See* 5 U.S.C § 552(a)(4)(A)(ii)(III); *see also Integra Supp.* 15:9–15. While the Court does not simply import this definition from FOIA into the FCA, it believes that it accurately reflects the sense in which a news media entity is ordinarily viewed as one that collects information from outside sources, exercises some editorial judgment in deciding what to publish, and then transmits the published information to an audience—put more simply, it curates information—in contrast to an entity that simply publishes information about itself.

*Third*, the Court believes that a source's intent to disseminate information widely, as opposed to only to a few individuals, is relevant to whether it is acting as a news media entity.

*Fourth*, traditional news outlets like newspapers and radio and television stations unquestionably fall within the news media provision of the public disclosure bar. Accordingly, the more that an online source functions like one of these traditional outlets, the more likely it is to be news media under the FCA. Relevant to this consideration is the extent to which the conveyance of newsworthy information is the primary purpose of entity publishing the online source or whether the dissemination of such information is merely ancillary to some other purpose.

*Finally*, consistent with the Supreme Court's approach in *Schindler Elevator*, the Court believes that the most important consideration is whether the source in question falls within the "broad ordinary meaning" of the term "news media"—in other words, whether it could reasonably be described as "news media" as at least some people would that term in everyday speech. *See Schindler Elevator*, 363 U.S. at 408. Accordingly, while there may be some debate in society about whether non-traditional sources, like blogs, should be considered part of the news media, the fact that at least some people would describe them as such is likely enough to bring them within the public disclosure bar's "broad scope." *See id.* In contrast, the fact that

ADDENDUM 23

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

nobody would describe a menu on a restaurant website as coming from the news media is strong evidence that it falls outside the reach of the public disclosure bar.

None these factors on their own are necessarily dispositive of whether an online source should be considered news media, and other factors may be relevant in a given case. But taken together, the Court believes that they provide guidance on how to adhere to the Supreme Court's description of the news media provision as evidencing the public disclosure bar's "broad sweep," *see id.* (cleaned up), while still ensuring that any application of the provision remains tethered to the text—"news media"—that Congress has chosen.

### 3. *Application*

Having set forth a framework for determining the contours of the public disclosure bar's news media provision as applied to online sources, the Court now turns to whether it can decide at the current stage whether the online sources containing information about JATA's business practices constitute "news media." It concludes that it cannot. The public disclosure bar is an affirmative defense, and an affirmative defense can only be adjudicated on a motion to dismiss when the allegations in the complaint or information that the court can take judicial notice of are sufficient to establish the defense. *See Sams*, 713 F.3d at 1179. The complaint does not describe the sources of the JATA business practice information.[9] Accordingly, the Court could decide

---

[9] Defendants argue that the websites containing the JATA business practice information have been incorporated by reference into the SAC. *See Def. Supp.* 25:8–18. In support, they cite to cases holding that a court adjudicating a motion to dismiss can take into account "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (cleaned up); *see also Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. CV 15-8574 PSG (MRWx), 2016 WL 6782768, at *8 (C.D. Cal. Aug. 9, 2016). However, the incorporation by reference doctrine is most commonly applied when the allegations in the complaint clearly implicate a document but the document is not attached to the pleading, for example when claims are based on a contract or insurance policy. *See Knievel*, 393 F.3d at 1076. Here, there appears to be at least some dispute about the extent to which the information underlying the allegations in the SAC came from the websites Defendants have put forward, as opposed to interviews with former JATA employees. *See Pl. Supp.* 22:5–23:8; *SAC* ¶ 1 (alleging that information about the fraud came in part from "interviewing former employees"). In any event, even assuming for the sake of argument that the online sources were incorporated by reference, a determination of whether any source constitutes "news media"

---

ADDENDUM 24

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

now whether that information has been publicly disclosed from the news media only if this fact is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy is not in question." *See* Fed. R. Evid. 201(b)(2) (standard for judicial notice). These conditions are not present here.

Relator very much disputes the extent to which several of the online sources qualify as "news media." For example, it contends that information about JATA's "Documentation Tips" was marked "Proprietary and Confidential" and was posted only on "internal staff homepages." *See Integra Supp.* 17:11–19. Likewise, it argues that information in Providence's internal newsletters was not publicly disclosed from the news media because the newsletters were only intended for Providence's own medical staff. *See id.* 18:2–10. Additionally, it appears that at least some of the information comes from online sources that were not easily accessible. For example, according to Relator, a presentation hosted on the webpage of Becker's Hospital Review can only be accessed "by typing in a precise URL," which brings up a list of hundreds of folders, one of which contains the presentation, which is labeled only by a gibberish file name. *See id.* 19:20–20:9.

These facts, which in some instances seem to be in dispute, could be relevant to whether the sources at issue were "news media" sources within the meaning of the FCA. Further, Defendants have largely ignored them in the briefing currently before the Court, instead resting on their contention that everything on the Internet falls within the scope of public disclosure bar. Without evidence and briefing from both sides about the specific nature of each source, the Court is not able to determine which sources constitute "news media" and which do not. Accordingly, adjudication of whether the information about JATA's business practices was publicly disclosed from the news media will have to await a later stage of the case.

> ii.    *Substantial Similarity*

Defendants argue that regardless of whether the JATA business practice information was publicly disclosed through the news media, the case should *still* be dismissed because Relator's claims are based on substantially the same information contained in the Medicare claims data

---

within the meaning of the public disclosure bar will require more than simply looking at the screenshots Defendants have put forward. *See* Dkt. # 76. Accordingly, the issue is not ripe for adjudication.

ADDENDUM 25

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

and HHS OIG reports, which, as explained above, were publicly disclosed in federal reports within the meaning of the FCA.[10]  *See Def. Supp.* 4:16–7:18.

The FCA's public disclosure bar provides that a case should be dismissed "if substantially the same allegations or transactions" were publicly disclosed through the channels listed in the statute.  31 U.S.C. § 3730(e)(4)(A).  In deciding whether a case falls within the scope of the public disclosure bar, a court must determine (1) whether the publicly disclosed information contains an "'allegation or transaction' of fraud" and (2) whether the claims in the complaint are "'based upon' said 'allegation or transaction.'"  *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570 (9th Cir. 2016).  An "allegation" is a "direct claim of fraud," while a transaction refers to "facts from which fraud can be inferred."  *Id.* at 571.

The Court begins with the Medicare claims data.  It is undisputed that this raw data does not contain an "allegation" of fraud—that is, "a direct claim of fraud."  *Id.*  But "the substance of the disclosure need not contain an explicit 'allegation' of fraud so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain."  *Id.* (cleaned up).  As the Ninth Circuit has explained:

> If X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

*Id.* (quoting *United States ex rel. Found. Aiding the Elderly v. Horizon W.*, 265 F.3d 1011, 1015 (9th Cir. 2001)).  "[I]n a fraud case, X and Y inevitably stand for but two elements: a misrepresented state of facts and a true state of facts."  *Id.* (cleaned up).  Therefore, unless the

---

[10] Defendants had originally taken the position that Relator's claims would be precluded by the public disclosure bar as substantially similar to publicly disclosed information only if the Medicare claims data, HHS OIG reports, *and* the online information about JATA's business practices were *all* publicly disclosed. *See, e.g, JATA Reply*, 17:15–19.  But at the February 13 hearing, they argued for the first time that public disclosure of the Medicare claims data and HHS OIG reports *alone* would be enough to trigger the public disclosure bar, regardless of whether the information about the JATA business practices was publicly disclosed.  At the Court's request, the parties submitted supplemental briefs addressing this argument, *see Def. Supp.* 4:16–7:18; *Relator Supp.* 6:1–12:27, and it is now ripe for adjudication.

ADDENDUM 26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

information at issue reveals *both* the misrepresented state of facts and the true state of facts, the fraudulent transaction has not been publicly disclosed.  *See id.*

The Medicare claims data undoubtedly contains the alleged misrepresented state of facts: it reveals the extent to which Defendants submitted Medicare claims that included MCCs for encephalopathy, respiratory failure, and severe malnutrition—codes that the SAC alleges were not merited by the clinical circumstances.  The question is whether the data also reveals the *true* state of facts, i.e. whether it reveals that the use of the codes was not merited.

The Court does not believe that it does.  The most that can be determined from the data alone is that the Hospital Defendants submitted claims with MCCs for encephalopathy, respiratory failure, and severe malnutrition at rates that far exceeded their peers.  The data itself does not provide an explanation for the high coding rates.

At other points in their motions, Defendants appear to agree.  They argue strenuously that these allegations of statistical disparities in the Medicare claims data are not enough to plead fraud under the relevant pleading standards.[11]  As discussed further below, the Court agrees with Defendants that the statistics alone are likely not enough to state a viable fraud claim.  *See infra* IV.B.i.  This does not end up being fatal to Relator's claims here, however, because the complaint contains more than just numbers.  Specifically, the complaint alleges facts—taken from the JATA business practice information—that explain why the high coding rates for the three MCCs are plausibly attributable to fraud, as opposed to some other cause.  The JATA business practice information is therefore key to Relator's fraud claim; without it, there likely *would be no claim*.

For this same reason, then, the Court concludes that the Medicare claims data alone does not reveal the alleged true state of facts that would allow readers to "infer . . . the conclusion that fraud has been committed."  *See Mateski*, 816 F.3d at 571.  Nothing in the claims data reveals JATA's role in the alleged scheme, or even JATA's existence.  Accordingly, public disclosure of the Medicare claims data alone did not publicly disclose "substantially the same allegations or transactions" of fraud that are alleged in Relator's complaint.  *See* 31 U.S.C. § 3730(e)(4)(A).

---

[11] *See, e.g.*, *Hosp. Mot.* 24:17–21 ("Relator's central allegation is that Providence had a statistically significant higher incidence of coding for three MCCs than other hospitals.  From this, Relator makes the inferential leap that the claims that use those codes are fraudulent.  This lack of a claim-specific analysis is fatal to its complaint.")

ADDENDUM 27

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

Nor does the public disclosure of the OIG reports regarding kwashiorkor coding change the analysis. These reports addressed industry-wide miscoding of kwashiorkor caused by a discrepancy in the ICD-9 coding guidelines[12] that created ambiguity as to whether a code that was intended only for kwashiorkor could be used to code other forms of malnutrition. *See* Dep't Health & Human Servs. OIG, *CMS Did Not Adequately Address Discrepancies in the Coding Classification for Kwashiorkor* (Dec. 2017), *Exhibit 31 to RJN*, Dkt. # 59-35 ("*Dec. 2017 OIG Report*"), at 731–32. While a 2014 OIG report specifically addressed Providence Portland Medical Center's overcoding of kwashiorkor, it did not draw a conclusion about the cause of the overcoding, and the hospital attributed it to confusion about the ICD-9 guidelines. *See* Dep't Health & Human Servs. OIG, *Providence Portland Medical Center Incorrectly Billed Medicare Inpatient Claims With Kwashiorkor* (Sept. 2014), *Exhibit 10 to RJN*, Dkt. # 59-11 ("*Sept. 2014 OIG Report*"), at 188–94. The industry-wide miscoding of kwashiorkor, which was attributed to ambiguous ICD-9 guidelines, is far different than the scheme alleged by Relator: that Providence and JATA specifically instructed doctors to code kwashiorkor—even though it is "not typically found in the United States"—in order to increase reimbursements. *See SAC* ¶¶ 26–27. Accordingly, the OIG reports, even taken together with the Medicare claims data, did not publicly disclose the "substantially the same allegations or transactions" of fraud that are alleged in Relator's complaint. *See* 31 U.S.C. § 3730(e)(4)(A).

Because Relator's claims are not substantially based on the information revealed in the Medicare claims data and HHS OIG reports alone, and because the Court cannot determine on the current record and briefing whether the online information about JATA's business practices was publicly disclosed, the Court **DENIES** Defendants' motion to dismiss based on the public disclosure bar.

The Court now proceeds to address Defendants' arguments that Relator has nonetheless failed to sufficiently plead its claims.

B.    Primary FCA Claims

To state a claim under the FCA, Relator must allege the following elements: "(1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant

---

[12] The ICD or "International Classification of Diseases" is maintained by the World Health Organization and is the "international standard diagnostic tool for epidemiology, health management, and clinical purposes." *Dec. 2017 OIG Report* at 728. ICD-9 was the ninth revision of the ICD.

ADDENDUM 28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent." *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012).

Because FCA claims sound in fraud, they must satisfy both the plausibility requirement of Rule 8 *and* the particularity requirement of Rule 9(b). *See United Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016). Accordingly, Relator's complaint must "set forth what is false or misleading about a statement, and why it is false"; in other words, "the who, what, when, where, and how" of the misconduct charged. *Vess*, 317 F.3d at 1106; *see also Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) ("To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.") (internal quotation marks omitted). In the context of the FCA, Rule 9(b) requires "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998–99 (9th Cir. 2010) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

Defendants argue that Relator failed to adequately plead the elements of falsity, materiality, and scienter.

       *i.*    *Falsity*

Relator alleges that the Hospital Defendants submitted false claims to Medicare by including unwarranted MCCs for encephalopathy, respiratory failure, and severe malnutrition. *See generally SAC*. For each of these three categories, the complaint contains a table listing specific claims that Relator alleges were false. *See id.* ¶¶ 66, 74, 81. Among other information, the tables list the claim ID number, the hospital, the principal diagnosis, the alleged MCC false claim, and the false claim amount. *See id.* While the complaint does not contain allegations about the medical conditions of specific patients—i.e. the symptoms they exhibited or their medical test results—because Relator does not have access to patient medical records, it alleges, based on its proprietary statistical analysis, that there is only a 1 in 1,000 to 1 in 100 million probability (depending on the diagnosis) that Providence's use of the encephalopathy, respiratory failure, and severe malnutrition MCCs at rates disproportionate to other hospitals is attributable to chance. *See JATA Opp.* 18:14–24. Importantly, Relator provides an explanation for this disparity, alleging that the MCCs Providence used at high rates line up with Defendant JATA's documentation tips, which instructed Providence doctors that these were MCCs that could result

ADDENDUM 29

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

in increased reimbursement. *See SAC* ¶ 29. And Relator further alleges that Defendants' use of leading queries and the incentives doctors had to code MCCs give rise to a plausible inference that false claims were submitted. *See id.* ¶¶ 32–39.

Defendants argue that this is not enough. They contend that without information about the actual medical conditions of specific patients, Relator cannot plausibly allege that any particular use of an MCC was not supported by the clinical circumstances. Relator's attempt at identifying false Medicare claims through statistical analysis appears to be novel. Neither side has identified any cases precisely on point. But the Third Circuit has relied on similar statistical data in determining that a relator had adequately pleaded its FCA claims. *See United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 258 (3d Cir. 2016).

In *Victaulic*, the relator alleged that the defendant had failed to properly mark pipe fittings it had imported from abroad (only imported fittings had to be marked). *See id.* at 247–48. In support of its claims, it relied principally on two sources of information: (1) an analysis of shipping manifest data that showed the majority of the defendant's pipe fittings were imported from abroad and (2) a study that showed that most of the defendant's products in the marketplace did not have the proper markings. *Id.* Notably, the complaint did not identify any specific pipe fittings that were alleged to be both imported from abroad and improperly marked; instead, it alleged that the number of pipe fittings the defendant imported combined with the number of unmarked fittings on the market gave rise to an inference that at least some imported fittings did not have the proper markings. *Id.* The Third Circuit found this sufficient to allege falsity under both Rule 8 and Rule 9(b). *See id.* at 256–58. It determined at the motion to dismiss stage that it had to credit the relator's expert's conclusion that the only possible explanation for the lack of markings on products in the marketplace was that unmarked goods were being imported. *Id.* at 257. And it concluded that the relator did not need to identify specific shipments of unmarked goods under Rule 9(b) because only the defendant had "access to the documents that could prove or disprove [Relator's] well-pled allegations." *Id.* at 258.

The Court finds the Third Circuit's analysis persuasive. At this stage, it must credit Relator's allegations that the Hospital Defendants' high rates of coding for encephalopathy, respiratory failure, and severe malnutrition are highly unlikely to be caused by chance. And while the coding rates alone likely would not be enough to state a claim for fraud, Relator's allegations about the documentation tips that JATA gave to Providence's doctors, along with

ADDENDUM 30

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|----------|----------------------|------|---------------|

| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. |
|-------|---------------------------------------------------------------------------------------------|

JATA's promotion of leading queries[13] and its guarantee that it would increase hospitals' case mix, are enough to give rise to a plausible inference that the increased coding rates were plausibly caused by the Hospital Defendants submitting claims with MCCs that were not supported by the clinical realities.

Defendants' arguments to the contrary are unpersuasive. *See JATA Mot.* 24:14–28:14. First, they rely on three out-of-circuit cases that they contend stand for the proposition that relators cannot rely on statistical analyses to allege falsity. *See United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451 (4th Cir. 2013); *United States ex rel. Crews v. NCA Healthcare of Ill., Inc.*, 460 F.3d 853 (7th Cir. 2006); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997). But these cases are inapposite.

In *Thompson*, the defendant alleged only that "in reasonable probability, based on statistical studies performed by the Government and others approximately 40 percent of claims submitted by defendants . . . were for services that were not medically necessary." 125 F.3d at 903. The Fifth Circuit found that this bare reference to statistical studies was not enough to allege falsity because the studies did not show that the defendants were the cause of the disparity. *Id.* In contrast, Relator here has provided detailed allegations explaining why JATA and the Hospital Defendants were responsible for the allegedly false claims reflected by the statistical analysis.

In *Nathan*, the Fourth Circuit found that the statistical inferences the relator was making to connect various data points were "implausible and unsupported by the stated facts." 707 F.3d at 460. Here, however, the Court believes the Hospital Defendants' use of certain MCC codes at rates that far exceed other hospitals, when combined with allegations about JATA's business practices, renders Relator's inferences at least plausible.

---

[13] Defendants argue that Relator cannot base its FCA claims on allegedly leading queries because there is no CMS or other government guidance on the use of queries. *See Hosp. Mot.* 30:16–32:13. But while the Court agrees that merely violating industry practices that are not codified in any government regulation cannot create liability, that is not what Relator alleges here. Relator instead points to Defendants' alleged non-conformance with the practices of the industry to explain *why* Defendants coded MCCs at rates that far exceeded other hospitals. If these allegations are true, they could tend to show that the queries predictably led Providence doctors to code MCCs that were not supported by a patient's condition. In other words, Relator does not ground its FCA claim in violations of industry standards; it instead points to Defendants' query practices as evidence that supports its theory that false claims were submitted.

---

ADDENDUM 31

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

Finally, in *Crews*, the Seventh Circuit found that a statistical analysis was not enough to show that any given claim was false. *See* 460 F.3d at 856–57. But in the Ninth Circuit, unlike in the Seventh Circuit, relators need not identify a specific false claim; instead, they may "allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998–99. Accordingly, *Crews*'s holding is simply not relevant in this circuit.

Defendants also point to the fact that while Medicare conducts similar statistical analyses of claims as part of its auditing practices, its contractors are not permitted to deny claims on the basis of statistics without first reviewing the relevant medical record. *See Hosp. Mot.* 27:9–28:10 (citing CMS, *Medicare Program Integrity Manual*, Pub. 100-08 Ch. 2—Data Analysis (rev. June 22, 2016) ("PIM")). However, Defendant cannot argue that statistical analysis of the type performed by Relator is entirely irrelevant. Medicare's manual itself specifically notes that "Data Analysis is an essential first step in determining whether patterns of claims submissions and payments indicate potential problems. Such data should include identification of statistical outliers in billing patterns within a well-defined group, or more sophisticated detection of patterns within claims or groups of claims that might suggest improper billing or payment." PIM § 2.1.C.

Defendants view this Medicare guidance as a point in their favor, arguing that that if statistical analyses "are not even enough to deny a claim, they are certainly not enough to initiate an FCA action." *Hosp. Mot.* 28:11–14. But the argument proceeds from a faulty premise. On a motion to dismiss, Relator does not need to have enough evidence to justify denying a claim—i.e. to *prove* that a claim is false—because it does not need to prove its case at this stage. Instead, it need only allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. Relator's statistical analysis, which Medicare itself has acknowledged can suggest improper billing, combined with its allegations about JATA's practices, take its claims out of the realm of the speculative.

Defendants also argue that Relator has failed to satisfy the particularized pleading requirements of Rule 9(b). *See JATA Reply*, 6:15–7:22. But the Court agrees with Relator that it has adequately alleged the "who, what, when, where, and how" of the alleged fraud: the "who" is JATA and the Providence hospitals, the "what" is the upcoding of three categories of MCCs (encephalopathy, respiratory failure, and severe malnutrition), the "when" is between 2011 and 2017, and the "how" is by training doctors to use language supporting the MCCs and steering them into using that language through leading queries and incentives. *See Hosp. Opp.* 30:9–20; *see also Vess*, 317 F.3d at 1106. Defendants argue that Relator has not alleged the "who"

ADDENDUM 32

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

because it has "failed to identify a single Providence affiliate who engaged in misconduct or a single physician who went against her own medical judgement to diagnose a patient with a condition she did not have." *Hosp. Mot.* 10:21. But this is not entirely correct. Relator has provided a list of 125 alleged false claims and has identified the hospital at issue for each of them. *See id.* ¶¶ 66, 74, 81. As for the names of the doctors who provided the diagnoses that led to these specified claims, their names can be easily determined by Defendants and therefore did not need to be alleged in the complaint. *See United States ex rel. Mei Ling v. City of L.A.*, No. CV 11-974 PSG (JCx), 2018 WL 3814498, at *11 (C.D. Cal. July 25, 2018) ("The individuals who signed the claims and statements can be divined by [Defendants]; the Government need not include them in its complaint when its allegations already provide Defendants with the notice required by Rule 9(b)" (cleaned up)). In short, the Court concludes that the detailed allegations in the complaint provide Defendants with sufficient notice of the allegedly fraudulent conduct, satisfying the requirements of Rule 9(b).

       ii.     *Materiality*

A falsehood is material under the False Claims Act if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

Defendants contend that Relator has not adequately alleged materiality because "coding an MCC does not necessarily change reimbursement." *Hosp. Mot.* 32:22–23. This is because while each claim can have multiple secondary diagnoses, there are only three severity levels: (1) "without Complication or Major Complication," (2) "with Complication," or (3) "with Major Complication." *SAC* ¶ 23. Defendants argue that even if some MCCs for encephalopathy, respiratory failure, and severe malnutrition were coded incorrectly, it is possible that the severity level of the claim—and consequently the reimbursement—would not have changed because it could have been adequately supported by other, legitimately coded, MCCs. *See JATA Mot.* 20:1–11. In support, it points to an audit that HHS OIG performed of Providence Portland Medical Center's claims using the diagnosis code for kwashiorkor, a type of severe malnutrition. *See id.* 20:12–25; *Sept. 2014 OIG Report*. HHS OIG identified 90 claims that improperly used the kwashiorkor code but determined that for 87 of those 90 claims, the severity level of the claim was unaffected because it was adequately supported by other diagnosis codes that had a similar or greater severity level. *Sept. 2014 OIG Report at* 189–90.

However, Relator alleges that for each of the 125 specific claims identified in the SAC, adding the MCC increased the severity level and the reimbursement amount. *See Hosp. Opp.*

ADDENDUM 33

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

26:7–12; *see SAC* ¶¶ 66, 74, 81.  At the motion to dismiss stage, the Court must take these allegations as true, and they are enough to adequately plead materiality.

      *iii.*    *Scienter*

      A defendant is liable under the FCA only if it acted "knowingly."  31 U.S.C. § 3729(b)(1).  The defined term "knowingly" is somewhat of a misnomer because it includes both acting with "actual knowledge of the information" and acting with "deliberate ignorance" or "reckless disregard of the truth or falsity of the information.  *See id.* § 3729(b)(1)(i)–(iii). Mere negligence, however, is insufficient to state a claim under the FCA.  *See United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) ("Congress specifically expressed its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.") (internal quotation marks omitted).  Although "knowledge must [] be pleaded sufficiently to make entitlement to relief plausible," *United States ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1012 (C.D. Cal. 2015), it need not be pleaded with particularity.  *See id.* at 1011–12; *see also United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011) ("[M]alice, intent, knowledge, and other conditions of a person['s] mind, including scienter, can be alleged generally.") (internal quotation marks omitted).

      Defendants' argument for lack of scienter is essentially that Relator has not adequately alleged that Defendants knew the claims they were submitting to Medicare contained MCCs that were not justified by the clinical circumstances.  *See JATA Mot.* 21:1–22:9.  But the Court is not persuaded.  Relator has alleged that Defendants implemented a coding program that was intended to increase Medicare revenue by leading physicians to use language that would support coding of certain MCCs.  *SAC* ¶¶ 26–31.  They did so by training physicians to use such language and by sending allegedly leading queries, in contravention of industry practices, that physicians responded to in a manner that supported the addition of an MCC.  *Id.* ¶¶ 33–39. Further, JATA's Regional Director allegedly taught Providence physicians that the only way to avoid being harassed by queries would be to document an MCC in the first place.  *Id.* ¶ 38.  All of these allegations taken together are enough to give rise to a plausible inference that Defendants were primarily focused on increasing their Medicare revenue such that they at least recklessly disregarded the possibility that the tactics they used could lead to improper upcoding. Because acting with reckless disregard is enough to satisfy the FCA's "knowingly" requirement, Relator has adequately alleged scienter.

ADDENDUM 34

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

C.    Conspiracy Claims

The FCA claims described above provide for liability if the defendant acts "knowingly," which is defined as having actual knowledge *or* acting in deliberate ignorance or with reckless disregard.  *See* 31 U.S.C. § 3729(b)(1).  However, the FCA's reference to *conspiracy* claims does *not* have this "knowingly" requirement.  *See id.* § 3729(a)(1)(C).  Accordingly, most courts have concluded that general civil conspiracy principles apply to the conspiracy provision of the FCA.  *See United States ex rel. Rizzo v. Horizon Lines, LLC*, No. CV 10-7409 PA (AJWx), 2013 WL 12131171, at *4 (C.D. Cal. Oct. 23, 2013); *see also United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999).  Under these principles, Relator "must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful agreement."  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (cleaned up).  As the alleged object of this conspiracy was to submit false claims to Medicare, Relator must show that Defendants jointly intended to do so.  For conspiracy, reckless disregard is not enough.

The Court concludes that the allegations in the SAC are not sufficient to make this showing.  While Relator adequately alleges that Defendants may have recklessly disregarded the possibility that their actions would lead to false claims, nothing in the SAC—beyond a conclusory allegation of conspiracy—alleges that the Hospital Defendants and JATA set out with a joint purpose to submit false claims.  It instead alleges that they intended to increase the Hospital Defendants' Medicare reimbursements.  That, in and of itself, is not illegal.  If the Hospital Defendants were previously underbilling Medicare, then it would be legitimate to attempt to increase the billing rate.  While Relator has plausibly alleged Defendants' plan was executed in a manner that predictably led to false claims, such that it was reckless for Defendants to disregard the fact that false claims were submitted, this does not necessarily mean that submitting false claims was Defendants' goal at the outset.

Because Relator has not adequately alleged an agreement between the Hospital Defendants and JATA to submit false claims, it has not adequately alleged a conspiracy. Accordingly, the Court **GRANTS** Defendants' motion to dismiss the conspiracy claims.

D.    Reverse FCA Claims

In 2009, Congress expanded the scope of the FCA by making it unlawful to "knowingly conceal[] or knowingly and improperly avoid[] . . . an obligation to pay or transmit money or

ADDENDUM 35

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

property to the Government." 31 U.S.C. § 3729(a)(1)(G). These claims based on failure to pay money owed to the Government are known as "reverse FCA claims."

Relator's reverse FCA claim is predicated upon Defendants' statutory obligation to report and return Medicare overpayments. *See Hosp. Opp.*; 42 U.S.C. § 1320a-7k. Essentially, Relator alleges that after overcharging Medicare, Defendants further violated the FCA by failing to return the overpayments. However, "[i]n cases where a plaintiff alleges a reverse false claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the [reverse FCA] claim as redundant." *United States v. Kinetic Concepts, Inc.*, No. CV 08-1885 BRO (AGRx), 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017).

Relator argues that its reverse FCA claim is not redundant because the Court could find that Defendants did not knowingly submit false claims but did "knowingly conceal" false claims by avoiding Medicare audits. *See Hosp. Opp.* 28:19–26. But the Court does not believe this theory is supported by the single allegation Relator cites from the SAC, which alleges that a JATA official advised hospitals at an industry event to avoid single CC or single MCC diagnoses to avoid triggering audits. *See SAC* ¶ 40. The complaint does not allege that this advice was ever given *to Defendants*, and in any event, Relator has not explained how Defendants could knowingly attempt to avoid audits by manipulating CC or MCC codes without at least recklessly disregarding whether the codes it used were accurate (which would give rise to a primary FCA claim).

Because the Court finds that Relator's reverse FCA claim is redundant of its primary claims, it **GRANTS** Defendants' motion to dismiss this claim.

E.     Anti-Kickback Claims

Relator's second cause of action alleges that Defendants violated the FCA by submitting claims that were tainted by violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). *See SAC* ¶¶ 134–42. The statute prohibits paying or receiving kickbacks in exchange for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made . . . under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

Relator's theory of liability on this claim is that JATA and the Hospital Defendants conspired to pay JATA kickbacks, in the form of increased remuneration, in exchange for a

ADDENDUM 36

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

guarantee that JATA would increase the hospitals' Medicare billing. But under the plain text of the Anti-Kickback Statute, this is not a violation. The statute applies only to kickbacks paid in exchange for "referring *an individual*" for health care services. *See id.* There are no allegations that JATA referred individuals to the Hospital Defendants for treatment; nor could there be because JATA is a coding consultant, not a physician.

As Relator has not adequately alleged a violation of the Anti-Kickback Statute, it likewise has not alleged an FCA violation based on violation of that statute. Accordingly, the Court **GRANTS** Defendants' motion to dismiss the FCA claims in the second cause of action.

F. Summary

For the foregoing reasons, the Court concludes that Relator has adequately pleaded its FCA claims against both Defendants based on the submission of false claims to Medicare but has not adequately pleaded its claims based on conspiracy or violation of the Anti-Kickback Statute. The Court further concludes that the reverse FCA claims should be dismissed as redundant. And it finds that resolution of the question of whether the public disclosure bar prohibits Relator's claims must wait for further factual development.

Accordingly, Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part. The Court **DISMISSES** the conspiracy, reverse FCA, and Anti-Kickback Statute claims. Relator may proceed on its other claims.

V. Leave to Amend

Whether to grant leave to amend rests in the sound discretion of the trial court. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). The Court considers whether leave to amend would cause undue delay or prejudice to the opposing party, and whether granting leave to amend would be futile. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996). Generally, dismissal without leave to amend is improper "unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

The Court **GRANTS** leave to amend in part and **DENIES** it in part. As the defects in Relator's conspiracy claims could be cured by additional allegations about the nature of the agreement between JATA and the Hospital Defendants, the Court **GRANTS** leave to amend the conspiracy claims. As for the reverse FCA claims, the Court is skeptical that Relator will be

ADDENDUM 37

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | July 16, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

able to allege a claim that is not redundant of its primary claims, but it concludes that it should at least be given an opportunity to do so.  Accordingly, the Court **GRANTS** leave to amend the reverse FCA claims.  However, the Court concludes that amendment of the Anti-Kickback Statute claims would be futile and therefore **DENIES** leave to amend these claims.

Relator must amend its conspiracy and reverse FCA claims no later than **August 16, 2019** or they will be dismissed with prejudice.

VI.   <u>Conclusion</u>

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part.  The Anti-Kickback Statute claims are **DISMISSED** with prejudice.  The conspiracy and reverse FCA claims are **DISMISSED** without prejudice to amendment.  The motions to dismiss are **DENIED** as to Relator's primary FCA claims based on Defendants' alleged knowing submission of false claims to Medicare.

Relator must amend its conspiracy and reverse FCA claims no later than **August 16, 2019** or they will be dismissed with prejudice.

**IT IS SO ORDERED**.

ADDENDUM 38

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#93

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):     Order GRANTING Defendants' motion to certify the order for interlocutory appeal, GRANTING Defendants' motion to stay, and DENYING the motion to phase discovery**

Before the Court is a motion to certify an order for interlocutory appeal and a motion to stay, or in the alternative to phase discovery filed by Defendants Providence Health & Services ("Providence" or "Providence H&S"), its affiliate hospitals, and Defendant J.A. Thomas and Associates, Inc. ("JATA"), (collectively, "Defendants"). *See* Dkt. # 93 ("*Mot.*"). Relator Integra Med Analytics LLC ("Relator") opposes, *see* Dkt. # 96 ("*Opp.*"), and Defendants filed a joint reply, *see* Dkt. # 97 ("*Reply*"). The Court held oral argument on this matter on October 7, 2019. After considering the moving papers and oral arguments, the Court **GRANTS** Defendants' motion for interlocutory appeal, **GRANTS** Defendants' motion to stay, and **DENIES** the motion to phase discovery.

I.     <u>Background</u>

This action stems from Relator's allegation that Defendants conspired to submit, and did submit, false claims to Medicare in violation of the False Claims Act ("FCA"). The Court has previously recounted the full factual background of the case in another order. *See United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, No. CV 17-1694 PSG (SSx), 2019 WL 3282619, at *1–*3 (C.D. Cal. July 16, 2019).

Defendants brought a motion to dismiss Relator's Second Amended Complaint ("SAC"). *See id.* Specifically, Defendants argued that the public disclosure bar precluded Relator's claims and that Relator failed to state a FCA claim. *See id.* at *4. Defendants first argued that Relator could not bring a FCA claim against it because its complaint relied upon information that was publicly disclosed, and the FCA bars these claims. *See id.* at *5. Next, Defendants argued that

ADDENDUM 39

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

Relator failed to adequately plead falsity, materiality, and scienter under the FCA. *See id.* at *18.

On July 16, 2019, this Court issued an Order ("the Order") denying Defendants' motion because it held that the public disclosure bar did not apply and that Relator had adequately pleaded its FCA claim. *See id.* at *24. The Court found that the public disclosure bar did not apply to Defendant JATA's business practice information, which Relator relied on in its complaint, because it was not disclosed through the "news media." *See id.* at *18. Breaking with an apparent general consensus among other federal courts that reads the public disclosure bar's "news media" provision broadly to include almost all publicly available online information, the Court undertook an ordinary meaning analysis. *See id.* at *13. The Court consulted dictionaries, common usage, and statutory context, ultimately articulating five guideposts to determine whether something was disclosed from the "news media":

> (1) "the extent to which the information typically conveyed by a source would be considered newsworthy"; (2) whether there is "editorial independence, or at least some separation, between the original source of information and the medium that conveys it"; (3) "a source's intent to disseminate information widely, as opposed to only to a few individuals"; (4) how much "an online source functions like a traditional news outlet," particularly considering that source's primary purpose, and; (5) most importantly, "whether the source in question falls within the 'broad ordinary meaning' of the term 'news media.'"

*See id.* at *14–*15. The Court concluded that based on these factors, it could not determine whether the online information about JATA's business practices was publicly disclosed, and thus Defendants' public disclosure bar defense failed. *See id.* at *18.

Next, the Court concluded that Relator properly pleaded its FCA claim. *See id.* at *24. In particular, Relator adequately pleaded falsity because, based on its statistical analyses, Defendants' hospitals used MCCs for certain diagnoses at rates disproportionate to other hospitals. *See id.* at *19. Taken as true at the pleading stage, Relator's analyses combined with JATA's business practice tips created a reasonable inference that the hospital Defendants submitted false claims. *See id.*

On August 22, 2019, Defendants filed this motion for interlocutory appeal and for a stay pending appeal, or in the alternative, phased discovery. *See generally Mot.* Defendants seek interlocutory review of two questions.

ADDENDUM 40

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|----------|----------------------|------|-----------------|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

II.   Legal Standard

    A.   Interlocutory Appeal

As a general rule, an appellate court should not review a district court ruling until after the entry of final judgment. *See* 28 U.S.C. § 1291. As such, "[a] party seeking review of a nonfinal order must first obtain the consent of the trial judge." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474 (1978). The trial judge has the discretion to certify a decision for interlocutory review if all of the following statutory elements are met: (1) the order "involves a controlling question of law"; (2) there is a "substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the termination of the litigation." 28 U.S.C. § 1292(b); *see also United States v. Woodbury*, 263 F.2d 784, 787 (9th Cir. 1959) ("Section 1292(b) was intended primarily as a means of expediting litigation by permitting appellate consideration during the early stages of litigation of legal issues which, if decided in favor of the appellant, would end the lawsuit."). Interlocutory review should be allowed only under "exceptional circumstances justify[ing] a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand*, 437 U.S. at 475. The moving party bears the burden of establishing § 1292(b)'s narrowly construed elements. *Id.*

    B.   Stay

The Court's authority to stay a proceeding is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Among the competing interests to be weighed when considering a stay are "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). "The proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

ADDENDUM 41

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

III.    Discussion

Defendants pose two questions for certification:

> 1.    Whether all online information is disclosed from the "news media" such that it would fall under the public disclosure bar of the False Claims Act?
>
> 2.    Whether Relator adequately alleged falsity under the False Claims Act?

The Court next applies the § 1292(b) elements in turn, and then discusses Defendants' motion to stay.

A.    Interlocutory Appeal

i.    *Question 1: News Media*

a.    *Controlling Question of Law*

A controlling question of law is one where "resolution of the issue on appeal could materially affect the outcome of litigation in the district court."  *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981).  Under § 1292(b), a "'question of law' means a 'pure question of law,' not a mixed question of law and fact or an application of law to a particular set of facts."  *TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*, No. SACV 14-00341 JVS (ANx), 2014 WL 12588293, at *3 (C.D. Cal. Sept. 30, 2014) (quoting *Barrer v. Chase Bank, USA, N.A.*, 2011 WL 1979718, *4 (D. Or. May 18, 2011)).  Routine applications of settled legal standards to facts alleged in a complaint are not proper for interlocutory appeal unless the question for review seeks to clarify a legal standard.  *See Dukes v. Wal-Mart Stores, Inc.*, 2012 WL 6115536, at *3 (N.D. Cal. Dec. 10, 2012) (discussing *In re Text Messaging Antitrust Litig.*, 630 F.3d. 622, 625–27 (7th Cir. 2000)).  In other words, a party presents a controlling legal question when it alleges that a court articulated an incorrect legal standard.  *See Steering Committee v. United States*, 6 F.3d 572, 575 (9th Cir. 1993).

Defendants argue that the news media question raises a controlling question of law.  *See Mot.* 6:17.  First, it is a question of law because it involves an analysis of statutory construction, namely how courts are to define "news media" under the FCA.  *See id.* 6:26–28.  Next, it is a

ADDENDUM 42

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | | Date | October 8, 2019 |
|---|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | | |

controlling question because if the JATA business practice information came from the news media, the Court would have to dismiss the case under the public disclosure bar unless Relator could show that it was an original source. *See id.* 7:11–14. Relator counters that the question is not controlling because even if the Ninth Circuit adopted a news media definition that included the JATA business practice information, the Court would still have to decide whether Relator is an "original source" under the FCA. *See Opp.* 2:15–20.

The Court agrees with Defendants that the news media question presents a controlling question of law, first because it is a legal question. In the Order, the Court fashioned a standard for "news media" by looking to dictionary definitions, the term's ordinary meaning, and statutory context. *See Integra*, 2019 WL 3282619 at *14–*15. The standard that the Court formulated for what constitutes a "news media" presents a question of statutory construction that an appellate court would review de novo. *See Schleining v. Thomas*, 642 F.3d 1242, 1246 (9th Cir. 2011); *Rey v. Rey*, 666 F. App'x 675, 677 (9th Cir. 2016). Because the definition of "news media" under the FCA is "the abstract type of question [that] could be decided without significant engagement with the facts of this case," it is a question of law suited for interlocutory review. *See Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 879 (C.D. Cal. 2012).

Next, the question is also controlling because it would materially advance the termination of the litigation. *See In re Cement Antitrust Litig.*, 673 F.2d at 1026. If the Ninth Circuit answered the question in Defendants' favor, it would advance the case because the public disclosure bar would apply to Relator's claims. Although Relator argues that even if the public disclosure bar applied, the Court would still have to determine whether it is an "original source," this alternative argument does not mean that the news media question is not controlling. *See Opp.* 2:15–20. The Ninth Circuit has held that appellants do not need to pose a question of law that will determine who wins on the merits, but instead need only pose a question that could cause the "needless expense and delay of litigating a case." *See Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996) (citing *In re Cement Antitrust Litig.*, 673 F.2d at 1027 n.5); *see also Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) ("However, neither § 1292(b)'s literal text nor controlling precedent requires that the interlocutory appeal have a final, dispositive effect on the litigation, only that it 'may materially advance' the litigation."). Ultimately, Defendants pose such a question.

Accordingly, because Defendants seek certification on a controlling question of law, they meet § 1292(b)'s first prong.

ADDENDUM 43

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

        *b.     Substantial Ground for Difference of Opinion*

        "A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution." *Reese*, 643 F.3d at 688. Defendants argue that there is substantial ground for difference of opinion because, as the Court established in its Order, its definition of "news media" departed from the current district court consensus. *See Integra*, 2019 WL 3282619, at \*13. Defendants cite numerous cases from this District and elsewhere that apply a much broader standard for "news media" than the Court's five-part test. *See Mot.* 11:11–13:16. Relator acknowledges that other district courts have more broadly defined "news media," but responds that adopting Defendants' definition "would lead to absurd results." *Opp.* 9:13–20.

        The Court finds that there is substantial ground for difference of opinion, as it indicated in the Order itself. *See Integra*, 2019 WL 3282619, at \*13. In its Order, the Court acknowledged that its approach represented a departure "from the general consensus in the federal courts." *Id.* To this point, Defendants identify several "conflicting and contradictory opinions" that employ a broader news media definition. *See Mot.* 11:11–13:16 (citing cases); *Couch v. Telescope, Inc.*, 611 F.3d 629, 634 (9th Cir. 2010) (quoting *Union Cty., Iowa v. Piper Jaffray & Co., Inc.*, 525 F.3d 643 (8th Cir. 2008)). While the Court crafted a definition from the ordinary meaning, its invitation for other courts to do the same indicates that other courts have, and could further, disagree.[1] *See Integra*, 2019 WL 3282619, at \*22 n.8. The Court believes its approach is correct, but recognizes that reasonable jurists have used different methods. *See Reese*, 643 F.3d at 688.

        Accordingly, because reasonable jurists could disagree on the definition of "news media" under the FCA, Defendants meet § 1292(b)'s second prong.

        *c.     Materially Advance the Termination of the Litigation*

        The material advancement prong is met where "an interlocutory appeal of [an] issue may avoid protracted and expensive (but ultimately unnecessary) litigation and the burdens on the

---

[1] Relator cites *Hong* for the proposition that the Ninth Circuit has rejected Defendants' proposed "news media" definition as too broad, but Relator is mistaken. *See Opp.* 10:11–16; *United States ex rel. Hong v. Newport Sensors, Inc.*, 728 Fed. App'x 660, 662–63 (9th Cir. 2018). In *Hong*, the court did not outright reject the district court's "broad holding" defining "news media," but instead "d[id] not address [it]." *See Hong*, 728 F. App'x at 662–63.

ADDENDUM 44

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

litigants and court system that would result from the denial of § 1292(b) certification." *Beeman v. Anthem Prescription Mgmt., Inc.*, No. EDCV 04-407-VAP (SGLx), 2007 WL 8433884, at *2 (C.D. Cal. Aug. 2, 2007). "Courts apply pragmatic considerations to determine whether certifying non-final orders will materially advance the ultimate termination of the litigation." *See id.*

Defendants argue that certifying the Order will materially advance the termination of the litigation because the appeal, if successful, could allow Defendants to mitigate or even avoid the "far-reaching and tedious" discovery in this case. *See Mot.* 14:19. Specifically, they will need to provide Relator with individual medical records across numerous hospitals with differing policies and procedures, as well as hire various experts, which will place costly burdens on all parties. *See id.* 14:19–15:21. Relator refutes Defendants' argument that an appeal would advance the litigation because, even after the Ninth Circuit decides the news media issue, the Court will have to relitigate another motion to dismiss based on the Circuit's decision. *See Opp.* 10:19–26. According to Relator, this back and forth will delay trial. *See id.* 10:25–26. Finally, Relator disputes whether the discovery burden that Defendants articulate "is necessary or even allowed under the Federal Rules." *See id.* 11:15–16.

After analyzing the "pragmatic considerations" at issue here, the Court finds that certifying the Order would materially advance the termination of the litigation. *See Beeman*, 2007 WL 8433884, at *2. The Court agrees that Defendants' potential discovery burden is quite high given the quantity and complexity of the documents at issue. *See Mot.* 14:19–15:21. Further, Defendants will need to coordinate with the Government, outside experts, and its own affiliates. *See id.* Even if the Court needs to apply a different "news media" standard to Relator's allegations after the appeal, this presents a considerably lower burden than the potential discovery burden. *See Opp.* 10:19–26. Given the time and costs involved, the Court finds an interlocutory appeal proper on the news media question, which has "important implications for assigning liability." *City of Los Angeles v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. CV 12-7662 BRO (AGRx), 2014 WL 12573322, at *4 (C.D. Cal. Apr. 29, 2014).

Relator cites cases where this Court has declined to certify an interlocutory appeal because of the potential delay, even without a trial date, but those cases are distinguishable. *See Opp.* 10:25–11:3. In *Sirius XM*, the Court declined to certify an interlocutory appeal because the case had an impending trial date. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. CV 13-5693 PSG (RZx), 2014 WL 12614472, at *2–3 (C.D. Cal. Nov. 20, 2014). Although a trial date was not yet set in *Andrews*, the Court and the parties had an idea of when trial would commence,

ADDENDUM 45

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

which was before the Ninth Circuit would have likely resolved the appeal. *See Andrews v. Plains All Am. Pipeline, L.P.*, No. CV 15-4113 PSG (JEMx), 2017 WL 9831401, at *5 (C.D. Cal. Nov. 7, 2017). Here, the parties have not yet even had a scheduling conference, and given the potential size of discovery, trial does not appear imminent. Therefore, unlike the questions in *Sirius XM* or *Andrews*, the Ninth Circuit will likely resolve the appeal before trial in this case.

As such, Defendants meet all three of § 1292(b)'s prongs on the "news media" question. The Court thus **CERTIFIES** the following question for interlocutory review: Whether all online information is disclosed from the "news media" such that it would fall under the public disclosure bar of the False Claims Act?

      *ii.*     *Question 2: Pleading Falsity*

The second question that Defendants seek to certify is whether Relator has adequately pleaded falsity. *See Mot.* 16:24. Interlocutory appeal is not usually appropriate for mixed questions of law and fact. *See Baranchick v. City of Redondo Beach*, No. CV 10-6870 PA (JCGx), 2011 WL 13217546, at *3 (C.D. Cal. Sep. 12, 2011); *Riley's Am. Heritage Farms, v. Claremont Unified Sch. Dist.*, No. EDCV-18-2185-JGB (SHKx), 2019 WL 4391128, at *3 (C.D. Cal. May 2, 2019). However, mixed questions of law and fact are suited for certification when there is at least one legal question and the mixed question is "material to the order." *Steering Comm.*, 6 F.3d at 575–76; *In re Fontem US, Inc. Consumer Class Action Litig.*, No. SACV 15-01026 JVS (RAOx), 2017 WL 10402988, at *5 (C.D. Cal. Mar. 8, 2017).

Because Defendants pose a legal question and the question of whether the Relator pleaded falsity is material to the order, the Court also certifies this question for interlocutory review. The second question is a mixed question of law and fact because the Court applied the settled falsity standard to Relator's allegations that, based on its statistical analyses, Defendants' hospitals used MCCs for certain diagnoses at rates disproportionate to other hospitals. *See Integra*, 2019 WL 3282619 at *19. However, this question is material to the order because it is dispositive. If Relator cannot state a claim for falsity, its FCA claims fail. *See In re Fontem US, Inc. Consumer Class Action Litig.*, No. SACV 15-01026 JVS (RAOx), 2017 WL 10402988, at *5 (C.D. Cal. Mar. 8, 2017) (holding that a mixed question was "material to the order" because the question was dispositive). Although Relator argues that resolving this question will require more than "minimal reliance on the record," the Circuit need only look at the face of the complaint. *See Opp.* 12:3–4. As a result, the Circuit will minimally rely on the record in determining whether Relator properly pleads falsity.

ADDENDUM 46

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

Next, there is substantial ground for difference of opinion. Defendants point to *Baylor*, decided soon after the Order in this case, to show how jurists can disagree on whether statistical analyses are enough to plead a fraudulent scheme under the FCA. *See Mot.* 17:3–18:12; *United States v. Baylor Scott & White Health*, No. 5:17-CV-886-DAE, 2019 WL 3713756, at *6 (W.D. Tex. Aug. 5, 2019). In *Baylor*, the court dismissed the same Relator's FCA claims because it did not believe that Relator pleaded falsity with its statistical analyses. *See Baylor*, 2019 WL 3713756, at *6. That conclusion conflicts with this Court's Order, as well as the reasoning of the Third Circuit, which held that high rates of coding for certain conditions "are highly unlikely to be caused by chance" and thus create a plausible inference of a fraudulent scheme. *See Integra*, 2019 WL 3282619 at *19–*20; *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 258 (3d Cir. 2016). Because the Ninth Circuit has not weighed in on this issue and other courts have come to different conclusions, reasonable jurists could disagree here. *See Reese*, 643 F.3d at 688.

Finally, certifying this question would materially advance the termination of the litigation. *See Beeman*, 2007 WL 8433884, at *2. Like the news media question, the question of whether Relator has properly pleaded falsity has "important implications for assigning liability" because it is dispositive. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2014 WL 12573322, at *4. While Relator argues that the Court should discount Defendants' "discovery-based arguments," these considerations are crucial given the high discovery burden Defendants face. *See Opp.* 13:26–14:3. Ultimately, the Court finds that these "pragmatic considerations" weigh in favor of allowing interlocutory review. *See Beeman*, 2007 WL 8433884, at *2.

Accordingly, because the second question is paired with a question of law, is material to the Order, and meets § 1292(b)'s other requirements, the Court **CERTIFIES** the following question for interlocutory review: Whether Relator adequately alleged falsity under the False Claims Act?

### B. <u>Motion to Stay</u>

The next question before the Court is Defendants' motion to stay the case pending the interlocutory appeal. *See Mot.* 19:10–22:11. Certification of an interlocutory appeal does not automatically stay district court proceedings. 28 U.S.C. § 1292(b). Rather, a court may grant a stay in its discretion "upon [consideration of] the circumstances of the particular case." *Nken v. Holder*, 129 S. Ct. 1749, 1761 (2009). The party requesting a stay bears the burden of showing that the circumstances justify a stay. *Id.* In determining whether to issue a stay pending an interlocutory appeal, the Supreme Court has required courts to consider four factors: (1) whether

ADDENDUM 47

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured in the absence of a stay; (3) whether issuance of the stay will substantially injure the non-moving party; and (4) whether the stay is in the public interest. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, CV 13–5693 PSG (RZx), 2015 WL 4397175, at *3 (C.D. Cal. June 8, 2015); *see also, e.g.*, *In re Apple & ATTM Antitrust Litig.*, No. C 07-5152 JW, 2010 WL 11489069, at *2 (N.D. Cal. Sept. 15, 2010) (citing *Nken*, 129 S. Ct. at 1761).

Courts balance these factors on a sliding scale where "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Finder v. Leprino Foods Co.*, No. CV 13-2059 AWI (BAMx), 2016 WL 4095833, at *5 (E.D. Cal. Aug. 1, 2016). Because the first two factors are most important in the analysis, some courts have grouped the four factors into two categories: (1) whether serious legal questions are raised on appeal, and (2) whether the balance of hardships tips in the moving party's favor. *See Golden Gate Restaurant Ass'n v. City & Cty. of S.F.*, 512 F.3d 1112, 1115–16 (9th Cir. 2008).

Defendants argue for a stay because the news media issue raises a serious legal question. *See Reply* 10:2–22. Further, Defendants would avoid the hardship of engaging in potentially wasteful discovery while Relator, by contrast, would merely suffer a delay. *See Mot.* 21. Relator contends that Defendants are unlikely to succeed on the merits given the broadness of their proposed news media definition. *See Opp.* 17:4–11. In addition, Relator argues that the balance of hardships tips in its favor because Defendants merely complain about ordinary litigation costs while Relator will potentially lose evidence given that "documents will be lost, memories will fade, and witnesses will become unavailable." *See id.* 18:18–26 (quoting *Consumer Fin. Prot. Bureau v. D & D Mktg., Inc.*, No. CV 15-9692 PSG (EX), 2017 WL 5974248, at *6 (C.D. Cal. Mar. 21, 2017)).

The Court finds a stay appropriate, first because the news media question presents a serious legal issue. The case is one of first impression given that the Ninth Circuit has never squarely defined "news media" under the FCA, which indicates this is a "substantial case." *See Munro v. Univ. of S. Cal.*, No. CV 16-6191 VAP (CFEx), 2017 WL 5592904, at *2 (C.D. Cal. July 7, 2017). Moreover, the decision will significantly impact the proceedings, possibly dismissing Relator's claim entirely. Although Defendants advocate for a broad definition of news media that this Court has rejected, Relator is incorrect that they must show that they are likely to succeed. *See Opp.* 17: 4–11; *See Flo & Eddie*, 2015 WL 4397175, at *2 ("To satisfy the likelihood of success factor, [Sirius XM] need *not* demonstrate that it is more likely than not

ADDENDUM 48

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|----------|----------------------|------|-----------------|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

that [it] will succeed on the merits.").  Instead, Defendants must only show that the appeal presents a serious question of law, which they have done here.  *See Flo & Eddie*, 2015 WL 4397175, at *4–*5 ("Rather, 'the minimum quantum of likely success necessary to justify a stay' is a 'reasonable probability' of success, 'a substantial case on the merits,' or that 'serious questions are raised.'") (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 967–68 (9th Cir. 2011)).

Next, a stay is appropriate because Defendants have shown that the balance of hardships tips in its favor.  *See id.* at *2.  As previously noted, Defendants will have to produce volumes of complex documents, coordinate with various entities, and hire experts.  *See Mot.* 14:19–15:21.  Given the size of this case, this potentially burdensome discovery represents more than the ordinary litigation expenses that would counsel against a stay.  *See Opp.* 17:12–14; *Flo & Eddie*, 2015 WL 4397175, at *3 ("[M]onetary losses can be considered irreparable harm if defendants are forced to incur much of the expense of potentially unnecessary trial-oriented litigation before their appeal is heard.").  Moreover, the parties will have incurred any discovery costs inefficiently, or possibly needlessly, if the Court does not issue a stay and the Ninth Circuit alters the Court's news media standard.  *See Finder v. Leprino Foods Co.*, No. 113 CV 02059 AWI (BAM), 2017 WL 1355104, at *4 (E.D. Cal. Jan. 20, 2017).  Finally, the countervailing burden on Relator is slight.  While Relator argues in general terms that the delay will cause a loss of evidence, it does not specifically explain what documents could be lost or what witnesses' memories will fade.  *See Opp.* 18:18–26.  Therefore, given the potential for "substantial, unrecoverable, and wasteful" discovery, the Court finds that the balance of the hardships tips towards Defendants.  *See Pena v. Taylor Farms Pac., Inc.*, No. 2:13-CV-01282-KJM-AC, 2015 WL 5103157, at *4 (E.D. Cal. Aug. 31, 2015).

Lastly, the public interest favors a stay.  This Court has stated that "[t]he public 'generally has an interest in accuracy of judicial proceedings and in efficient use of government resources.'"  *See Flo & Eddie*, 2015 WL 4397175, at *4.  Here, staying the case would serve this interest because it would avoid costly and unnecessary litigation, thus saving juridical resources, while the Ninth Circuit decides the news media issue.  *See id.*  Although a stay is not automatic upon certification of an interlocutory appeal, Defendants have shown that they face high burdens in terms of time and costs if and when discovery commences.  *See Opp.* 18:27–19:4; *Mot.* 14:12–15:16.  Given the potential for inefficiencies in the discovery process due to the pending Ninth Circuit appeal, a stay serves the public interest.

For the foregoing reasons, the Court **GRANTS** Defendants' application for a stay and simultaneously **DENIES** the motion to phase discovery.

ADDENDUM 49

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1694 PSG (SSx) | Date | October 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Integra Med Analytics LLC v. Providence Health and Services, et al. | | |

IV.   Conclusion

The Court therefore **GRANTS** Defendants' motion to certify interlocutory appeal to the Ninth Circuit under 28 U.S.C. § 1292(b) on the following questions:

Whether all online information is disclosed from the "news media" such that it would fall under the public disclosure bar of the False Claims Act?

Whether Relator adequately alleged falsity under the False Claims Act?

Because Defendants pose a serious legal question and the balance of hardships tips in its favor, the Court simultaneously **GRANTS** Defendants' request for a stay and **DENIES** the motion to phase discovery.

**IT IS SO ORDERED.**

ADDENDUM 50

1  JASON H. TOKORO (State Bar No. 252345)
2  jtokoro@millerbarondess.com
   MILLER BARONDESS, LLP
3  1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
4  Telephone:   (310) 552-4400
   Facsimile:   (310) 552-8400
5
6  P. JASON COLLINS (Admitted *Pro Hac Vice*)
   jcollins@rctlegal.com
7  JEREMY H. WELLS (Admitted *Pro Hac Vice*)
   jwells@rctlegal.com
8  REID COLLINS & TSAI LLP
   1301 S. Capital of Texas Highway
9  Building C, Suite 300
   Austin, Texas 78746
10 Telephone:   (512) 647-6100
   Facsimile:   (512) 647-6129
11
12 Attorneys for Plaintiff/Relator
   INTEGRA MED ANALYTICS LLC
13

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

14

15 **UNITED STATES DISTRICT COURT**

16 **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

17

18 UNITED STATES OF AMERICA,            **CASE NO. 2:17-cv-01694-PSG-SS**
19 *ex rel.* INTEGRA MED ANALYTICS
   LLC,                                  **SECOND AMENDED COMPLAINT**
20                                       **[REDACTED]**
              Plaintiff,
21                                       **DEMAND FOR JURY TRIAL**
           v.
22                                       Assigned to the Hon. Philip S. Gutierrez
23 PROVIDENCE HEALTH SERVICES,
   et al.,
24
              Defendants.
25

26

27

28

394151.1                                          Case No. 2:17-cv-01694-PSG-SS

ADDENDUM 51

1

<u>**TABLE OF CONTENTS**</u>

2

<u>**Page**</u>

3

4   I.    INTRODUCTION ................................................................ 1

5   II.   JURISDICTION AND VENUE ........................................ 2

6   III.  PARTIES ........................................................................... 3

7   IV.   SUBSTANTIVE ALLEGATIONS ................................... 4

8         A.   Overview of Medicare Reimbursement and Upcoding ......... 4

9         B.   In Consultation with JATA, Providence Pushed Its Coders, CDI
              Specialists, and Doctors to Apply Unnecessary CCs and MCCs ........... 6
10
11             1.   Providence, aided by JATA, trained doctors to upcode
                    MCCs ....................................................................... 6

12             2.   With the Assistance of JATA, Providence Pressured
                    Doctors to Upcode MCC Using Leading Queries ...................... 10
13
14             3.   JATA Gave Providence Tips on How to Avoid Audits of
                    Their Upcoding ....................................................... 13

15             4.   Providence and JATA Incentivized Staff to Upcode MCCs ...... 14

16             5.   JATA's software promoted upcoding MCCs ........................... 15

17             6.   JATA's upcoding strategies extend beyond Providence ........... 16

18        C.   Relator's Methodology ....................................................... 17

19        D.   Defendants' False Claims ................................................... 20

20             1.   The False Claims Made by Providence in Consultation
                    with JATA ............................................................. 20
21
22                  (a)   Encephalopathy .............................................. 23

23                        (i)    Specific Patterns of Fraud with
                                 Encephalopathy .................................... 25

24                        (ii)   Specific False Claims with Encephalopathy .......... 33

25                  (b)   Respiratory Failure ......................................... 38

26                        (i)    Specific Patterns of Fraud with Respiratory
                                 Failure ............................................ 41
27
28                        (ii)   Specific False Claims with Respiratory
                                 Failure ............................................ 44

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

394151.1

ii

Case No. 2:17-cv-01694-PSG-SS

ADDENDUM 52

(c)    Severe Malnutrition ........................................................ 50

        (i)    Specific Patterns of Fraud with Severe Malnutrition ................................................. 52

        (ii)    Specific False Claims with Severe Malnutrition ................................................. 55

2.    Alternative Hypotheses for Excessive Rates of Misstated MCCs Do Not Stand and Confirm that Providence Fraudulently Billed Medicare ...................................... 58

    (a)    Patient Characteristics and Demographics Do Not Explain the Excessive Rates of Misstated MCCs at Providence ........................................................ 59

        (i)    Principal Diagnosis Bin-Based Fixed Effect Linear Regression .................................... 60

        (ii)    Aggregate Fixed Effect Regression Model ............ 64

        (iii)    System and Hospital Residuals for Misstated MCCs ...................................................... 66

    (b)    Providence's Merger with St. Joseph Health Demonstrates that Providence Management Causes the Excessive MCC Rates ...................................... 69

    (c)    Attending Physicians are not Responsible for the Excessively High Rates of Misstated MCCs ................. 73

    (d)    Unique Characteristics of Providence's Patients Do Not Account for the Excessively High Rates of Misstated MCCs ........................................................ 86

    (e)    Regional Factors do not Explain Why Providence Has Higher Rates of MCCs .............................................. 88

    (f)    Summary of What Caused Excessively High Rates of Misstated MCCs at Providence ................................... 90

3.    Economic Damages ................................................... 91

CAUSES OF ACTION ................................................................ 94

    COUNT ONE ................................................................ 94

    COUNT TWO ............................................................... 95

PRAYER FOR RELIEF ............................................................... 96

JURY TRIAL DEMANDED .......................................................... 96

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

iii

ADDENDUM 53

1        This is an action brought by Plaintiff/Relator Integra Med Analytics LLC

2   ("**Relator**") on behalf of the United States of America pursuant to the Federal False

3   Claims Act, 31 U.S.C. § 3729, et seq. (the "**False Claims Act**").  In support thereof,

4   Relator alleges as follows:

5   **I.**      **INTRODUCTION**

6        1.      Through a proprietary analysis of all claims submitted to Medicare

7   nationwide since 2011, Relator uncovered that Providence Health & Services and its

8   affiliated hospitals (collectively, "**Providence**" or the "**Providence Defendants**")

9   routinely used unwarranted Major Complication and Comorbidity secondary codes,

10  which falsely inflated claims submitted to Medicare.  A multi-faceted investigation

11  of the business practices of Providence and its consultant, J.A. Thomas and

12  Associates LLC ("**JATA**")—which included interviewing former employees,

13  reviewing training and marketing materials, and extensive econometric analysis—

14  confirmed that Providence's false Medicare claims were not only intentional, but

15  were part of a systematic effort to boost its Medicare revenue.  Relator now brings

16  this action to recover over $188.1 million paid by the United States as a result of

17  Providence's fraud.

18       2.      Providence is one of the nation's largest health systems, operating 34

19  hospitals and 600 clinics across five states.  Providence operates a number of

20  wholly-owned and/or controlled entities, including the defendant facilities.  Of

21  Providence's $14.4 billion in revenue in 2015, approximately $6.2 billion came

22  from Medicare reimbursements.

23       3.      To establish amounts billed to Medicare for patient services, systems

24  like Providence must properly code such services according to preapproved

25  standards, which Providence purported to monitor and audit through its "One

26  Revenue Cycle" department.  Providence also purported to engage JATA to help

27  support the system's compliance with clinical documentation management.  In

28  reality, documentary evidence uncovered by Relator and interviews with former

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   employees confirm that Providence and JATA worked seamlessly to create a culture

2   throughout Providence that promoted increasing Medicare billing without regard for

3   accuracy.  Providence and JATA's efforts ranged from pushing doctors to make

4   unwarranted diagnoses, to using leading queries to change doctors' original

5   diagnoses.  Even JATA's proprietary software was designed to manipulate

6   diagnoses to maximize Medicare revenue.

7         4.    In addition to identifying the Defendants' false claims through its

8   proprietary analysis—and then confirming its findings through exhaustive

9   investigation—Relator also performed extensive econometric analysis designed to

10   eliminate conceivable innocent explanations.  Thus, for instance, Relator's analysis

11   rules out the possibility that the Defendants' inflated Medicare billings arise from an

12   issue with the treating doctors or the type of patient that Providence treats.

13   Moreover, to be conservative, only the most extreme, statistically significant cases

14   of upcoding have been identified by the Relator as fraudulent.

15         5.    In short, Relator has determined that Providence, with the

16   encouragement of JATA, has submitted more than $188.1 million in false claims for

17   Medicare reimbursement over the past seven years.

18   **II.**    **<u>JURISDICTION AND VENUE</u>**

19         6.    This Court has subject matter jurisdiction over this action pursuant to

20   31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

21         7.    This Court has personal jurisdiction over the named Defendants

22   because, inter alia, the Defendants transacted business in this District; reside in this

23   District; engaged in wrongdoing in this District; and/or caused the submission of

24   false or fraudulent claims in this District. Further, 31 U.S.C. § 3732(a) provides for

25   nationwide service of process.

26         8.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28

27   U.S.C. § 1391(b) and (c).  During the relevant time period, a substantial portion of

28   the events complained of that gave rise to Plaintiff's claims occurred in this District

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 55

1    in violation of 31 U.S.C. § 3729 and § 3730.

2        9.    There has been no public disclosure of the allegations herein.  To the

3    extent that there has been a public disclosure unknown to Relator, Relator is an

4    "original source" under 31 U.S.C. § 3730(e)(4).  Relator has direct and independent

5    knowledge of the information on which the allegations are based and voluntarily

6    provided the information to the Government before filing this *qui tam* action based

7    on that information.  *See* 31 U.S.C. § 3730(e)(4).

8    **III.   <u>PARTIES</u>**

9        10.   Relator Integra Med Analytics LLC is a Texas limited liability

10   company with its principal place of business in Austin, Texas.

11       11.   Relator is an associated company of Integra Research Group LLC,

12   which specializes in using statistical analysis to uncover and prove fraud.  Integra

13   Research Group LLC's sister company, Integra REC LLC, has extensive experience

14   using statistical analysis to detect and prove fraud, specifically in mortgage-backed

15   securities and other financial markets.  Integra REC LLC has successfully initiated

16   numerous cases under the False Claims Act.

17       12.   Defendant Providence Health & Services is a Washington non-profit

18   corporation with its registered agent in California listed as Business Filings Inc., at

19   818 W. 7th Street, Suite 930, Los Angeles, CA 90017.

20       13.   Defendant Providence Health System – Southern California, is a

21   California non-profit corporation with its registered agent listed as Business Filings

22   Inc., at 818 W. 7th Street, Suite 930, Los Angeles, CA 90017.

23       14.   Defendant Providence Health & Services – Washington, is a

24   Washington non-profit corporation with its registered agent in California listed as

25   Business Filings Inc., at 818 W. 7th Street, Suite 930, Los Angeles, CA 90017.

26       15.   Defendant Providence Health & Services – Oregon, is an Oregon non-

27   profit corporation with its registered agent in California listed as Business Filings

28   Inc., at 818 W. 7th Street, Suite 930, Los Angeles, CA 90017.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 56

1   16.   Defendant Providence Saint John's Health Center, is a California

2   nonprofit corporation with its registered agent listed as Business Filings Inc., at 818

3   W. 7th Street, Suite 930, Los Angeles, CA 90017.

4   17.   Defendant Providence Health & Services – Montana, is a Montana non-

5   profit corporation with its registered agent listed as Business Filings Inc., at 3011

6   American Way, Missoula, MT 59808.

7   18.   Defendant Swedish Health Services, is a Washington non-profit

8   corporation with its registered agent listed as Business Filings Inc., at 505 Union

9   Ave. SE, Suite 120, Olympia, WA 98501.

10   19.   Defendant Swedish Edmonds, is a Washington non-profit corporation

11   with its registered agent listed as Business Filings Inc., at 505 Union Ave. SE, Suite

12   120, Olympia, WA 98501.

13   20.   Defendant J.A. Thomas and Associates, Inc. is a Georgia corporation

14   with its principal office address listed as 1 Wayside Road, Burlington, MA 01803,

15   and its registered agent listed as CT Corporation System, 289 South Culver Street,

16   Lawrenceville, GA 30046.

17   **IV.   SUBSTANTIVE ALLEGATIONS**

18      **A.   Overview of Medicare Reimbursement and Upcoding**

19   21.   Medicare makes payments to hospitals on a per-discharge basis, *i.e.*,

20   one payment for each inpatient hospital stay.  The payment is designed to cover the

21   average cost of resources needed to treat each patient's needs.  To account for the

22   patient's needs, Medicare assigns each discharge to a diagnosis related group (a

23   "**DRG**"), which groups patients with similar clinical problems that are expected to

24   require similar amounts of hospital resources.[1]  The DRG is the single most

25   impactful factor in determining the average payment for a claim, which can be

26   

---

27   [1] *See* Medpac, *Hospital Acute Inpatient Services Payment System Payment Basics*,

28   Oct. 2014.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 57

1   further adjusted by hospital-specific factors such as market conditions in the

2   hospital's city, indirect medical education payments, and disproportionate share

3   payments.

4        22.     The DRG is primarily determined by three types of codes from a

5   Medicare claim: the principal diagnosis code, surgical procedure codes, and

6   secondary diagnosis codes.  The principal diagnosis code is defined as the

7   "condition established after study to be chiefly responsible for occasioning the

8   admission of the patient to the hospital for care."[2]  Surgical procedure codes

9   represent surgical procedures performed in an operating room setting at the hospital.

10  Secondary diagnoses represent "all conditions that coexist at the time of admission,

11  that develop subsequently, or that affect the treatment received and/or the length of

12  stay."[3]

13       23.     There are more than 330 base DRGs, and each base DRG can have up

14  to three severity levels: (i) without Complication or Major Complication, (ii) with

15  Complication, and (iii) with Major Complication.[4]  The secondary diagnoses on the

16  claim determine the severity level of a DRG.  The Centers for Medicare and

17  Medicaid Services (the "**CMS**") publishes a list of codes each year that, when added

18  to a claim, result in the claim being considered a Complication or Comorbidity (a

19  "**CC**") or Major Complication or Comorbidity (an "**MCC**").  Adding a CC

20  secondary code to a claim can increase the value of the claim from anywhere

21  between approximately $1,000 and $10,000. Adding an MCC secondary code can

22  increase the value $1,000 to $25,000.  Hospitals are thus incentivized to add

23

24  [2] *See* Centers for Disease Control, *ICD-9-CM Official Guidelines for Coding and*

25  *Reporting*, Oct. 1, 2011, at 88.

26  [3] *See id.* at 91.

27  [4] *See* Medpac, *Hospital Acute Inpatient Services Payment System Payment Basics*,

28  Oct. 2014.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 58

1   unwarranted secondary diagnosis codes to Medicare reimbursement claims.

2   **B.   In Consultation with JATA, Providence Pushed Its Coders, CDI**

3   **Specialists, and Doctors to Apply Unnecessary CCs and MCCs**

4   24.    Like most hospital groups, Providence has a clinical documentation

5   improvement ("**CDI**") program to bridge potential gaps between Medicare's coding

6   standards and commonly used clinical language.  Providence engaged JATA to help

7   with these efforts.  Since its formation in 1991, JATA has been a leading provider of

8   CDI consulting services.  JATA purports to help hospitals "ensure the accuracy of

9   clinical documentation reflecting the appropriate severity of illness."  In reality,

10  Relator's investigation uncovered that JATA's work was primarily designed to ramp

11  up its clients' Medicare revenue without regard for accuracy.  Indeed, JATA

12  guaranteed an increase in its clients' Case Mix Index ("**CMI**"), which is influenced

13  by a hospital's CC and MCC rates.



Guaranteed to increase CMI

See how we're helping hospitals achieve a 4-8% increase in their Case Mix Index through better documentation.

Learn More ▸

20  25.    JATA also engaged in revenue sharing arrangements with its hospital

21  clients.  In its sales pitch to one hospital, JATA "guaranteed return on investment if

22  [the hospital] followed [JATA's] process."  While this could be seen as a risk

23  sharing mechanism, such an arrangement effectively meant that JATA would be

24  compensated through helping hospitals to increase Medicare revenue by increasing

25  the coding of MCCs.

26  **1.   Providence, aided by JATA, trained doctors to upcode MCCs**

27  26.    JATA's efforts to inflate Providence's Medicare revenue touched on all

28  aspects of Providence's CDI program, beginning with a doctor's initial

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   documentation of treatment.  Relator uncovered that Providence gave its doctors

2   "Documentation Tips," prepared by JATA, that aggressively pushed the use of

3   specific language conducive to coding for secondary CCs and MCCs, which JATA

4   referred to as "pearls for hospitalist documentation":

Pearls for Hospitalist Documentation:
☐  Describe "Clinical Impression" (e.g. thought process)
  –  Diagnoses are commonly not "certain"
  –  Use words like *probable, likely, suspect*, etc.
☐  **Heart Failure** ("CHF" no longer adds to severity)
  –  *Chronic* systolic, diastolic (or combined) failure adds severity as a comorbidity (CC)
  –  *Acute* systolic, diastolic (or combined) failure adds severity as a *major* comorbidity (MCC)
☐  **Sepsis** = SIRS + Infection (as the cause) – an MCC
  –  Positive blood cultures not necessary
  –  *Not* synonymous with "bacteremia"
  –  "Urosepsis" = UTI (to a hospital coder)

27.    These Documentation Tips often bore no relation to the clinical

realities facing Providence doctors.  For example, in one Documentation Tip for

patients suffering from malnutrition, Providence encouraged doctors to specify the

type of malnutrition.  In doing so, Providence highlighted a severe protein-energy

malnutrition called kwashiorkor.

JATA
•  Link diabetes related conditions and complications (continued)
–  Diabetic neuropathy/retinopathy
–  Diabetic bone changes:  Focal diabetic osteonecrosis in bone
–  Diabetic osteopathy (i.e., cause of non-traumatic aseptic necrosis)
–  Diabetes related carotid stenosis
–  Diabetic ulcers:
  ❖  Diabetic PVD related ulcer
  ❖  Diabetic neuropathic ulcer
  ❖  If osteomyelitis is unrelated to diabetes that must be stated
•  Malnutrition:
–  Specify Type (i.e., protein calorie, nutritional marasmus kwashiorkor)
–  Degree:  mild, moderate or severe
  ❖  *Severe* Malnutrition (MCC)
  ❖  *Malnutrition (CC)*
•  Obesity with BMI 40 or > (CC)
•  Underweight with BMI < 19 (CC)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

28.     However, kwashiorkor is a disease that "affects children living in tropical and subtropical parts of the world during periods of famine or insufficient food supply [and] *is not typically found in the United States*."[5]  Not surprisingly, according to Relator's analysis of Medicare billing nationwide, Providence's rate of reimbursement for Kwashiorkor is about three times the national average across all hospitals.

**Figure 1. Rate of Kwashiorkor for Providence Versus Other Hospitals.**
This figure shows the rate at which Providence codes Kwashiorkor versus the rate at which other hospitals code Kwashiorkor.



29.     The doctor tip sheets created by JATA and disseminated to Providence doctors also reveal how doctors were trained to document specific diagnoses identified by Relator for excessive use—encephalopathy, acute respiratory failure and severe malnutrition—in order to get an MCC. For example, while encephalopathy was noted as an MCC, other related diagnoses were discouraged because they were "not even a CC."

---

[5] Office of the Inspector General, U.S. Department of Health & Human Services, *OIG Work Plan 2017* at 7 (2017), *available at* https://goo.gl/BsJPyZ.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

– ARnF(AKI) with ATN (acute tubular necrosis) remains an MCC
- **Chronic Kidney Disease** (CKD) – *must* identify stage
– Stage 4 (GFR<30) and stage 5 (GFR<15) = CC
– Chronic Renal Insufficiency (CRI) = *low severity*
- **Noncompliance with dialysis**
– Document if CHF present in addition to just "fluid overload"
– Document "non-cardiogenic pulmonary edema" if appropriate
– List specific reason for emergent/urgent HD, e.g. fluid overload/CHF, acidemia, etc.
- **Kidney Transplants**
– Remember to identify both chronic kidney disease (CKD) and acute renal failure/AKI s/p transplant
– Specifically identify "transplant rejection" if present, even if presumed
- **Acute Respiratory Failure** – an MCC
– Clinical diagnosis, no need for ETT/mechanical ventilation
– Respiratory distress = *low severity*
– Pulmonary insufficiency (except post-op) = *low severity*
- **Encephalopathy** – an MCC
– *"Encephalopathy due to profound azotemia"*
– "Delirium" is not a CC unless specified as a certain type.  Altered MS is a *symptom* – not even a CC
- *Severe* **Malnutrition** (MCC)
– Malnutrition or cachexia = CC
– Emaciation is also an MCC

30.    Similarly, acute respiratory failure was highlighted as "an MCC," yet respiratory distress was also de-emphasized since it yielded "little credit." With respect to severe malnutrition, the tip sheet for surgeons instructs doctors: "Document severe malnutrition—it not only adds severity as an MCC, it will likely prolong the post-op course thereby aligning the illness severity with length of stay."

ADDENDUM 62

Pearls for CV Surgical Documentation
- Describe Your "Clinical Impression" of diagnosis/etiology
  – You can use words like probable, likely, suspect, etc.
- Document "Acute respiratory failure" or "Post-op pulmonary insufficiency" (both MCCs) rather than "Failure to wean" or "Unable to wean" in the post-op period
  – Also describe any underlying lung disease that contributes, e.g. "chronic respiratory failure due to COPD"
- Document all procedures performed as well as causative underlying illnesses
  – "ICD placement *and* cardiac catheterization w/principle diagnosis acute systolic heart failure"
- Document *severe malnutrition* – it not only adds severity as an MCC, it will likely prolong the post-op course thereby aligning the illness severity with length of stay
- Congestive Heart Failure – "CHF" no longer adds to severity;
  – *Chronic systolic, diastolic* or *combined* heart failure adds severity via a minor co morbidity (CC)

31.    JATA's own staff directly trained Providence doctors to code MCCs. In 2015, a JATA Regional Director created a video training Providence surgeons and anesthesiologists on how to manage the transition from ICD-9 codes to ICD-10 codes.  When covering the diagnoses related to cholelithiasis, which has 40 possible ICD-10 codes, the video instructed Providence that only the code resulting in an MCC is the "appropriate" diagnosis.  Referring to this MCC, the Regional Director instructs, "This is the way we describe conditions anyways, pretty much, and this is the only one that is going to get you a major comorbidity, by the way.  So as long as we describe things in this way we are going to arrive at the most appropriate diagnostic code over here out of the 40 different possibilities."

**2.    With the Assistance of JATA, Providence Pressured Doctors to Upcode MCC Using Leading Queries**

32.    JATA also influenced Providence's coding process in order to boost the system's "capture" of CCs and MCCs.  Hospitals are not allowed to apply a CC or MCC unless it is sufficiently documented in the patient's medical files.  Providence CDI specialists thus sent "queries" to doctors designed to push them to change their initial assessments in ways that would justify a coding of a CC or MCC.

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    33.    Relator uncovered that Providence CDI staff used non-compliant

2  leading queries[6] to direct doctors to a document specific diagnoses, such as severe

3  malnutrition, one of the MCCs identified by Relator for excessive use.  The CDI

4  staff either queried doctors verbally or issued queries through EPIC (their electronic

5  health record system) which in turn gave doctors a choice to agree, disagree or skip

6  the query.

7    34.    The use of leading queries at Providence is consistent with JATA's

8  practices at other hospital systems.  Despite branding its services as CDMP—or

9  "*Compliant* Documentation Management Program [emphasis added]" —JATA

10  promoted non-compliant leading queries to its clients.  A former staff at JATA

11  hospital recalls CDI querying for MCCs such as sepsis even when "there weren't

12  enough indicators to query the physician," and JATA promoted issuing queries

13  based on MCC rates and financial impact rather than documenting accurately.

14    35.    Not only did JATA coach hospitals to issue leading queries, but it also

15  unscrupulously tried to convince hospitals that they should not be concerned about

16  leading queries, citing two specious reasons.

17    36.    First, JATA made a point to hire nurses into CDI roles and argued that

18  nurses did not have to be concerned with leading queries because they were not

19  coders.  In a discussion on the topic of leading queries in a CDI member forum, the

20  CDI manager at CoxHealth overseeing JATA's CDMP program was concerned

---

22  [6] The fraudulent practice of issuing leading queries has been targeted in at least two

23  False Claims Act settlements by the United States Department of Justice, including

24  Good Samaritan Hospital where its employees "used leading questions so that the physician would answer that the patient was malnourished" and Johns Hopkins

25  Bayview Medical Center where its employees "advised treating doctors to include"

26  MCC "secondary diagnosis such as malnutrition or respiratory failure."  Moreover, the American Health Information Management Association (AHIMA) provides

27  guidelines for CDIs to issue Medicare-compliant queries, explicitly prohibiting

28  CDIs from issuing a leading query, defined as one which "directs a provider to a specific diagnosis or procedure."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 64

1    about JATA's views on leading queries: "[JATA] informed my CDI team that since

2    we are all RN's and part of the clinical team we do not have to be as concerned

3    about leading clarifications as a coder would…I am having a hard time accepting

4    this because all the literature I have researched has said to give multiple choice

5    options and never give just one diagnosis option as that would be considered leading

6    the provider."  In another CDI forum discussion on leading queries, a CDI notes that

7    "[JATA] allows their CDS [clinical documentation specialists] more leeway" by

8    providing a different standard for nurses than coders.  However, CDI nurses are not

9    clinicians, but are instead focused on documenting care for the purposes of medical

10   coding.  As another CDI specialist points out, "As a nurse speaking to a physician

11   [asking about a specific diagnosis] would be considered appropriate communication,

12   but as a CDI Specialist speaking to a physician, it is considered inappropriate to

13   'lead' that way."  Indeed, in one of the U.S. Department of Justice's enforcement

14   actions against a hospital for upcoding, the CDI was even a physician, but

15   nonetheless culpable of advising treating physicians using leading queries.

16         37.    Second, JATA unscrupulously justifies leading queries by convincing

17   hospitals that it is doctors, not CDIs, who are entirely responsible for

18   documentation.  In one instance discussed in the CDI member forum, a CDI was

19   evaluating JATA CDI software and noticed that the JATA software presented a new

20   diagnosis that generated leading queries.  When she raised this issue to JATA,

21   JATA responded that "[doctors] are responsible for their response and we are not

22   responsible regardless of the query."

23         38.    JATA's argument that only doctors, not CDIs, are responsible for

24   documentation is particularly troubling when considering how they trained CDI and

25   doctors.  JATA-trained CDI exerted pressure on doctors to document for higher

26   severity to the point of acquiescence.  For instance, a former coder at JATA facility

27   recalls doctors being tired of being constantly queried to the point that the doctors

28   would just ask what they should right down, as opposed to using their clinical

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 65

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   judgement to document accurately; there were "doctors that will just say whatever

2   you ask him to say just to get you off his back."  Furthermore, JATA's Regional

3   Director taught Providence doctors that the only way to avoid being queried by a

4   CDI would be to document an MCC.  This pressure to code MCCs would

5   sometimes result in the creation of contradictory medical records.  According to a

6   former Providence CDI staffer, it was not uncommon for doctors to initially

7   document delirium, but after being queried they hastily added encephalopathy to the

8   bottom of the chart.

9        39.     In sum, JATA advised CDIs to issue leading queries to doctors who

10   were responsible for the medical record.  Knowing doctors wanted to avoid being

11   queried, JATA advised doctors they could avoid queries by documenting an MCC.

12   This fraudulent scheme resulted in the excessive coding of MCCs identified by

13   Relator through its proprietary statistical analysis.

14        **3.     JATA Gave Providence Tips on How to Avoid Audits of**

15             **Their Upcoding**

16        40.     All the while promoting leading queries and the excessive coding of

17   MCCs, JATA also coached hospitals to avoid being audited.  For example, in a

18   presentation to CDI personnel at an industry event, Mario Perez, Director of Clinical

19   Consulting at JATA, advised hospitals to avoid single CC or single MCC

20   diagnoses—one of the metrics tracked in the PEPPER report issued by CMS to

21   support hospitals' compliance activities—since that was a target identified by

22   Medicare auditors as being at high risk of improper payment.

23

24

25

26

27

28

ADDENDUM 66



**RAC Target: DRGs Designated as CC or MCC With Only One Secondary Diagnosis**

- RACs identified improper payments due to the coding of DRGs with complications or comorbidities (CC) or major complications or comorbidities (MCC) with *only one* MCC or CC
- Examples of these include:
  - MS-DRG 329, major small and large bowel with MCC
  - MS-DRG 330, major small and large bowel with CC
  - MS-DRG 331, major small and large bowel w/o cc/MCC

  - Documentation does not support code assigned
  - For example: 285.1 as single CC

#### 4.    Providence and JATA Incentivized Staff to Upcode MCCs

41.    To increase the coding of MCCs, Providence gave CDI and doctors financial incentives for successful queries, and it made clear to doctors and staff that it closely tracked their responsiveness.  For instance, a monthly newsletter at one Providence hospital posted "Physician Agree Rates" and thanked medical and surgical staff for responding to queries.  It also provided CDI specialists with what the hospital deemed as that month's "Top 5 Queries," as well as the "Most Effective Query" measured by how much that query helped the hospital's bottom line. Frequently among the "Top 5 Queries" were the three MCCS identified by Relator for excessive use—encephalopathy, respiratory failure and malnutrition.  CDI staff thus had the incentive to query doctors to document these diagnoses since CDI performance is measured by the financial impact of their queries.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

ADDENDUM 67

**CPDI Report: April**

| | *Concurrent / Retrospective* | April's Top 5 Queries: | Most Effective Query: |
|---|---|---|---|
| Total Reviews: | 334/573 | 1. Anemia | Sepsis |
| | | 2. CHF | |
| Total Queries: | 44/3 | 3. Documentation Clarification | Impact of most effective query: |
| | | 4. Sepsis | Revenue: $14,816 |
| Response Rate: | 95%/67% | 5. Malnutrition | Case mix: 0.0064 |
| Physician Agree Rate: | 69%/50% | | |
| Total Case Mix Index for Medicare and Managed Medicare: | 1.5288 | | |

Thank you to the medical and surgical staff for taking the time to respond to these queries. Please contact Melanie Westerinen, CPDI Program Supervisor, at 425.640.4378 with any questions.

42.     Providence measured its CDI specialists by their CC and MCC capture rates, thus giving them an incentive to upcode.  Notably, JATA's software tracked the net effect of both positive and negative queries.  If a coder or CDI specialist issued a negative query—*i.e.*, a query that reduced the severity of a DRG—JATA's software reduced the net effect of that coder's queries.  Thus, Defendants not only incentivized upcoding, but disincentivized coders from sending negative queries. This helped to create a one-way ratchet for Medicare billing—and helped JATA deliver on its guaranteed increase of Providence's CMI.

43.     Relator's investigation also revealed evidence that Providence tied doctor salaries to the extent to which they responded to CDI queries.  A former Providence CDI specialist recalls that doctors employed by Providence would have their performance and salary negatively impacted if they did not respond to queries.

### 5.     JATA's software promoted upcoding MCCs

44.     Providence used JATA's proprietary software to help design queries. Using JATA's software, the moment a CDI specialist entered the patient's principal diagnosis, the CDI specialist was told immediately if a CC or MCC would impact the severity level of the DRG.  The software then gave the user suggestions of possible CCs and MCCs along with associated signs and symptoms.

45.     JATA clinical documentation software has a reputation for generating outsized additional revenue.  In a CDI discussion forum, a CDI manager recounted how her new VP of Finance used JATA in the past and wanted her department to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 68

1   switch to JATA.  Despite having a "mature CDI program" that had been developed

2   by 5 different CDI consultants over a span of 12 years, the new VP of Finance

3   wanted to implement JATA believing they would "recoup beaucoup dollars in the

4   process."

5          46.    The effectiveness of JATA's software in increasing revenue is driven

6   by issuing its own leading queries.  JATA documents show how its software will

7   even directly prompt doctors to code specific high revenue diagnoses—e.g., hepatic

8   encephalopathy—even though CDIs are precluded from telling doctors how to

9   document care since those are considered as leading queries.

10              **6.      JATA's upcoding strategies extend beyond Providence**

11         47.    Finally, JATA's role in encouraging and enabling Providence to code

12   CCs and MCCs excessively was not an isolated occurrence but rather a deliberate

13   systematic strategy.  Through its multifaceted investigation, Relator uncovered that

14   JATA also provided significant encouragement, training and software to assist many

15   other hospitals to submit false and inflated claims to Medicare.

16         48.    Relator's statistical analysis shows how JATA systematically

17   influenced other hospital systems to upcode MCCs, and confirms that when a

18   system switches to JATA as its CDI consultant, its usage of encephalopathy,

19   respiratory failure, and severe malnutrition (the exact same codes which Providence

20   uses to upcode) jumps significantly.  This confirms statistically that JATA plays a

21   significant role in the upcoding and validates Relator's investigation related to

22   JATA's direct involvement in enabling hospitals to upcode.  The result of this

23   statistical analysis is demonstrated in Figure 2 below.  The use of encephalopathy,

24   respiratory failure, and severe malnutrition at Valley Medical Center in Renton,

25   Washington, more than doubled after they started using JATA.

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 69

1

2

3

4

5

6

7

8

9

10

11

12

13



**Figure 2: Rate of Encephalopathy, Respiratory Failure, and Severe Malnutrition at Valley Medical Center Jumps Significantly After They Start Using JATA**

14    **C.    Relator's Methodology**

15        49.    Relator uncovered Providence and JATA's fraud by employing unique

16    algorithms and statistical processes to analyze inpatient claims data for short term

17    acute care hospitals from 2011 through June 2017,[7] obtained from the CMS.  These

18    proprietary methods have allowed Relator to identify with specificity the false

19    claims made by Providence (with the help of JATA) to fraudulently inflate revenue

20    on Medicare claims.  Relator's analysis focused on identifying certain secondary

21    diagnoses codes—MCCs—that were fraudulently added by Providence to Medicare

22    claims to increase reimbursements.

23        50.    Relator first formed groupings corresponding to 312 specific principal

24    diagnosis codes.  To control for the patient's principal diagnosis, Relator used these

25    groupings as comparative "bins."  Within each bin, Relator compared the usage rate

26

27    ─────────────────────

28    [7] Only claims through the second quarter of 2017 were analyzed by Relator.
      Claims after June 30, 2017, have not yet been made available to Relator.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 70

1    of specific MCCs at hospitals in the Providence system to usage rates in other acute

2    care inpatient hospitals.  In addition, to ensure that only the truly fraudulent claims

3    were analyzed, Relator excluded any claims for which adding an MCC did not

4    increase the value.[8]  Similarly, Relator excluded any claims involving patients who

5    died in the course of their treatment, as these claims tend to involve patients that are

6    sicker and have higher rates of MCCs.

7        51.    Given that some natural variation in usage rates among hospitals is

8    expected, Relator used two filters to further ensure that it identified truly abnormal

9    usage.  First, only instances where MCCs were used <u>more than twice the national</u>

10   <u>rate</u> or were used at a rate <u>three percentage points higher than in the other hospitals</u>

11   were considered false claims.  Second, Relator validated the results of its analysis by

12   determining the statistical significance of each fraudulent pattern used by

13   Providence.  Relator only flagged claim groupings where there was less than a one-

14   thousandth percent chance of Relator's findings being due to chance.  Under this

15   approach, Relator identified 271 combinations of principal diagnosis codes and

16   Misstated MCCs in which Providence excessively upcodes.  Relator included only

17   the principal diagnosis code groups that were used excessively by Providence.

18       52.    For example, Providence and other hospitals have a large number of

19   claims involving a Fracture of the Neck of the Femur (hip).  Relator has found that

20   among Providence's more than 11,000 claims involving a femoral neck fracture,

21   1,429 had had an accompanying secondary MCC of encephalopathy,[9] representing

22   12.34 percent of their femoral neck fracture claims.  The other non-Providence

23   hospitals, used by Relator for benchmarking, had more than 1,100,000 femoral neck

24

25

26   [8] Some diagnosis related groups do not have an MCC severity level, and as such, adding an MCC does not increase the reimbursement amount.

27   [9] See section IV.D.1(a) for a description of encephalopathy and the relevant codes

28   that are included.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  fracture claims, but only 4.46 percent of those claims reported encephalopathy as an

2  MCC. In other words, Providence coded encephalopathy on these claims at a rate

3  that is 2.77 times higher than comparable hospitals—and profited nearly $7,500

4  each time it did so.

5       53.    While Relator's precise benchmarking of medical billing is unique,

6  experts have developed and applied similar benchmarks in financial return

7  literature.[10]  Benchmarking has the advantage of allowing for very specific and

8  comparative groupings.  This avoids imposing specific linearity on the data, which

9  in turn gives Relator's methodology more statistical power and precision.

10       54.    To further validate its conclusions and control for other explanations,

11  Relator ran a bin-based fixed effect linear regression model.  Separate regressions

12  were run for claims under each principal diagnosis bin and Relator included

13  variables to control for patient characteristics such as age, gender, and race, as well

14  as county demographic factors such as the unemployment rate, median income, and

15  urban-rural differences.  Additionally, variables for the length of stay and discharge

16  status were included to control for the patient's health and overall claim severity.

17  Relator also tested for the potential impact that doctors, individual patients, and the

18  hospital's region could have on MCC rates.  Even when considering all of these

19  factors, Providence's MCC usage rate is significantly higher than at other hospitals.

20

21

22

23

24  [10] See the widely-used methodology developed by Kent Daniel, Mark Grinblatt,

25  Sheridan Titman, Russ Wermers, *Measuring Mutual Fund Performance with Characteristic-Based Benchmarks*, The Journal of Finance, vol. 52(3) (1997), at

26  1035–1058.  This methodology is first applied to measuring hedge-fund

27  performance by John M. Griffin and Jin Xu, *How Smart Are the Smart Guys? A Unique View from Hedge Fund Stock Holdings*, Review of Financial Studies, Vol.

28  22.7 (2009), at 2531–2570.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

D.   **Defendants' False Claims**

1.   **The False Claims Made by Providence in Consultation with JATA**

55.   Relator has determined that Providence, in consultation with JATA, primarily used three categories of secondary MCC codes to increase the value of its claims: encephalopathy (including toxic encephalopathy), respiratory failure (which also includes pulmonary insufficiency), and severe malnutrition (collectively, the "**Misstated MCCs**").  These will each be discussed in more detail in the following sections.

56.   As illustrated in Figure 3, Providence used the Misstated MCCs at a significantly higher rate than other hospitals.  Specifically, non-Providence hospitals used one of these three codes on approximately 10.05 percent of claims from 2011 through June 2017, while Providence hospitals used one of these three codes on 17.05 percent of such claims—or 1.7 times the rate at other hospitals.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**Figure 3. Rate of Misstated MCC Upcoding by Year for Providence Versus Other Hospitals.** This figure shows the rate at which Providence is using one of the Misstated MCCs relative to other hospitals over time. This analysis is based on the principal diagnosis codes listed in each section for the specific fraudulent patterns.



57.     The following figure shows just how drastic some of these patterns are when individual hospitals are analyzed and demonstrate how widespread this abuse is at nearly all the Providence hospitals.  As shown in Figure 4, Providence has 14 of the top 250 hospitals (out of more than 3,000 hospitals) based on the rate of Misstated MCCs.  If this distribution were random, the statistical probability of one system having 14 of the top 250 hospitals is less than 1 in 100 million.

**Figure 4. Rate of Misstated MCC by Hospital.**
The following figure plots 3,358 hospitals with at least 100 claims in the relevant principal diagnosis code categories. The hospitals are plotted along the x-axis in order of percentage of Misstated MCC usage. Providence has 14 of the top 250 hospitals. The Providence hospitals are in red, while non-Providence hospitals are in blue.



58.     Figure 5 below shows that Providence used a higher rate of Misstated MCC codes not just in the principal diagnosis categories analyzed by Relator in this complaint, but across a large variety of principal diagnosis codes.  Specifically, Figure 5 shows a dot for each principal diagnosis category, with the rate of Misstated MCC at Providence on the x-axis and the rate of Misstated MCC at other non-Providence hospitals on the y-axis.  Dots to the right of the 45-degree line indicate a higher rate of Misstated MCCs at Providence within that principal diagnosis category than at other non-Providence hospitals.  As the figure shows, Providence has higher rates of Misstated MCCs across 296 of 312 (94.87%) principal diagnosis categories.  This demonstrates that the extent to which Providence excessively upcoded on the categories identified by Relator was not offset by a relative downcoding for other principal diagnosis categories as Providence consistently upcodes relative to other hospitals across a large variety of principal diagnosis codes.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 75

1

2 **Figure 5. Rate of Misstated MCCs by Principal Diagnosis Code at Providence Versus Other Hospitals.**

3 For the 312 principal diagnoses with at least 100 claims at Providence (each represented by a dot), this figure compares the rate of Misstated MCCs at Providence versus non-Providence hospitals. Red dots to the

4 right of the 45-degree line indicate Providence is coding the Misstated MCCs higher than average.



### (a)   Encephalopathy

59.     The first Misstated MCC fraudulently used by Providence to make false claims is encephalopathy.  The codes included with encephalopathy are listed in Table 1.  Encephalopathy is a term for brain disease or damage to the brain where the brain is regarded as "altered in its structure or function."  The telltale symptom is

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   an altered mental state, but altered mental state alone is insufficient for diagnosing

2   encephalopathy.  Encephalopathy can be acute or chronic, so the related signs and

3   symptoms can be varied as well.  This condition commonly manifests as confusion,

4   agitation, or lethargy, but may include aphasia (altered speech), ataxia (altered gait)

5   and memory loss.

6

7   **Table 1. List of Encephalopathy ICD-9 and ICD-10 Diagnosis Codes.**

| ICD-9 Diagnosis Code | Description |
| --- | --- |
| 34830 | Encephalopathy, unspecified |
| 34831 | Metabolic encephalopathy |
| 34839 | Other encephalopathy |
| 34982 | Toxic encephalopathy |

| ICD-10 Diagnosis Code | Description |
| --- | --- |
| G92 | Toxic encephalopathy |
| G9340 | Encephalopathy, unspecified |
| G9341 | Metabolic encephalopathy |
| G9349 | Other encephalopathy |
| I6783 | Posterior reversible encephalopathy syndrome |

14   60.    The most common causes of encephalopathy are liver damage, cerebral

15   anoxia (severe lack of oxygen to the brain) or kidney failure.  Because the causes are

16   extremely varied, no single lab test can prove the presence of encephalopathy.

17   Therefore, in diagnosing the condition, a medical practitioner must keep multiple

18   considerations in mind.  The challenge is to properly identify the root cause of the

19   symptoms observed and eliminate unlikely causes based on objective signs.

20   61.    Encephalopathy is distinguishable from conditions that have similar

21   symptoms.  In elderly hospital patients, for instance, temporary instances of

22   lethargy, agitation and confusion are commonly observed, often right after an

23   intense surgery or as the result of a urinary tract infection.  These same signs can be

24   observed in patients as "sundowning" or "late-day confusion" in the late afternoon

25   or evening, but these effects are temporary and are actually related to chronic

26   dementia, not encephalopathy.

27   62.    Between 2011 and June 2017, Providence was 2.07 times more likely

28   to code encephalopathy than other hospitals.  During this period, Providence coded

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 77

encephalopathy on 12.57 percent of all its claims, compared to 6.07 percent of claims at other hospitals.  Providence's usage of encephalopathy over time, relative to the nationwide average, is shown in Figure 6.

**Figure 6. Rate of Encephalopathy by Year for Providence Versus Other Hospitals.**
This figure shows the rate of encephalopathy at Providence and at other hospitals from 2011 through June 2017, when added to the relevant principal diagnosis codes listed in Table 2.



(i)      **Specific Patterns of Fraud with Encephalopathy**

63.     Table 2 provides a list of the principal diagnosis codes used by Providence to upcode with encephalopathy.  Relator identified 215 principal diagnosis codes in conjunction with which Providence coded encephalopathy at a rate at least two times and/or three percentage points higher than the nationwide average.  Relator has included only patterns that were statistically significant at the 99.9% level, meaning it is virtually impossible the patterns are due to chance.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**Table 2. Patterns Used by Providence to Upcode with Encephalopathy.**
The following table lists the principal diagnosis categories in which Providence excessively upcodes with encephalopathy. 12 principal diagnosis categories with fewer than 11 fraudulent claims at Providence have been omitted from the table.

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Nationwide Average | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Unspecified Septicemia | 19.07% | 30.29% | 159% | 4,088 |
| Urinary Tract Infection; Site Not Specified | 18.08% | 36.83% | 204% | 1,597 |
| Occlusion of Cerebral Arteries | 8.42% | 18.09% | 215% | 1,464 |
| Acute Renal Failure | 12.29% | 23.36% | 190% | 1,429 |
| Pneumonia; Organism Unspecified | 5.54% | 13.06% | 236% | 974 |
| Congestive Heart Failure; Nonhypertensive | 3.28% | 7.91% | 242% | 939 |
| Fracture of Neck of Femur (hip) | 4.46% | 12.34% | 277% | 913 |
| Aspiration Pneumonitis; Food/vomitus | 13.93% | 28.18% | 202% | 814 |
| Infection and Inflammation--internal Prosthetic Device; Implant; and Graft | 10.57% | 19.53% | 185% | 579 |
| Intracranial Hemorrhage | 14.07% | 29.84% | 212% | 468 |
| Epilepsy | 14.98% | 31.56% | 211% | 399 |
| E. Coli Septicemia | 18.55% | 30.87% | 166% | 398 |
| Other Intracranial Injury | 8.30% | 19.93% | 240% | 373 |
| Hyposmolality | 11.44% | 23.58% | 206% | 343 |
| Diabetes with Other Manifestations | 8.17% | 17.40% | 213% | 284 |
| Other Gram Negative Septicemia | 19.19% | 32.82% | 171% | 283 |
| Poisoning by Other Medications and Drugs | 19.67% | 41.10% | 209% | 272 |
| Staphylococcal Septicemia | 20.71% | 34.94% | 169% | 265 |
| Substance-related Disorders | 19.28% | 31.23% | 162% | 245 |
| Intestinal Infection | 4.10% | 9.68% | 236% | 238 |
| Osteoarthritis; Localized | 0.56% | 1.22% | 220% | 214 |
| Poisoning by Psychotropic Agents | 26.54% | 57.21% | 216% | 202 |
| Pathological Fracture | 4.01% | 11.97% | 298% | 192 |
| Malfunction of Device; Implant; and Graft | 2.02% | 4.82% | 239% | 191 |
| Other Endocrine Disorders | 13.68% | 26.78% | 196% | 189 |
| Hypovolemia | 6.32% | 13.86% | 219% | 182 |
| Obstructive Chronic Bronchitis | 1.60% | 3.74% | 233% | 180 |
| Hypertensive Heart and/or Renal Disease | 4.43% | 7.46% | 169% | 172 |
| Convulsions | 12.33% | 28.96% | 235% | 170 |
| Cystitis and Urethritis | 13.88% | 30.85% | 222% | 169 |
| Atrial Fibrillation | 1.61% | 3.38% | 210% | 168 |
| Streptococcal Septicemia | 18.06% | 30.34% | 168% | 168 |
| Cellulitis and Abscess of Leg | 2.50% | 5.61% | 224% | 161 |
| Influenza | 6.32% | 15.08% | 239% | 159 |
| Hemorrhage of Gastrointestinal Tract | 2.77% | 6.48% | 234% | 158 |
| Diabetes with Ketoacidosis or Uncontrolled Diabetes | 8.81% | 17.36% | 197% | 155 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Nationwide Average | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Fracture of Vertebral Column without Mention of Spinal Cord Injury | 4.03% | 10.32% | 256% | 153 |
| Secondary Malignancy of Brain/spine | 10.08% | 21.88% | 217% | 135 |
| Other Connective Tissue Disease | 4.68% | 10.43% | 223% | 135 |
| Postoperative Infection | 4.09% | 8.22% | 201% | 134 |
| Alcohol-related Disorders | 6.86% | 10.90% | 159% | 127 |
| Hemorrhage from Gastrointestinal Ulcer | 2.96% | 6.74% | 228% | 117 |
| Other Intestinal Obstruction | 1.50% | 3.67% | 245% | 113 |
| Cancer of Bronchus; Lung | 2.84% | 6.26% | 220% | 112 |
| Other Fluid and Electrolyte Disorders | 8.35% | 18.55% | 222% | 111 |
| Pulmonary Heart Disease | 2.41% | 4.95% | 206% | 101 |
| Acute Pancreatitis | 2.14% | 5.63% | 263% | 99 |
| Infections of Kidney | 4.82% | 11.71% | 243% | 96 |
| Other and Unspecified Gastrointestinal Disorders | 2.01% | 5.02% | 249% | 91 |
| Other Fracture of Lower Limb | 3.35% | 9.21% | 275% | 88 |
| Fracture of Pelvis | 2.81% | 7.74% | 275% | 82 |
| Congestive Heart Failure | 1.71% | 4.92% | 288% | 80 |
| Other Nervous System Symptoms and Disorders | 3.08% | 8.41% | 273% | 79 |
| Cancer of Brain and Nervous System | 9.78% | 21.01% | 215% | 75 |
| Non-Hodgkin's Lymphoma | 6.32% | 14.57% | 231% | 75 |
| Delirium Dementia and Amnestic and Other Cognitive Disorders | 14.98% | 27.17% | 181% | 74 |
| Other and Unspecified Hereditary and Degenerative Nervous Conditions | 8.05% | 13.95% | 173% | 73 |
| Disorders of Mineral Metabolism | 12.55% | 24.83% | 198% | 73 |
| Cancer of Colon | 2.20% | 5.26% | 239% | 72 |
| Other Injuries and Conditions Due to External Causes | 6.10% | 13.76% | 226% | 71 |
| Fracture of Ankle | 2.56% | 7.47% | 292% | 70 |
| Fracture of Humerus | 3.24% | 8.22% | 254% | 65 |
| Other Peripheral and Visceral Atherosclerosis | 2.44% | 6.16% | 252% | 65 |
| Other Cardiac Dysrhythmias | 2.44% | 5.64% | 231% | 65 |
| Infective Arthritis and Osteomyelitis (except That Caused by Tb or STD) | 3.36% | 7.42% | 221% | 62 |
| Diverticulitis | 1.36% | 3.09% | 227% | 59 |
| Peritoneal or Intestinal Adhesions | 2.42% | 4.85% | 200% | 59 |
| Other Bacterial Pneumonia | 7.13% | 10.59% | 149% | 57 |
| Intervertebral Disc Disorders | 1.45% | 2.94% | 203% | 57 |
| Other Specified Septicemia | 16.60% | 26.52% | 160% | 57 |
| Other and Unspecified Viral Infection | 7.59% | 16.46% | 217% | 56 |
| Spinal Stenosis; Lumbar Region | 1.66% | 3.38% | 203% | 56 |

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Nationwide Average | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Gangrene | 4.75% | 10.45% | 220% | 56 |
| Encephalitis (except That Caused by Tb or STD) | 25.33% | 55.49% | 219% | 55 |
| Other Aneurysm | 3.79% | 8.62% | 228% | 54 |
| Other Venous Embolism and Thrombosis | 1.60% | 4.05% | 253% | 54 |
| Pleurisy; Pleural Effusion | 2.42% | 5.92% | 245% | 53 |
| Liver Abscess and Sequelae of Chronic Liver Disease | 6.26% | 9.84% | 157% | 53 |
| Atherosclerosis of Arteries of Extremities | 1.55% | 3.63% | 234% | 52 |
| Hypotension | 4.81% | 12.48% | 260% | 51 |
| Cancer of Pancreas | 2.68% | 7.75% | 289% | 50 |
| Calculus of Bile Duct | 1.82% | 4.35% | 239% | 49 |
| Melena | 1.96% | 5.11% | 260% | 49 |
| Fracture of Ribs; Closed | 2.89% | 8.45% | 292% | 49 |
| Noninfectious Gastroenteritis | 1.66% | 5.22% | 315% | 48 |
| Crushing Injury or Internal Injury | 3.56% | 10.35% | 291% | 48 |
| Sinoatrial Node Dysfunction | 2.41% | 4.84% | 201% | 48 |
| Hyperpotassemia | 4.57% | 8.26% | 181% | 47 |
| Superficial Injury; Contusion | 2.78% | 8.42% | 303% | 46 |
| Suicide and Intentional Self-inflicted Injury | 26.39% | 44.19% | 167% | 46 |
| Chronic Rheumatic Disease of the Heart Valves | 3.31% | 7.35% | 222% | 46 |
| Other Pneumonia | 3.92% | 10.22% | 261% | 45 |
| Diabetes with Circulatory Manifestations | 3.86% | 8.70% | 225% | 44 |
| Late Effects of Cerebrovascular Disease | 10.25% | 24.50% | 239% | 43 |
| Secondary Malignancy of Bone | 4.42% | 10.85% | 246% | 42 |
| Osteoarthritis; Generalized and Unspecified | 0.65% | 1.67% | 256% | 41 |
| Other and Unspecified Metabolic; Nutritional; and Endocrine Disorders | 5.72% | 14.14% | 247% | 40 |
| Other Disorders of Stomach and Duodenum | 1.84% | 4.25% | 230% | 40 |
| Acute Posthemorrhagic Anemia | 2.70% | 6.72% | 249% | 40 |
| Other Diseases of the Nervous System and Sense Organs | 7.84% | 14.67% | 187% | 38 |
| Cholelithiasis with Acute Cholecystitis | 1.81% | 3.64% | 201% | 38 |
| Diseases of White Blood Cells | 2.63% | 6.46% | 246% | 36 |
| Hemorrhage or Hematoma Complicating A Procedure | 1.49% | 4.00% | 268% | 36 |
| Diverticulosis | 1.34% | 2.84% | 213% | 34 |
| Other Biliary Tract Disease | 2.14% | 5.88% | 275% | 34 |
| Other Bone Disease and Musculoskeletal Deformities | 1.57% | 4.08% | 259% | 33 |
| Complications of Transplants and Reattached Limbs | 2.33% | 6.46% | 278% | 33 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Nationwide Average | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Cancer of Liver and Intrahepatic Bile Duct | 3.91% | 11.11% | 285% | 32 |
| Malaise and Fatigue | 2.98% | 8.46% | 284% | 32 |
| Concussion | 6.85% | 24.31% | 355% | 32 |
| Other Mycoses | 11.55% | 19.54% | 169% | 31 |
| Anemia; Unspecified | 1.66% | 5.47% | 331% | 31 |
| Disorders of the Peripheral Nervous System | 2.82% | 7.21% | 256% | 30 |
| Neoplasms of Unspecified Nature or Uncertain Behavior | 2.84% | 6.25% | 220% | 30 |
| Empyema and Pneumothorax | 2.86% | 7.32% | 256% | 30 |
| Other Non-Traumatic Joint Disorders | 1.77% | 5.28% | 297% | 30 |
| Other Diseases of the Respiratory System | 2.23% | 9.24% | 415% | 30 |
| Other Esophageal Disorders | 1.64% | 3.70% | 226% | 30 |
| Other Cellulitis and Abscess | 2.04% | 4.92% | 241% | 29 |
| Essential Hypertension | 2.23% | 6.97% | 313% | 29 |
| Fracture of Tibia and Fibula | 2.59% | 5.98% | 231% | 28 |
| Decubitus Ulcer | 4.21% | 9.09% | 216% | 27 |
| Constipation | 1.82% | 5.44% | 299% | 27 |
| Gout and Other Crystal Arthropathies | 2.53% | 9.61% | 380% | 27 |
| Multiple Myeloma | 9.31% | 17.30% | 186% | 27 |
| Other and Ill-defined Cerebrovascular Disease | 5.78% | 10.11% | 175% | 27 |
| Cholecystitis without Cholelithiasis | 2.23% | 5.12% | 229% | 27 |
| Cancer of Stomach | 2.25% | 7.60% | 338% | 26 |
| Other Hypertensive Complications | 4.80% | 9.94% | 207% | 26 |
| Other and Unspecified Liver Disorders | 6.56% | 12.71% | 194% | 26 |
| Hematemesis | 3.17% | 8.11% | 255% | 26 |
| Hematuria | 1.80% | 7.80% | 434% | 25 |
| Cancer of Head and Neck | 2.29% | 9.91% | 433% | 25 |
| Leukemias | 4.15% | 8.79% | 212% | 25 |
| Cardiac Arrest and Ventricular Fibrillation | 8.42% | 16.50% | 196% | 25 |
| Cellulitis and Abscess of Arm | 2.12% | 4.85% | 229% | 25 |
| Herpes Zoster Infection | 7.39% | 16.36% | 221% | 25 |
| Fracture of Radius and Ulna | 2.25% | 5.87% | 260% | 25 |
| Cellulitis and Abscess of Foot | 1.88% | 6.34% | 337% | 25 |
| Urinary Complications | 6.98% | 16.29% | 233% | 25 |
| Benign Neoplasm of Cerebral Meninges | 7.42% | 12.61% | 170% | 24 |
| Chronic Obstructive Asthma with Acute Exacerbation | 0.86% | 2.65% | 307% | 24 |
| Atrial Flutter | 1.11% | 2.74% | 247% | 23 |
| Other Injury and Poisoning | 3.28% | 15.85% | 484% | 23 |
| Respiratory Failure | 14.70% | 24.36% | 166% | 23 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

29

SECOND AMENDED COMPLAINT

ADDENDUM 82

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Nationwide Average | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Acute Upper Respiratory Infections of Multiple or Unspecified Sites | 3.27% | 13.36% | 409% | 22 |
| Cancer of Bladder | 2.71% | 5.74% | 212% | 22 |
| Diabetes with Renal Manifestations | 6.63% | 14.83% | 224% | 22 |
| Other Cns Infection and Poliomyelitis | 13.11% | 23.76% | 181% | 22 |
| Other Endocrine; Nutritional; and Metabolic Diseases and Immunity Disorders | 3.52% | 11.40% | 324% | 21 |
| Abdominal Aortic Aneurysm; without Rupture | 1.23% | 2.63% | 213% | 21 |
| Paralytic Ileus | 2.63% | 5.43% | 207% | 21 |
| Hepatitis | 4.55% | 8.08% | 178% | 21 |
| Other and Unspecified Circulatory Disease | 3.46% | 7.72% | 223% | 20 |
| Other Diseases of the Circulatory System | 1.94% | 5.02% | 259% | 20 |
| Multiple Sclerosis | 3.27% | 9.84% | 301% | 20 |
| Other Specified Anemia | 1.99% | 6.04% | 304% | 19 |
| Esophagitis | 1.72% | 5.11% | 297% | 19 |
| Chronic Kidney Disease | 6.74% | 12.39% | 184% | 19 |
| Cancer of Rectum and Anus | 1.99% | 4.10% | 206% | 19 |
| Incisional Hernia with Obstruction/gangrene | 1.59% | 4.27% | 269% | 19 |
| Calculus of Ureter | 1.22% | 3.09% | 253% | 19 |
| Peritonitis and Intestinal Abscess | 3.42% | 6.94% | 203% | 18 |
| Other and Unspecified Lower Respiratory Disease | 1.78% | 4.48% | 252% | 18 |
| Poisoning by Nonmedicinal Substances | 14.16% | 30.56% | 216% | 18 |
| Abdominal Pain | 0.91% | 2.17% | 239% | 17 |
| Inflammatory Conditions of Male Genital Organs | 2.53% | 9.16% | 362% | 17 |
| Shock | 19.47% | 34.82% | 179% | 17 |
| Secondary Malignancy of Liver | 3.87% | 7.35% | 190% | 17 |
| Arterial Embolism and Thrombosis of Lower Extremity Artery | 3.23% | 6.27% | 194% | 16 |
| Other Back Pain and Disorders | 1.46% | 2.92% | 200% | 16 |
| Hemorrhage of Rectum and Anus | 1.76% | 5.21% | 295% | 16 |
| Cancer of Other GI Organs; Peritoneum | 2.28% | 5.12% | 224% | 16 |
| Cirrhosis of Liver without Mention of Alcohol | 4.51% | 7.91% | 175% | 15 |
| Migraine | 2.30% | 7.56% | 329% | 15 |
| Cancer of Ovary | 1.58% | 3.92% | 248% | 15 |
| Allergic Reactions | 2.74% | 8.37% | 306% | 15 |
| Other Infectious and Parasitic Diseases | 6.47% | 12.95% | 200% | 14 |

ADDENDUM 83

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Nationwide Average | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Cholelithiasis with Other Cholecystitis | 1.35% | 3.63% | 268% | 14 |
| Cardiac Complications | 2.73% | 8.33% | 305% | 14 |
| Unspecified Gastritis and Gastroduodenitis | 1.91% | 4.55% | 238% | 14 |
| Unstable Angina (intermediate Coronary Syndrome) | 1.20% | 2.45% | 205% | 14 |
| Inguinal Hernia with Obstruction or Gangrene | 2.20% | 4.84% | 220% | 14 |
| Cellulitis and Abscess of Hand | 1.49% | 4.88% | 327% | 13 |
| Obesity | 0.71% | 3.15% | 447% | 13 |
| Open Wounds of Extremities | 1.71% | 7.59% | 443% | 13 |
| Lumbago | 2.43% | 6.83% | 280% | 13 |
| Diseases of Mouth; Excluding Dental | 3.45% | 8.82% | 256% | 13 |
| Other Arterial Embolism and Thrombosis | 2.52% | 5.84% | 232% | 13 |
| Cancer of Kidney and Renal Pelvis | 4.01% | 15.18% | 378% | 13 |
| Coma; Stupor; and Brain Damage | 7.54% | 14.88% | 197% | 12 |
| Open Wounds of Head; Neck; and Trunk | 2.88% | 9.09% | 316% | 12 |
| Other and Unspecified Genitourinary Symptoms | 3.88% | 12.00% | 309% | 12 |
| Backache; Unspecified | 2.53% | 10.13% | 401% | 12 |
| Gastric Ulcer | 2.33% | 6.29% | 270% | 12 |
| Other Upper Respiratory Disease | 1.63% | 4.35% | 266% | 12 |
| Dysphagia | 3.20% | 7.78% | 243% | 12 |
| Rheumatoid Arthritis and Related Disease | 1.64% | 5.82% | 355% | 11 |
| Other Diseases of the Blood and Blood-forming Organs | 2.73% | 8.17% | 299% | 11 |
| Calculus of Kidney | 1.23% | 4.19% | 342% | 11 |
| Other Diseases of the Genitourinary System | 2.50% | 6.07% | 243% | 11 |
| Cellulitis and Abscess of Fingers and Toes | 1.45% | 4.72% | 326% | 11 |
| Other Diseases of Veins and Lymphatics | 1.51% | 4.65% | 308% | 11 |

64.    The following figure shows just how drastic some of these patterns are when individual hospitals are analyzed, and starkly demonstrate Providence's widespread abuse.  As shown in Figure 7, Providence hospitals are consistently among those with the highest rates of encephalopathy.  In fact, Providence has 18 of the top 250 hospitals in the country (out of more than 3,000 total hospitals) based on

ADDENDUM 84

1   rate of encephalopathy.  If this distribution were random, the statistical probability

2   of having 18 of the top 250 hospitals is less than 1 in 100 million.

3

4   **Figure 7. Rate of Encephalopathy by Hospital.**
    The following figure plots 3,356 hospitals with at least 100 claims in the relevant principal diagnosis codes

5   listed in Table 2. The hospitals are plotted along the x-axis in order of percentage of encephalopathy usage.



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

18   65.    Figure 8 below shows that Providence not only used a higher rate of

19   encephalopathy in the few categories listed above, but also across a large variety of

20   principal diagnosis codes.  The red dots to the right of the 45-degree line indicate

21   higher rates of encephalopathy at Providence versus the nationwide average.  This

22   figure shows that Providence has a higher rate of encephalopathy for 304 out of 312

23   (97.44%) principal diagnosis categories.  In other words, the extent to which

24   Providence excessively upcoded encephalopathy on the categories listed in Table 2

25   above was not offset by relative downcoding in other principal diagnosis categories.

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1

**Figure 8. Rate of Encephalopathy by Principal Diagnosis Code at Providence Versus Other Hospitals.** For the 312 principal diagnoses with at least 100 claims at Providence (each represented by a dot), this figure compares the rate of encephalopathy at Providence versus non-Providence hospitals. Red dots to the right of the 45-degree line indicate Providence is coding encephalopathy at a rate higher than the nationwide average.



(ii)    **Specific False Claims with Encephalopathy**

66.    The Relator has identified many specific false Medicare claims submitted by Providence involving encephalopathy.  The following table includes 50 examples.

ADDENDUM 86

**Table 3. False Claims made by Providence Using Encephalopathy.**
The following table presents specific examples of false claims made by Providence using encephalopathy.
The first six digits of the beneficiary ID has been removed to make it harder to identify the individual patients.

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | █ | ██ | ████ | ██ | ██ |
| ██ | ██ | ██ | █ | ████ | ██ | ██ | ██ |
| ██ | ██ | ██ | █ | ██ | ███ | ██ | ██ |
| ██ | ██ | ██ | █ | ██ | | ██ | ██ |
| ██ | ██ | ██ | █ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | █ | ██ | ██ | ██ | ██ |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

ADDENDUM 87



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400



ADDENDUM 89





**(b)** <u>**Respiratory Failure**</u>

67.     The second Misstated MCC that Providence used at an excessive rate is respiratory failure, which includes pulmonary insufficiency.  The codes classified as respiratory failure are listed in Table 4 below.  Respiratory failure is a syndrome characterized by poor gas transfer in the lungs at the alveolar and capillary levels as a result of a problem making it difficult to breathe.  It can be acute or chronic.  There are two types: the first and most common is hypoxemia ("oxygenation

ADDENDUM 91

failure"), and the second type demonstrates both hypoxemia and hypercapnia ("ventilatory failure").  Respiratory failure can be acute and life-threatening, or chronic and manageable with modifications.

**Table 4. List of Respiratory Failure ICD-9 and ICD-10 Diagnosis Codes.**

| ICD-9 Diagnosis Code | Description |
| --- | --- |
| 5184 | Acute edema of lung, unspecified |
| 5185 | Pulmonary insufficiency following trauma and surgery |
| 51851 | Acute respiratory failure following trauma and surgery |
| 51852 | Other pulmonary insufficiency not elsewhere classified following trauma/surgery |
| 51853 | Acute and chronic respiratory failure following trauma and surgery |
| 51881 | Acute respiratory failure |
| 51884 | Acute and chronic respiratory failure |

| ICD-10 Diagnosis Code | Description |
| --- | --- |
| J810 | Acute pulmonary edema |
| J951 | Acute pulmonary insufficiency following thoracic surgery |
| J952 | Acute pulmonary insufficiency following nonthoracic surgery |
| J953 | Chronic pulmonary insufficiency following surgery |
| J95821 | Acute postprocedural respiratory failure |
| J95822 | Acute and chronic postprocedural respiratory failure |
| J9600 | Acute respiratory failure, unspecified whether with hypoxia or hypercapnia |
| J9601 | Acute respiratory failure with hypoxia |
| J9602 | Acute respiratory failure with hypercapnia |
| J9620 | Acute and chronic respiratory failure, unspecified whether with hypoxia or hypercapnia |
| J9621 | Acute and chronic respiratory failure with hypoxia |
| J9622 | Acute and chronic respiratory failure with hypercapnia |
| J9690 | Respiratory failure, unspecified, unspecified whether with hypoxia or hypercapnia |
| J9691 | Respiratory failure, unspecified with hypoxia |
| J9692 | Respiratory failure, unspecified with hypercapnia |

68.    The possible root causes are myriad, and may include poor circulation, neuromuscular disease, chronic bronchitis, COPD, obesity or drug use, an obstructing object, or an injury to the brain or spinal cord.  The signs and symptoms are bluish skin, shortness of breath, labored breathing and feeling unable to get enough air.  The patient may also become very sleepy, lose consciousness, be confused, or have arrhythmia.  After listening to the patient's heartbeat and lungs, a pulse oximetry test, an arterial blood gas test from a blood draw, and a chest x-ray can together help determine a proper diagnosis.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 92

69.     Respiratory failure is distinguishable from conditions that have similar symptoms.  Elderly patients, for example, frequently breathe shallowly during sleep. Chronic conditions such as structural and neuromuscular issues can lead to slow decline in breathing quality.  Also, elderly patients who have recently undergone surgery may experience symptoms that are similar to those of respiratory failure. Though they may necessitate mechanical oxygenation assistance, it is unlikely that these conditions are sufficient for an acute respiratory failure diagnosis.

70.     As shown in Figure 9, Providence coded at a significantly higher rate of respiratory failure than other hospitals.  From 2011 through June 2017, across the relevant codes, Providence coded respiratory failure at 1.49 times the rate at other hospitals, using it on 27.91 percent of claims, versus 18.72 percent at other hospitals.

**Figure 9. Rate of Respiratory Failure by Year for Providence Versus Other Hospitals.**
This figure shows the rate of respiratory failure at Providence and at other hospitals from 2011 through June 2017, when added to the suspicious principal diagnosis codes listed in Table 5 below.



Miller Barondess, llp
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

SECOND AMENDED COMPLAINT

ADDENDUM 93

1
2

**(i)**      <u>Specific Patterns of Fraud with Respiratory Failure</u>

3
4
5
6
7
8

71.     The following table provides a list of the principal diagnosis codes used by Providence to upcode with respiratory failure.  Relator identified 28 principal diagnosis codes in conjunction with which Providence coded respiratory failure at a rate at least two times and/or three percentage points higher than the nationwide average.  Only patterns that were statistically significant at the 99.9% level, meaning virtually impossible to be due to chance, are included.

9
10

**Table 5. Patterns Used by Providence to Upcode with Respiratory Failure.**
The following table lists the principal diagnosis categories in which Providence excessively upcodes with respiratory failure. One principal diagnosis category with fewer than 11 fraudulent claims at Providence has been omitted from the table.

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Other Hospitals | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Congestive Heart Failure; Nonhypertensive | 21.89% | 33.53% | 153% | 2,358 |
| Pneumonia; Organism Unspecified | 18.91% | 26.45% | 140% | 976 |
| Obstructive Chronic Bronchitis | 17.71% | 26.14% | 148% | 709 |
| Aspiration Pneumonitis; Food/vomitus | 27.15% | 36.33% | 134% | 524 |
| Hypertensive Heart and/or Renal Disease | 18.22% | 26.50% | 145% | 469 |
| Pulmonary Heart Disease | 16.72% | 25.10% | 150% | 331 |
| Congestive Heart Failure | 10.84% | 18.91% | 174% | 200 |
| Influenza | 17.54% | 28.23% | 161% | 194 |
| Chronic Obstructive Asthma with Acute Exacerbation | 11.56% | 22.06% | 191% | 139 |
| Other Bacterial Pneumonia | 30.74% | 38.93% | 127% | 136 |
| Pleurisy; Pleural Effusion | 14.06% | 20.99% | 149% | 105 |
| Other Pneumonia | 22.35% | 34.31% | 154% | 85 |
| Epilepsy | 7.69% | 10.89% | 142% | 77 |
| Other and Unspecified Viral Infection | 4.34% | 15.98% | 369% | 74 |
| Other and Unspecified Lower Respiratory Disease | 23.61% | 32.74% | 139% | 61 |
| Staphylococcal Septicemia | 21.80% | 25.01% | 115% | 60 |
| Cancer of Head and Neck | 14.22% | 29.43% | 207% | 51 |
| Fracture of Ribs; Closed | 5.68% | 10.62% | 187% | 43 |
| Postinflammatory Pulmonary Fibrosis | 26.57% | 35.53% | 134% | 38 |
| Non-Hodgkin's Lymphoma | 6.83% | 10.41% | 152% | 33 |
| Crushing Injury or Internal Injury | 11.85% | 16.45% | 139% | 32 |
| Other Chronic Pulmonary Disease | 12.16% | 24.52% | 202% | 32 |
| Lung Disease Due to External Agents | 30.75% | 53.19% | 173% | 32 |
| Cardiac Arrest and Ventricular Fibrillation | 37.95% | 47.25% | 124% | 29 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**SECOND AMENDED COMPLAINT**

**ADDENDUM 94**

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Providence | Providence Rate Relative to Other Hospitals | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Leukemias | 7.52% | 12.45% | 166% | 27 |
| Allergic Reactions | 8.81% | 14.83% | 168% | 16 |
| Other Infectious and Parasitic Diseases | 6.80% | 13.84% | 203% | 16 |

72.    Figure 10 shows the extent of the fraud at Providence hospitals.  The figure shows the rate of respiratory failure for claims in the above principal diagnosis categories.  Providence had 9 of the top 250 hospitals based on respiratory failure usage rate for the above principal diagnosis categories.  The probability of Providence randomly having 9 of its hospitals in the top 250 hospitals is less than 1 in 30 thousand.

**Figure 10. Rate of Respiratory Failure by Hospital.**
The following figure plots every Provider with at least 100 claims in the above principal diagnosis code categories. 3,173 hospitals had at least 100 claims with the relevant principal diagnosis codes listed in Table 5. The hospitals are plotted along the x-axis in order of percentage of respiratory failure usage. The Providence hospitals are in red, while other hospitals are in blue.



| Non-Providence Hospitals | Providence

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000    LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 95

73.    Figure 11 below shows that Providence used a higher rate of respiratory failure not just in the few categories listed above, but across a large variety of principal diagnosis codes.  The red dots to the right of the 45-degree line indicate higher rates of respiratory failure at Providence versus the nationwide average.  This figure shows that Providence has a higher rate of respiratory failure for 230 out of 312 (73.72%) principal diagnosis categories.  In other words, the extent to which Providence excessively upcoded respiratory failure on the categories listed in Table 5 above was not offset by relative downcoding in other principal diagnosis categories.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 96

**Figure 11. Rate of Respiratory Failure by Principal Diagnosis Code at Providence Versus Other Hospitals.**
For the 312 principal diagnoses with at least 100 claims at Providence (each represented by a dot), this figure compares the rate of respiratory failure at Providence versus non-Providence hospitals. Red dots to the right of the 45-degree line indicate Providence is coding respiratory failure at a rate higher than the nationwide average.



(ii)   **Specific False Claims with Respiratory Failure**

74.   The Relator has identified many specific false Medicare claims submitted by Providence involving respiratory failure.  The following table includes 50 examples.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**Table 6. False Claims made by Providence to Using Respiratory Failure.**
The following table presents specific examples of false claims made by Providence using respiratory failure. The first six digits of the beneficiary ID has been removed to make it harder to identify the individual patients.

| Beneficiary ID / Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 98

| Beneficiary ID / Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| Beneficiary ID / Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| Beneficiary ID / Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

SECOND AMENDED COMPLAINT

ADDENDUM 101

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| Beneficiary ID / Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

ADDENDUM 102



| Beneficiary ID / Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

(c)   **Severe Malnutrition**

75.    The final Misstated MCC that Providence used to commit fraud at a higher rate was severe malnutrition.  There are three malnutrition codes, listed in Table 7, that are considered MCCs.  Severe malnutrition in the elderly is a disorder of extreme lack of nutrition involving the highest level of protein-energy malnutrition and protein-calorie malnutrition.  Another rare form, Kwashiorkor malnutrition, is common in Sub-Saharan Africa, and is unlikely to be present in the elderly in the United States.  Nutritional marasmus is caused by insufficient nutrients and is most common in children.  In the elderly, malnourishment can manifest for a variety of reasons including anorexia, dehydration and malabsorption.

ADDENDUM 103

**Table 7. List of Severe Malnutrition ICD-9 and ICD-10 Diagnosis Codes.**

| ICD-9 Diagnosis Code | Description |
|---|---|
| 260 | Kwashiorkor |
| 261 | Nutritional Marasmus |
| 262 | Other Severe Protein-Calorie Malnutrition |

| ICD-10 Diagnosis Code | Description |
|---|---|
| E40 | Kwashiorkor |
| E41 | Nutritional marasmus |
| E42 | Marasmic kwashiorkor |
| E43 | Unspecified severe protein-calorie malnutrition |

76.     Patients may initially present malnutrition signs to a healthcare provider, but the patient may simply be underweight (and may not need to be coded as malnutrition at all), or the condition may not be severe.  If so, other codes are available for malnutrition of a moderate degree (ICD-9 code 2630) and other protein-calorie malnutrition (ICD-9 code 2638).  Kwashiorkor malnutrition has been over diagnosed in the past and is now usually contra-indicated in American elderly.[11]  Additionally, interventions for malnutrition can often be used that supply calories and ameliorate the issue at a low cost, alleviating the need for tremendous resources associated with MCC codes.  Furthermore, certain emergency measures are now considered overused and often unhelpful.

77.     As shown in Figure 12, Providence coded a significantly higher rate of severe malnutrition than other hospitals.   From 2011 through June 2017, hospitals nationwide used severe malnutrition on 2.11 percent of claims, while Providence used it on 4.87 percent of claims—or 2.30 times as often.

---

[11] California Watch, *Prime Healthcare Reports Outsized Rates of Unusual Conditions*, *available at* https://goo.gl/k4gmgS; Dep't of Health and Human Servs., *Rex Hospital Incorrectly Billed Medicare Inpatient Claims with Kwashiorkor*, *available at* https://goo.gl/omTYij; HCPro, *News: OIG Fines Another Facility for Inappropriate Kwashiorkor Claims*, *available at* https://goo.gl/9nrAdU.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 104

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**Figure 12. Rate of Severe Malnutrition by Year for Providence Versus Other Hospitals.**
This figure shows the rate of severe malnutrition at Providence and at other hospitals from 2011 through June 2017, when added to the suspicious principal diagnosis codes listed in Table 8 below.



**(i)** **Specific Patterns of Fraud with Severe Malnutrition**

78.     The following table provides a list of the principal diagnosis codes used by Providence to upcode with severe malnutrition.  Relator identified 28 principal diagnosis codes in conjunction with which Providence coded severe malnutrition at a rate at least two times and/or at three percentage points higher than the nationwide average.  Only patterns that were statistically significant at the 99.9% level, meaning virtually impossible to be due to chance, are included.

**Table 8. Patterns Used by Providence to Upcode with Severe Malnutrition.**
The following table lists the principal diagnosis categories in which Providence excessively upcodes with severe malnutrition. 2 principal diagnosis categories with fewer than 11 fraudulent claims at Providence have been omitted from the table.

| Principal Diagnosis Code | % with MCC Code in Other Hospitals | % with MCC Code at Providence | Providence Rate Relative to Other Hospitals | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Obstructive Chronic Bronchitis | 0.96% | 2.19% | 228% | 103 |
| Other Secondary Malignancy | 6.76% | 11.71% | 173% | 81 |
| Hypovolemia | 3.57% | 6.77% | 189% | 77 |

ADDENDUM 105

| Principal Diagnosis Code | % with MCC Code in Other Hospitals | % with MCC Code at Providence | Providence Rate Relative to Other Hospitals | Num. of Fraud Claims at Providence |
|---|---|---|---|---|
| Cancer of Pancreas | 7.98% | 14.98% | 188% | 69 |
| Other Disorders of Stomach and Duodenum | 3.80% | 6.98% | 184% | 52 |
| Chemotherapy | 1.64% | 3.77% | 230% | 50 |
| Other Nervous System Symptoms and Disorders | 2.02% | 5.25% | 259% | 48 |
| Cancer of Stomach | 9.28% | 16.43% | 177% | 35 |
| Non-Hodgkin's Lymphoma | 5.20% | 8.98% | 173% | 35 |
| Diabetes with Ketoacidosis or Uncontrolled Diabetes | 1.43% | 3.21% | 225% | 32 |
| Aplastic Anemia | 4.30% | 9.71% | 226% | 31 |
| Epilepsy | 1.05% | 2.33% | 222% | 31 |
| Nausea and Vomiting | 2.67% | 6.51% | 244% | 30 |
| Hypopotassemia | 4.21% | 10.35% | 246% | 26 |
| Abdominal Pain | 1.26% | 3.04% | 242% | 25 |
| Cancer of Head and Neck | 9.75% | 16.82% | 173% | 24 |
| Empyema and Pneumothorax | 5.70% | 9.12% | 160% | 23 |
| Paralytic Ileus | 3.21% | 6.24% | 194% | 22 |
| Secondary Malignancy of Liver | 6.19% | 10.50% | 170% | 21 |
| Influenza | 1.05% | 2.09% | 200% | 19 |
| Noninfectious Gastroenteritis | 1.35% | 2.72% | 202% | 19 |
| Poisoning by Other Medications and Drugs | 1.21% | 2.52% | 208% | 17 |
| Diabetes with Neurological Manifestations | 1.27% | 2.60% | 205% | 15 |
| Constipation | 1.90% | 3.85% | 202% | 15 |
| Duodenal Ulcer | 4.60% | 10.37% | 225% | 14 |
| Iron Deficiency Anemia | 1.49% | 3.28% | 220% | 13 |

79.    The following figure shows just how drastic some of these patterns are when individual hospitals are analyzed, and demonstrate Providence's widespread abuse.  As shown in Figure 13, Providence hospitals are consistently among the highest based on rate of severe malnutrition.  Specifically, Providence had 12 of the top 250 hospitals with the highest rate of severe malnutrition.  The probability of this occurring due to random chance is less than 1 in 25 million.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 106

**Figure 13. Rate of Severe Malnutrition by Hospital.**
The following figure plots every Provider with at least 100 claims in the above principal diagnosis code categories. 3,104 hospitals had at least 100 claims for the relevant patterns listed in Table 8. The hospitals are plotted along the x-axis in order of highest percentage of severe malnutrition usage.



80.     Figure 14 below shows that Providence used a higher rate of severe malnutrition not just in the few categories listed above, but across a large variety of principal diagnosis codes.  The red dots to the right of the 45-degree line indicate higher rates of encephalopathy at Providence versus the nationwide average.  This figure shows that Providence has a higher rate of encephalopathy for 267 out of 312 (85.58%) principal diagnosis categories.  In other words, the extent to which Providence excessively upcoded encephalopathy on the categories listed in Table 8 above was not offset by relative downcoding in other principal diagnosis categories.

**Figure 14. Rate of Severe Malnutrition by Principal Diagnosis Code at Providence Versus Other Hospitals.**
For the 312 principal diagnoses with at least 100 claims at Providence (each represented by a dot), this figure compares the rate of severe malnutrition at Providence versus non-Providence hospitals. Red dots to the right of the 45-degree line indicate Providence is coding severe malnutrition at a rate higher than the nationwide average.



### (ii)    Specific False Claims with Severe Malnutrition

81.     The Relator has identified many specific false Medicare claims submitted by Providence involving severe malnutrition.  The following table includes 25 examples.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**Table 9. False Claims Made by Providence Using Severe Malnutrition.**
The following table presents specific examples of false claims made by Providence using severe malnutrition. The first six digits of the beneficiary ID has been removed to make it harder to identify the individual patients.

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ▓ | ▓ | ▬ | ▓ | ▓ | ▓ | ▓ | ▬ |
| ▓ | ▓ | ▬ | ▓ | ▓ | | ▓ | ▬ |
| ▓ | ▓ | ▬ | ▓ | ▓ | ▓ | | ▬ |
| ▓ | ▓ | ▬ | ▓ | | | ▓ | ▬ |
| ▓ | ▓ | ▬ | ▓ | ▓ | ▓ | ▓ | ▬ |
| ▓ | ▓ | ▬ | ▓ | | | | |
| ▓ | ▓ | ▬ | ▓ | | | ▓ | |
| ▓ | ▓ | ▬ | ▓ | ▓ | ▓ | ▓ | ▬ |
| ▓ | ▓ | ▬ | ▓ | ▓ | ▓ | ▓ | ▬ |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 109

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400



ADDENDUM 110



2.   **Alternative Hypotheses for Excessive Rates of Misstated MCCs Do Not Stand and Confirm that Providence Fraudulently Billed Medicare**

82.   To further demonstrate the Defendants' fraud and determine responsibility for the excessively high rates of Misstated MCCs, Relator has analyzed whether the statistically aberrant rates of Misstated MCCs described above could be attributed to a variety of other factors.  First, Relator ran a fixed effect linear regression model to control for a variety of possible explanations for MCCs, including patient characteristics and county demographic data.  Second, Relator analyzed the change in coding practices that occurred at St. Joseph Health after its merger with Providence.  Third, Relator considered whether the patient's attending physician is responsible for excessive Misstated MCCs by analyzing a subset of claims where Providence and other hospitals shared a common physician.  Fourth,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Relator analyzed a subset of claims where Providence and other hospitals shared common patients.  Finally, Relator analyzed the upcoding rate for Providence and other hospitals in the same metropolitan statistical area ("**MSA**") to determine whether the excessive rates of Misstated MCCs is due to regional differences.  As discussed further below, these analyses prove that the excessive rates of Misstated MCCs can be directly attributed to the Defendants' fraudulent activity as opposed to external factors, indicating that the fraud was known by the system and was intentional.

    (a)    **Patient Characteristics and Demographics Do Not Explain the Excessive Rates of Misstated MCCs at Providence**

83.     The Relator developed a proprietary linear regression model to control for the possibility that there are certain patient characteristics which might indicate a higher likelihood a patient would have a MCC, allowing Relator to isolate and calculate the specific impact Defendants had on the abuse of a Misstated MCC code after controlling for other characteristics.  These characteristics include basic patient characteristics, such as the age, gender, and race, as well as characteristics relating to the patient's inpatient stay, including principal diagnosis, length of stay, and discharge status.  Relator also used county-level demographic data, such as unemployment rate, percent of population without a high school diploma, median income, and the rural-urban continuum codes from the Department of Agriculture as control variables.[12]  These county demographic variables provided Relator with a proxy for the income levels, education levels, and access to care available to each patient.  Regression analysis is well established and has been used to pinpoint actors

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

---

[12] The Rural-Urban Continuum Codes measure whether each county is in a metro or non-metro area and reflect the overall size of the metropolitan area.

ADDENDUM 112

1  behind misreporting in financial and economic contexts.[13]  Relator's regression

2  analysis analyzed millions of claims and thousands of possible fraudulent patterns to

3  calculate the total fraud committed by Providence with the assistance of JATA.

4        84.    In this section, Relator employs three different regression analysis

5  methodologies, each of which demonstrate how Defendant billed for the Misstated

6  MCCs at fraudulently excessive rates.  First, Relator uses a principal diagnosis bin-

7  based fixed effect linear regression model to calculate the excessive Misstated

8  MCCs in each principal diagnosis category.  Second, Relator runs a fixed effect

9  linear regression across all claims.  Third, Relator calculates the residual for each

10  system and hospital to determine the unexplained rate of Misstated MCCs across all

11  systems and then across all hospitals.

**(i)      Principal Diagnosis Bin-Based Fixed Effect
Linear Regression**

14        85.    First, Relator continued with the principal diagnosis bin approach by

15  running separate regressions for each principal diagnosis category.  This approach

16  provides a number of benefits.  First, it allows for non-linear relationships so that the

17  effect of each of the control variables can vary between principal diagnosis codes.

18  For example, the impact length of stay has on the likelihood of an MCC might vary

19  from one principal diagnosis code to another.  Second, it allows for the specific

20  quantification of the defendants' impact on MCC rates for claims within each

21  principal diagnosis category.

22        86.    Lastly, Relator included a fixed effect control variable for Providence

23  to the regression model, which represents the incremental amount of Misstated

[13] Tomasz Piskorski, Amit Seru, and James Witkin, *Asset Quality Misrepresentation by Financial Intermediaries: Evidence from the RMBS Market*, The Journal of Finance, Vol. 70.6 (2015), at 2635–2678; Griffin, John M., and Gonzalo Maturana, *Who Facilitated Misreporting in Securitized Loans?*, Review of Financial Studies, Vol. 29.2 (2016), at 384–419.

1  MCCs at Providence beyond what could be explained by other variables.  Equation

2  1 shows the fixed effect linear regression model used by Relator.

3  **Equation 1. Relator's Fixed Effect Linear Regression Model.**
The following equation presents the fixed effect linear regression model used by Relator. The variable of

4  interest is $\beta_1$, which is the coefficient for Providence. Panel A provides the equation, and Panel B explains
the variables included in the model. The $i$ refers to a specific claim and $j$ refers to the potential options for

5  the categorical variables.

6  *Panel A: Fixed Effect Regression Model*

7  $$MCC_i \quad = \quad \beta_0 + \beta_1.Providence_i + \sum_{j=2}^{6} \beta_{2j}.Age_{ij} + \sum_{j=2}^{7} \beta_{3j}.Race_{ij} + \beta_4.Male_i + \beta_5.\log LOS_i$$

8

9  $$+ \sum_{j=2}^{3} \beta_{6j}.Discharge_{ij} + \sum_{j=2}^{4} \beta_{7j}.Season_{ij} + \sum_{j=2}^{9} \beta_{8j}.RUCC_{ij} + \beta_9.Pov_i + \beta_{10}.Unemp_i$$

10  $$+ \beta_{11}.Income_i + \varepsilon_i$$

11  *Panel B: Explanation of Regression Variables*

12

| Variable | Description |
|---|---|
| $\beta_0$ | Intercept |
| $MCC_i$ | Whether the claim included a MCC |
| $Providence_i$ | Whether the patient was treated at Providence |
| $Age_{ij}$ | Patient's age on the claim (6 age groups) |
| $Race_{ij}$ | Patient's race on the claim (7 race categories) |
| $Male_i$ | Patient's gender |
| $LOS_i$ | The patient's log length of stay at the hospital for claim $i$ |
| $Discharge_i$ | The patient's discharge status |
| $Season_{ij}$ | Season control variable for the claim (Winter, Spring, Summer, Fall) |
| $RUCC_{ij}$ | Patient's rural urban continuum code based on the county |
| $Pov_i$ | County poverty rate in 2014 |
| $Unemp_i$ | County unemployment rate in 2014 |
| $Income_i$ | County log median income in 2014 |
| $\varepsilon_i$ | Error term |

22      87.     By controlling for these characteristics, the regression model allowed

23  Relator to isolate the impact that being treated at a Providence hospital would have

24  on a patient's expected likelihood of being diagnosed with one of the Misstated

25  MCCs.  For example, given two patients with fracture of neck of femur, with the

26  same age and gender, from the same county, admitted during the same season, and

27  with the same length of stay, the patient treated at Providence would be 208.57%

28  times more likely to be diagnosed with encephalopathy.  Figure 15 shows the results

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    of each regression run for each principal diagnosis bin.

2        88.    The results for encephalopathy are shown in Panel A.  Each bar

3    represents the marginal effect of Providence on the MCC rate relative to other

4    hospitals within each principal diagnosis bin.  As can be seen in Panel A for

5    encephalopathy, the coefficients for each principle diagnosis bin are all above 100%

6    which indicates that encephalopathy rates are higher at Providence, even after

7    controlling for other characteristics.  Statistical significance of a coefficient that is

8    less than one in a thousand is in orange, while if the rate is even more rare at one in

9    a million or less it is in pink, and if the probability that the coefficient could happen

10   by chance is even lower at less than one in a hundred million then the bar is in red.

11   As can be seen in Panel A of the Figure 15, 69.3% of the bars have a probability of

12   being due to chance of less than 1 in 100 million.  Notably, none of the 215 patterns

13   have a significance level less than 1 in 1 thousand.

14       89.    Respiratory failure is shown in Panel B, and severe malnutrition is

15   shown in Panel C.  For respiratory failure, 64.3% of the 28 patterns are significant at

16   less than 1 in 100 million, and all but 1 have a significance of at least 1 in 1

17   thousand.[14]  For severe malnutrition, 46.4% of the 28 patterns are significant at less

18   than 1 in 100 million, and all 28 are significant at less than 1 in 1,000.  There are

19   fewer bars for respiratory failure and severe malnutrition because there are fewer

20   relevant patterns in which Providence's coding of Misstated MCCs was deemed

21   excessive.  This evidence demonstrates the excessive coding of Misstated MCCs at

22   Providence, even after controlling for other characteristics.

---

27   [14] Even the principal diagnosis code that was not statistically significant at less than

28   1 in 1,000 was still significant at a 95% confidence level.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**Figure 15. Regression-Adjusted Usage of Encephalopathy, Respiratory Failure, and Severe Malnutrition at Providence Relative to Non-Providence Hospitals for Each Principle Diagnosis Bin.** Relator used principal diagnosis bin-based fixed effect linear regressions to analyze approximately 48.5 million claims at Providence and other hospitals. The results for each principal diagnosis bin are presented in the following figure. The vertical lines represent Providence's marginal effect on the rate of Misstated MCCs relative to the rate at other hospitals nationwide, where values above 100% indicate excessive MCC upcoding. The statistical significance is denoted by the coloring described in the legend. All but 1 pattern was statistically significant (for respiratory failure) at less than 1% chance the difference is random, and most were significant at a probability of less than 1 in 100 million.

*Panel A: Encephalopathy Regression Results by Principal Diagnosis Bin*



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Case No. 2:17-cv-01694-PSG-SS

SECOND AMENDED COMPLAINT

ADDENDUM 116

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

*Panel B: Respiratory Failure Regression Results by Principal Diagnosis Bin*



*Panel C: Severe Malnutrition Regression Results by Principal Diagnosis Bin*

(ii)     **Aggregate Fixed Effect Regression Model**

90.     Second, Relator also ran a regression to calculate the cumulative effect of Providence's rate of Misstated MCCs across all claims in the relevant patterns. The same regression described in Equation 1 is used for this analysis, except Relator

1  runs one regression for all of the principal diagnosis codes in each MCC and adds a

2  control variable for the inpatient principal diagnosis category. This length of stay

3  variable is interacted with the principal diagnosis code to account for variation in the

4  expected length of stay given a principal diagnosis code.

5      91.    As shown in Table 10, after controlling for other factors, the

6  Providence coefficient for the Misstated MCCs is 0.0808. This means that 8.08

7  percent of Providence claims are coded with one of the Misstated MCCs when they

8  would not have been coded as such at another hospital. Given the baseline usage

9  rate of the Misstated MCCs at other hospitals is 10.05 percent, Providence's

10 calculated rate of Misstated MCCs is 18.13 percent. In other words, <u>Providence's</u>

11 <u>usage rate of the Misstated MCCs is 180.40% that of other hospitals</u>, even after

12 controlling for patient, medical and demographic characteristics. This result is

13 statistically significant with more than 99.9999 percent confidence—*i.e.*, almost

14 certainly not random.

15     92.    Not surprisingly, the individual coefficients for encephalopathy,

16 respiratory failure, and severe malnutrition are also large in magnitude.

17 Providence's usage rate for encephalopathy was 208.57% of the rate at other

18 hospitals, respiratory failure was 154.68%, and severe malnutrition was 223.92%.[15]

19

20

21

22

----

23 [15] For robustness analysis, Relator also considered the possibility that certain
surgical procedure codes or admission sources (such as being admitted from the

24 emergency room) might explain the higher rates of Misstated MCCs at Providence.
Relator ran the fixed-effect regression analysis while also including controls for

25 surgical procedures and admission source. With these coefficients, Providence's rate

26 of Misstated MCCs were 179.01% relative to other non-Providence hospitals.
Similarly, Providence's usage rate for encephalopathy was 207.43% of the rate at

27 other hospitals, respiratory failure was 149.83%, and severe malnutrition was

28 217.80%.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**Table 10. Results of Fixed Effect Linear Regression Model.**
Relator used the fixed effect linear regression discussed in Equation 1, except instead of running individual regressions for each principal diagnosis bin, Relator ran one regression for each Misstated MCC and included a control variable for the individual principal diagnosis categories. Relator analyzed approximately 48.5 million claims at Providence and other hospitals. The results are presented in the following table. The coefficient is listed first, and the p-value is in parenthesis, which represents the statistical significance of the coefficient. A lower p-value means the result is more statistically significant. Coefficients were not included for categorical variables. The Providence coefficient is added to the rate at other hospitals to get the expected Providence rate of excessive Misstated MCCs after including controls.

|  | Any of the MCCs | Encephalopathy | Respiratory Failure | Severe Malnutrition |
|---|---|---|---|---|
| Poverty Rate | -0.0014 (<0.0001) | -0.0009 (<0.0001) | -0.0029 (<0.0001) | 0.0003 (<0.0001) |
| Unemployment Rate | -0.0001 (0.0926) | 0.0006 (<0.0001) | -0.0026 (<0.0001) | -0.0006 (<0.0001) |
| Log (Median Income) | -0.0493 (<0.0001) | -0.029 (<0.0001) | -0.1042 (<0.0001) | -0.0016 (0.0027) |
| No High School Diploma Rate | -0.0007 (<0.0001) | -0.0004 (<0.0001) | -0.0017 (<0.0001) | -0.0003 (<0.0001) |
| Intercept | 0.4855 (0.0597) | 0.2906 (0.1648) | 1.263 (0.0008) | -0.0378 (0.7892) |
| Principal Diagnosis | Yes | Yes | Yes | Yes |
| Principal Diagnosis X Log(LOS[16]) | Yes | Yes | Yes | Yes |
| Season Control Variables | Yes | Yes | Yes | Yes |
| Age Control Variables | Yes | Yes | Yes | Yes |
| Sex Control Variables | Yes | Yes | Yes | Yes |
| Race Control Variables | Yes | Yes | Yes | Yes |
| Discharge Status Control | Yes | Yes | Yes | Yes |
| Principal Diagnosis Category | Yes | Yes | Yes | Yes |
| RUCC Control | Yes | Yes | Yes | Yes |
| Providence Coefficient | 0.0808 (<0.0001) | 0.0659 (<0.0001) | 0.1017 (<0.0001) | 0.0259 (<0.0001) |
| Nationwide Average | 10.05% | 6.07% | 18.60% | 2.09% |
| **Providence Rate** | **18.13%** | **12.66%** | **28.77%** | **4.68%** |
| **Providence Rate Relative to Other Hospitals** | **180.40%** | **208.57%** | **154.68%** | **223.92%** |

### (iii)   System and Hospital Residuals for Misstated MCCs

93.     Third, another regression method to analyze Providence's coding of

---

[16] LOS stands for length of stay.

SECOND AMENDED COMPLAINT

**ADDENDUM 119**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   Misstated MCCs is to calculate the unexplained rate of Misstated MCCs.  To

2   calculate this, Relator ran the regression without the fixed effect control variable for

3   Providence and calculated the probability each claim would have one of the

4   Misstated MCCs.  For each hospital system and for each individual hospital, the

5   average difference between the predicted probability (or rate) of Misstated MCCs is

6   compared to the actual rate of Misstated MCCs, which is referred to as a residual.

7   The difference between these two values represents the rate of Misstated MCCs that

8   is caused by each hospital system, after controlling for the other characteristics

9   previously described.

10          94.     Panel A of Figure 16 shows the average residual for rate of Misstated

11  MCCs for each hospital system, with Providence plotted in red.  Providence's

12  average unexplained rate of Misstated MCCs by this measure is 7.97%, making it

13  21st highest out of 729 hospital systems with at least 10,000 claims in the relevant

14  patterns.  Panel B of Figure 16 shows the average residual of each individual

15  hospital, with Providence plotted in red.  The average residual of the Providence

16  hospitals ranges from 2.20% to 15.95%, and 20 of 23 Providence hospitals are in the

17  top 90th percentile of hospitals.

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

ADDENDUM 120

**Figure 16. Average Unexplained Misstated MCC Rate for Each Hospital System and Individual Hospital.**

The following figure plots the results of the regression from Equation 1, except one regression was run for all principal diagnosis bins, the control variable for principal diagnosis code was added to the regression, and the Providence fixed effect variable was removed. All other variables included are the same. The graph in Panel A is based on 729 hospital systems with at least 10,000 claims from 2011 through June 2017. The graph in Panel B is based on 3240 hospitals with at least 500 claims during the same time period. The small vertical lines off of the points represent the confidence interval for each system's unexplained use of Misstated MCCs.

*Panel A: Average Residual of Any of the Misstated MCCs for Hospital Systems*



*Panel B: Average Residual of Any of the Misstated MCCs for Individual Hospitals*



ADDENDUM 121

95.     Taken together, Relator's regression analysis shows that the excessive rates of Misstated MCCs was not due to unique patient demographic or health characteristics but were specifically caused by the Defendants' practices.

**(b)     Providence's Merger with St. Joseph Health Demonstrates that Providence Management Causes the Excessive MCC Rates**

96.     Additionally, Providence's responsibility for the fraudulent conduct can be proven using causal methods, which are often used in economics, finance and other applications to assess the extent to which an effect can be identified to be caused, and not merely associated with, other explanatory variables.[17]  A common causal econometric methodology is the use of discontinuity analysis, which can be applied when there is a sudden change in the effect that one wishes to examine.[18]  A discontinuity analysis is able to determine whether there is a statistically significant sudden increase in the rate of a Misstated MCC due to an additional explanatory variable, such as a change in ownership or management of a hospital.  One common causal econometric methodology that can be used to prove Providence's fraudulent conduct is known as a Regression of Discontinuity Design (RDD), which can be applied to examine a sudden change in an effect in order to infer a causal relationship.[19]  In this case, Providence's causal influence on the rate of coding

---

[17] "The notion of ceteris paribus—that is, holding all other (relevant) factors fixed—is at the crux of establishing a causal relationship," Jeffrey Wooldrige, "Econometric Analysis of Cross Section and Panel Data" at 3, The MIT Press, second edition, 2010.

[18] *See* Angrist, J.D. and Pischke, J.S., "Mostly Harmless Econometrics: An Empiricist's Companion" at 251–253, Princeton University Press, 2009.

[19] "CITS… produce[s] causally valid inferences about program impacts." M. Somers, P. Zhu, R. Jacob, H. Bloom, *The Validity and Precision of the Comparative Interrupted Time Series Design and the Difference-in-Difference Design in Educational Evaluation*, MDRC Working Paper on Research Methodology, 2013.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   Misstated MCCs can be estimated by comparing a hospital's average coding rate

2   before it was acquired by Providence to the rate after it was acquired by Providence.

3         97.    Providence entered into its first agreement to merge with St. Joseph

4   Health ("St. Joseph") on September 30, 2015, and the merger was closed on January

5   1, 2016.  Upon completion of the merger, the governance structure of both hospital

6   systems changed as they were brought under one unified board of directors.  Relator

7   analyzed the rate of Misstated MCCs before the merger and after its close to

8   calculate the impact Providence has on the rate of Misstated MCCs at St. Joseph.

9   As shown in Figure 17, St. Joseph's rate of Misstated MCCs was lower than

10  Providence and slightly above the nation-wide average before the merger.

11  However, shortly after the merger was closed, the rate of Misstated MCCs jumps up

12  and is consistent with the rate at Providence hospitals.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**Figure 17. Rate of Misstated MCC Coding by Month for Providence, St. Joseph, and Other Hospitals.** This figure shows the rate at which St. Joseph, Providence, and other hospitals are using one of the three Misstated MCCs over time. St. Joseph is in red, Providence is in black, and other hospitals are in blue dots. The dashed line on the left is the date at which the first contract was signed and the dashed line on the right is when the agreement went into effect. St. Joseph's rate of the three Misstated MCCs begins to increase when the contract is signed with Providence and eventually has a similar usage rate after the agreement takes effect.



98.     Relator conducted further analysis to show that the change in the rate of Misstated MCCs was caused by the merger as opposed to other factors, such as changing patient health and demographics, by using Regression of Discontinuity Design (RDD). The red line in Figure 18 shows the results of the RDD analysis. Here, Relator can quantify the jump that occurred immediately upon the merger. Specifically, Relator calculates that the rate of Misstated MCCs jumped 3.92% as a result of the merger. This calculation is based on the RDD formula shown in Equation 2 below, which allowed Relator to compare the differences in coding behavior at St. Joseph before and after the merger with Providence, *relative to the rate of Misstated MCCs nationwide*. The advantage of this approach is that it

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   allows Relator to identify and quantify not only the short-term effect of management

2   change on the immediate increase in coding misstated codes but also the long-term

3   effect in the post-contract trend of upcoding.  This result was statistically significant

4   with a probability the jump is due to random chance being less than 1 in 100

5   million.

6

7   **Figure 18. RDD of Misstated MCCs for Providence's Merger with St. Joseph.**

8   This figure shows the rate at which St. Joseph and other hospitals are using one of the three Misstated MCCs over time. St. Joseph is in red and other hospitals are in blue dots. The dashed line on the left is the

9   date at which the first contract was signed and the dashed line on the right is when the agreement went into effect. St. Joseph's rate of the three Misstated MCCs begins to increase when the contract is signed with Providence and is higher than the nationwide average after the agreement takes effect.



23      99.     The increase in the rate of Misstated MCCs at St. Joseph upon merger

24   with Providence raises further questions. Namely, is it possible the increase in

25   Misstated MCCs is due to other less fraudulent factors?  For example, is it possible

26   St. Joseph simply started taking on sicker patients that are more likely to have these

27   Misstated MCCs?  Relator considered these possible explanations by re-running the

28   RDD described above, but by controlling for a variety of patient characteristics

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    which might explain the jump in Misstated MCCs.  Specifically, Relator controlled

2    for all of the characteristics discussed in Equation 1.  This analysis allowed Relator

3    to isolate the marginal increase in the coding of Misstated MCCs that can be

4    attributed directly to the merger, beyond what might be explained by changes in the

5    underlying patient population.  After controlling for potential alternative

6    explanations, Relator calculated that the merger led to a 3.99% increase in the rate

7    of Misstated MCCs coded on claims at St. Joseph.  This result is highly significant

8    as the probability the increase is due to random chance is less than 1 in 100 million.

9        100.   Relator's calculation is based on the RDD formula shown in Equation 2

10    below, which allowed Relator to compare the differences in coding behavior at St.

11    Joseph before and after the merger with Providence, relative to the rate of Misstated

12    MCCs nationwide.  The advantage of this approach is that it allows Relator to

13    identify and quantify not only the short-term effect of management change on the

14    immediate increase in coding misstated codes but also the long-term effect in the

15    post-contract trend of excessive rates of Misstated MCCs.

16

17    **Equation 2. Relator's Regression of Discontinuity Design Model.**
The following equation presents the RDD model used by relator. The aggregate short-run and long-run

18    effect of management change on the level of upcoding at St. Joseph is estimated through the variable

19    $\beta_{St.Joseph}$. This represents the jump in the rate of Misstated MCC upcoding while assuming that the coding rate will continue to increase at the same rate as the nation-wide average (as represented by the slope of the lines in Figure 18). The variable $\beta_{St.Joseph}$ represents the controls listed in Equation 1. When used without

20    controls, the outcome variable $MCC_{it}$ represents the monthly average MCC rate at St. Joseph in month t.

21    When run with controls, the outcome variable $MCC_{it}$ represents the binary value for existence or non-existence of MCC in a specific claim i at St. Joseph in month t.

22 $MCC_t = \beta_0 + \beta_{St.Joseph}.Contract_t + (\hat{\beta}_{Bench}^{Pre}).(t - t_c) + (\hat{\beta}_{Bench}^{Post} - \hat{\beta}_{Bench}^{Pre}).Contract_t.(t - t_c) +$

23 $\beta_{Controls} + \varepsilon_t$

24            **(c)**    <u>**Attending Physicians are not Responsible for the**</u>

25                  <u>**Excessively High Rates of Misstated MCCs**</u>

26        101.   Relator also considered whether the excessively high rates of Misstated

27    MCCs could be caused by the preferences or treatment decisions of physicians who

28    work with patients at Providence hospitals, as opposed to some system-wide

decision or corporate directive.  Could it be that the physicians who attended to Providence's patients were more disposed to identifying encephalopathy, respiratory failure, and severe malnutrition than other physicians?  To address this question, Relator analyzed a subset of claims involving doctors that treated patients at both Providence and other hospitals.

102.   As shown in Figure 19, when considering only claims for doctors with at least 10 claims at both Providence and other hospitals, the use of encephalopathy, respiratory failure, and malnutrition was still significantly higher at Providence. Between 2011 and 2017, doctors used one of the Misstated MCCs on 18.51 percent of claims while treating patients at Providence, but on only 14.02 percent of claims when treating patients at other hospitals.

**Figure 19. Rate of Any of The Misstated MCCs at Providence Relative to Other Hospitals for Claims with Common Doctors.**
The following figure includes any claims for common doctors between Providence and another hospital from 2011 through 2017. Even with doctors that work at both hospitals, Providence used one of the Misstated MCCs on 18.51 percent of claims, while those same doctors only use one of the Misstated MCCs on 14.02 percent of claims while at other hospitals. The analysis is based on 1,010 doctors with 10 claims at Providence and 10 claims at a non-Providence hospital. In total these doctors had more than 126,000 claims at Providence and more than 202,000 claims at other hospitals.



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 127

103.   Figure 20 shows that this tendency to have higher rates of Misstated MCCs at Providence is not limited to a few doctors but is systemic.  In the following figure, doctors with the same rate of Misstated MCCs at Providence and other hospitals would be clustered along the 45-degree line, whereas doctors with higher rates of Misstated MCCs at Providence would be to the right of the 45-degree line. As shown in Figure 20,  696 out of 1,010 doctors (or 68.9 percent) had a higher coding rate of the Misstated MCCs at Providence than at other hospitals.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

SECOND AMENDED COMPLAINT

ADDENDUM 128

1

**Figure 20. Rate of Any of the Misstated MCCs for Common Doctors at Providence Versus Other Hospitals.**

2
3
4

The following figure compares the rate of Misstated MCCs for common doctors at Providence versus other hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have higher upcoding at Providence and the blue circles represent doctors who have higher upcoding at other non-Providence hospitals. Only doctors with at least 11 claims at Providence and 11 claims at a non-Providence hospital are represented in this figure.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24

● Lower at Providence   ● Higher at Providence

25
26
27
28

104.   This result still holds when looking just at the individual Misstated MCCs.  For doctors that serve at both Providence and other hospitals, the rate of encephalopathy at Providence was 13.68 percent, while the rate of encephalopathy

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

at other hospitals was 9.86 percent, as demonstrated in Figure 21 below.  This suggests that a doctor was 138.7% as likely to diagnosis a patient with encephalopathy when treating the patient at Providence than when the same doctor was treating a patient at another hospital.[20]

**Figure 21. Rate of Encephalopathy at Providence Relative to Other Hospitals for Claims with Common Doctors.**
The following figure includes any claims for doctors with at least 10 claims at Providence and 10 claims at a non-Providence hospital from 2011 through June 2017. Even with doctors that work at both hospitals, Providence had an encephalopathy rate of 13.68 percent, while those same doctors only use encephalopathy on 9.86 percent of claims while at other hospitals. The analysis is based on 964 doctors with 10 claims at Providence and 10 claims at a non-Providence hospital. In total these doctors had more than 122,000 claims at Providence and more than 196,000 claims at other hospitals.



105.   Figure 22 shows that a significant number of doctors had higher rates of encephalopathy when they worked at Providence than at other hospitals. Specifically, it shows that 669 doctors out of 964 doctors considered (or 69.4 percent) used a higher rate at Providence.

[20] This general trend still holds when looking at any doctor that has at least one claim at Providence and one claim at a non-Providence hospital.  Specifically, the rate of encephalopathy is 12.59% at Providence and 9.39% at other hospitals.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

77

SECOND AMENDED COMPLAINT

ADDENDUM 130

1

**Figure 22. Rate of Encephalopathy for Common Doctors at Providence Versus Other Hospitals.**
The following figure compares the rate of encephalopathy for common doctors at Providence versus other
2   hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have higher
upcoding of encephalopathy at Providence and the blue circles represent doctors who have higher upcoding
3   at other non-Providence hospitals. Only doctors with at least 11 claims at Providence and 11 claims at a
non-Providence hospital are represented in this figure.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



25       106.   For doctors that serve at both hospitals, the rate of respiratory failure at

26   Providence was 30.92 percent, while the rate of respiratory failure at other hospitals

27   was 22.88 percent, as demonstrated in Figure 23 below.  This suggests that a doctor

28   was 135.1% as likely to diagnosis a patient with respiratory failure when treating the

Miller Barondess, llp
ATTORNEYS AT LAW
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

1  patient at Providence than when the same doctor was treating a patient at a non-

2  Providence hospital.[21]

3

4  **Figure 23. Rate of Respiratory Failure at Providence Relative to Other Hospitals for Claims with Common Doctors.**

5  The following figure includes any claims for doctors with at least 10 claims at Providence and 10 claims at

6  a non-Providence hospital from 2011 through June 2017. Even with doctors that work at both hospitals,
Providence had a respiratory failure rate of 30.92 percent, while those same doctors only use respiratory

7  failure on 22.88 percent of claims while at other hospitals. The analysis is based on 357 doctors with 10
claims at Providence and 10 claims at a non-Providence hospital. In total these doctors had more than

8  18,000 claims at Providence and more than 28,000 claims at other hospitals.



20      107.   Figure 24 shows that a significant number of doctors had higher rates

21  of respiratory failure when they worked at Providence than at other hospitals.

22  Specifically, the figure shows that 232 doctors out of 357 doctors considered (or

23  65.0 percent) used a higher rate at Providence.

24

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [21] This general trend still holds when looking at any doctor that has at least one
claim at Providence and one claim at a non-Providence hospital. Specifically, the

28  rate of respiratory failure is 29.62% at Providence and 22.39% at other hospitals.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**Figure 24. Rate of Respiratory Failure for Common Doctors at Providence Versus Other Hospitals.**
The following figure compares the rate of respiratory failure for common doctors at Providence versus other hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have higher upcoding of respiratory failure at Providence and the blue circles represent doctors who have higher upcoding at other non-Providence hospitals. Only doctors with at least 11 claims at Providence and 11 claims at a non-Providence hospital are represented in this figure.



108.   For doctors that serve at both hospitals, the rate of severe malnutrition at Providence was 6.59 percent, while the rate of severe malnutrition at other hospitals was 3.13 percent, as demonstrated in Figure 25 below.  This indicates that a doctor was 210.5% as likely to diagnosis a patient with severe malnutrition when

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

treating the patient at Providence than when the same doctor was treating a patient at a non-Providence hospital.[22]

**Figure 25. Rate of Severe Malnutrition at Providence Relative to Other Hospitals for Claims with Common Doctors.**
The following figure includes any claims for doctors with at least 10 claims at Providence and 10 claims at a non-Providence hospital from 2011 through June 2017. Even with doctors that work at both hospitals, Providence had a severe malnutrition rate of 6.59 percent, while those same doctors only use severe malnutrition on 3.13 percent of claims while at other hospitals. The analysis is based on 155 doctors with 10 claims at Providence and 10 claims at a non-Providence hospital. In total these doctors had 5,751 claims at Providence and 7,708 claims at other hospitals.



109.   Figure 26 shows that a significant number of doctors had higher rates of severe malnutrition when they worked at Providence than at other hospitals.  For example, the Figure shows that 107 doctors out of 155 doctors considered (or 69.0 percent) used a higher rate at Providence.

---

[22] This general trend still holds when looking at any doctor that has at least one claim at Providence and one claim at a non-Providence hospital.  Specifically, the rate of severe malnutrition is 6.86% at Providence and 3.76% at other hospitals.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

**Figure 26. Rate of Severe Malnutrition for Common Doctors at Providence Versus Other Hospitals.**
The following figure compares the rate of severe malnutrition for common doctors at Providence versus
other hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have
higher upcoding of severe malnutrition at Providence and the blue circles represent doctors who have higher
upcoding at other non-Providence hospitals. Only doctors with at least 11 claims at Providence and 11
claims at a non-Providence hospital are represented in this figure.



25    110.   Relator identified the specific doctors that had higher rates of

26  encephalopathy at Providence relative to other hospitals.  Table 11 below lists the

27  ten doctors with the largest disparity in encephalopathy upcoding when they worked

28  at Providence compared to when they worked at other hospitals.  Each of these

ADDENDUM 135

1  doctors coded encephalopathy at a rate at least two times higher when at

2  Providence.[23]

3

4  **Table 11. Doctors with the Most Excessive Rates of Encephalopathy at Providence Versus Other Hospitals.**

5  This table shows the difference in encephalopathy usage for the ten doctors with the highest difference in encephalopathy usage at Providence versus other hospitals. The first seven digits of the physician ID have

6  been hidden by Relator, so the specific physician will not be identifiable directly from this complaint. Only doctors with at least 11 claims at Providence and 11 claims at a non-Providence hospital are represented in

7  this table.

| Physician ID | Percent of Claims w/ Encephalopathy at Providence | Percent of Claims w/ Encephalopathy at Other Hospitals | Difference in Percent | Providence Rate Relative to Other Hospitals | P-Value |
|---|---|---|---|---|---|
| XXXXXXX716 | 45.45% | 6.80% | 38.66% | 669% | <0.0001 |
| XXXXXXX841 | 36.67% | 0.00% | 36.67% | Infinity | <0.0001 |
| XXXXXXX331 | 39.39% | 4.62% | 34.77% | 852% | <0.0001 |
| XXXXXXX865 | 57.14% | 24.63% | 32.51% | 232% | 0.0094 |
| XXXXXXX338 | 50.00% | 18.75% | 31.25% | 267% | <0.0001 |
| XXXXXXX970 | 30.23% | 2.46% | 27.77% | 1,229% | <0.0001 |
| XXXXXXX412 | 27.59% | 0.00% | 27.59% | Infinity | <0.0001 |
| XXXXXXX210 | 26.32% | 0.00% | 26.32% | Infinity | <0.0001 |
| XXXXXXX764 | 30.43% | 4.17% | 26.27% | 730% | <0.0001 |
| XXXXXXX536 | 27.78% | 2.20% | 25.58% | 1,264% | <0.0001 |

17      111.   Relator also re-ran the regression analysis for the subset of claims that

18  have at least 10 claims by a doctor at Providence and a non-Providence hospital.[24]

19  Relator used the same controls from the regression described in section 0.IV.D.2(a)

20  above, along with a control for the doctor that treated the patient.  This allows

21  Relator to quantify the marginal impact a patient being treated at Providence has on

23  ─────────────

24  [23] Relator only included the results for encephalopathy because it has the most claims among the Misstated MCCs, providing the most thorough comparison.

25

26  [24] More than 326,000 claims for Encephalopathy and more than 333,000 claims for Misstated MCC were included in this regression.  Encephalopathy was the only specific Misstated MCC in which Relator ran the regression because it had the largest number of claims.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

a patient being diagnosed with a Misstated MCC, beyond what can be explained by patient characteristics, demographic characteristics, as well as the individual doctor. As shown in Table 12, Providence's rate of any MCC, after these controls, was 135.87 percent of the rate at other hospitals, and Providence's encephalopathy rate was 138.86 percent of the rate at other hospitals.[25]

---

[25] Relator also considered whether the behavior of these doctors is due to their tendency to provide certain procedures at certain hospitals.  To do this, Relator also added control variables for the procedure codes and the admission status to identify admissions as from the emergency room, elective, or urgent.  For any Misstated MCC and for Encephalopathy, the coefficients were 0.0479 and 0.0374 respectively. In other words, Providence's rate of Misstated MCC was 134.71 percent of other hospitals, and rate of encephalopathy was 138.76 percent of other hospitals among claims with common doctors.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**Table 12. Fixed Effect Regression Results After Controlling for Attending Physician.**
Relator used a linear regression to analyze approximately 333,000 claims with common doctors at Providence and other hospitals. The results are presented in the following table. The coefficient is listed first, and the p-value is in parenthesis, which represents the statistical significance of the coefficient. A lower p-value means the result is more statistically significant. Coefficients were not included for categorical variables. Results were only included

| | Any Misstated MCC | Encephalopathy |
|---|---|---|
| Poverty Rate | -0.0019 (<0.0001) | -0.0006 (0.0554) |
| Unemployment Rate | 0.0035 (<0.0001) | 0.0034 (<0.0001) |
| Log (Median Income) | -0.0419 (<0.0001) | -0.0178 (0.0094) |
| No High School Diploma Rate | 0.0004 (0.0079) | 0.0005 (0.0003) |
| Intercept | 0.4019 (<0.0001) | 0.1163 (0.1612) |
| Principal Diagnosis | Yes | Yes |
| Principal Diagnosis X Log (LOS[26]) | Yes | Yes |
| Season Control Variables | Yes | Yes |
| Age Control Variables | Yes | Yes |
| Sex Control Variables | Yes | Yes |
| Race Control Variables | Yes | Yes |
| Discharge Status Group Controls | Yes | Yes |
| Principal Diagnosis Category Controls | Yes | Yes |
| RUCC Control | Yes | Yes |
| Doctor Control Variables | Yes | Yes |
| Providence Dummy Variable | 0.0495 (<0.0001) | 0.0375 (<0.0001) |
| Nationwide Average | 13.80% | 9.65% |
| **Providence Rate** | **18.75%** | **13.40%** |
| **Providence Relative Effect** | **135.87%** | **138.86%** |

112.   This analysis shows that the fraudulent upcoding was not caused by tendencies of certain doctors that treat patients at Providence but was instead caused by coding practices that were implemented specifically at Providence with the assistance of JATA.

---

[26] LOS stands for length of stay.

ADDENDUM 138

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

(d)   **Unique Characteristics of Providence's Patients Do Not Account for the Excessively High Rates of Misstated MCCs**

113.   Relator also considered whether it might be something else about Providence patients that would justify the higher rates of MCCs.  Although Relator already considered a variety of patient characteristics in the fixed effect linear regression model, Relator also analyzed the subset of patients that attended both Providence and at least one other hospital between 2011 and 2017, and then compared the rate of the MCC codes used when these patients were treated at Providence versus when treated at other hospitals.

114.   As shown in Figure 27, when only analyzing patients that have at least 5 claims at both Providence and other hospitals, the use of encephalopathy, respiratory failure, and malnutrition was still significantly higher at Providence. Between 2011 and 2017, patients were diagnosed with one of the Misstated MCCs on 23.83 percent of claims while being at Providence, but on only 16.41 percent of claims at other hospitals.  A patient being treated at Providence was coded with the Misstated MCCs at a rate that was 145.22% the rate at other non-Providence hospitals.

SECOND AMENDED COMPLAINT

ADDENDUM 139

**Figure 27. Rate of Any of The Misstated MCCs at Providence Relative to Other Hospitals for Claims with Common Patients.**

The following figure includes any claims for common patients between Providence and a non-Providence hospital from 2011 through June 2017. Even with patients at both hospitals, Providence used one of the Misstated MCCs on 23.83 percent of claims, while those same patients only have one of the Misstated MCCs on 16.41 percent of claims while at other hospitals. The analysis is based on 850 patients with 5 claims at Providence and 5 claims at a non-Providence hospital. In total these patients had 7,078 claims at Providence and 8,536 claims at other hospitals.



115.   For patients that were treated at both hospitals, the rate of encephalopathy at Providence was 19.81 percent, while the rate of encephalopathy at other hospitals was 13.79 percent, as demonstrated in Figure 28 below. This suggests that a patient was 143.7% as likely to be diagnosed with encephalopathy when being treated at Providence than when the same patient was treated at a non-Providence hospital.[27, 28]

---

[27] This general trend still holds when looking at any patient that has at least one claim at Providence and one claim at a non-Providence hospital. Specifically, the rate of encephalopathy is 34.95% at Providence and 22.87% at other hospitals.

[28] These results were not presented for respiratory failure and severe malnutrition due to the small number of common patients available for analysis.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**Figure 28. Rate of Encephalopathy at Providence Relative to Other Hospitals for Claims with Common Patients.**

The following figure includes any claims for patients with at least 5 claims at Providence and 5 claims at a non-Providence hospital from 2011 through June 2017. Even with patients at both hospitals, Providence had an encephalopathy rate of 19.81 percent, while those same patients only have encephalopathy on 13.79 percent of claims while at other hospitals. The analysis is based on 671 patients with 5 claims at Providence and 5 claims at a non-Providence hospital. In total these patients had 5,584 claims at Providence and 6,615 claims at other hospitals.



116.    As this analysis shows, even when looking at the same patient, Providence has significantly higher rates of Misstated MCCs than other hospitals. This shows that the upcoding behavior cannot be attributable to patient differences.

## (e)    Regional Factors do not Explain Why Providence Has Higher Rates of MCCs

117.    Relator also considered whether the high rates of MCC upcoding at Providence hospitals might be due to the region in which Providence's hospitals are located.  Although Relator has already controlled for a variety of county demographic factors through the regression, Relator now compares the rate of Misstated MCCs between Providence and other hospitals within each MSA.[29]

118.    As shown in Table 13, Providence had a significantly higher rate of

_____

[29] Relator only included MSAs in which there were at least 2 comparison hospitals.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  Misstated MCCs in each MSA.  As shown in Table 14, Providence had a higher rate

2  of encephalopathy than other hospitals in each MSA, with some having

3  encephalopathy rates that are nearly twice as high as the rate at other hospitals in the

4  same MSA.

5       119.   Table 15 shows the rate of respiratory failure was higher for Providence

6  hospitals in all but one MSA.  Table 16 shows that Providence had a higher rate of

7  severe malnutrition in all but one MSA, with Providence hospitals in the Spokane-

8  Spokane Valley MSA coding severe malnutrition at more than four times the rate as

9  other hospitals in the MSA.

10

11  **Table 13. Rate of Misstated MCCs at Providence Versus Other Hospitals in the Same MSA.**

12  This table compares the rate of Misstated MCCs in the suspicious patterns for the hospitals in Providence and other hospitals within the same geographic region.

| MSA | Providence MCC Rate | Nationwide MCC Rate | Providence Rate Relative to Other Hospitals | Probability |
|---|---|---|---|---|
| Los Angeles-Long Beach-Anaheim, CA | 17.11% | 12.68% | 135% | <0.0001 |
| Medford, OR | 16.04% | 12.18% | 132% | <0.0001 |
| Portland-Vancouver-Hillsboro, OR-WA | 17.07% | 13.21% | 129% | <0.0001 |
| Seattle-Tacoma-Bellevue, WA | 16.59% | 11.84% | 140% | <0.0001 |
| Spokane-Spokane Valley, WA | 18.63% | 10.91% | 171% | <0.0001 |

**Table 14. Rate of Encephalopathy at Providence Versus Other Hospitals in the Same MSA.**
This table compares the encephalopathy rate of the suspicious patterns for the hospitals in Providence and other hospitals within the same geographic region.

| MSA | Providence Encephalopathy Rate | Nationwide Encephalopathy Rate | Providence Rate Relative to Other Hospitals | Probability |
|---|---|---|---|---|
| Los Angeles-Long Beach-Anaheim, CA | 12.38% | 9.56% | 130% | <0.0001 |
| Medford, OR | 11.65% | 9.32% | 125% | <0.0001 |
| Portland-Vancouver-Hillsboro, OR-WA | 13.12% | 8.77% | 150% | <0.0001 |
| Seattle-Tacoma-Bellevue, WA | 13.03% | 7.73% | 169% | <0.0001 |
| Spokane-Spokane Valley, WA | 13.64% | 6.99% | 195% | <0.0001 |

**Table 15. Rate of Respiratory Failure at Providence Versus Other Hospitals in the Same MSA.**
This table compares the respiratory failure rate of the suspicious patterns for the Providence hospitals and other hospitals within the same geographic region.

| MSA | Providence Respiratory Failure Rate | Nationwide Respiratory Failure Rate | Providence Rate Relative to Other Hospitals | Probability |
|---|---|---|---|---|
| Los Angeles-Long Beach-Anaheim, CA | 26.53% | 17.06% | 156% | <0.0001 |
| Medford, OR | 23.82% | 16.10% | 148% | <0.0001 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| MSA | Providence Respiratory Failure Rate | Nationwide Respiratory Failure Rate | Providence Rate Relative to Other Hospitals | Probability |
|---|---|---|---|---|
| Portland-Vancouver-Hillsboro, OR-WA | 24.51% | 25.36% | 97% | 0.9766 |
| Seattle-Tacoma-Bellevue, WA | 27.21% | 23.25% | 117% | <0.0001 |
| Spokane-Spokane Valley, WA | 33.01% | 18.88% | 175% | <0.0001 |

**Table 16. Rate of Severe Malnutrition at Providence Versus Other Hospitals in the Same MSA.**
This table compares the severe malnutrition rate of the suspicious patterns for the Providence hospitals other hospitals within the same geographic region.

| MSA | Providence Malnutrition Rate | Nationwide Malnutrition Rate | Providence Rate Relative to Other Hospitals | P-value |
|---|---|---|---|---|
| Los Angeles-Long Beach-Anaheim, CA | 4.29% | 2.31% | 186% | <0.0001 |
| Medford, OR | 2.15% | 3.33% | 64% | 0.9954 |
| Portland-Vancouver-Hillsboro, OR-WA | 5.57% | 3.49% | 160% | <0.0001 |
| Seattle-Tacoma-Bellevue, WA | 3.54% | 2.11% | 168% | <0.0001 |
| Spokane-Spokane Valley, WA | 7.75% | 1.89% | 409% | <0.0001 |

120.   Based on this regional analysis, Relator has shown that the fraudulent upcoding cannot be attributed to geographic factors unique to Providence.

### (f)   Summary of What Caused Excessively High Rates of Misstated MCCs at Providence

121.   Relator has considered a number of potential explanations above to determine what phenomenon or which actor could be responsible for the excessively high rates of MCC upcoding at Providence.  The high rates of the Misstated MCCs are highly significant across 226 principal diagnosis categories and 23 Providence hospitals, indicating the excessive rates are not driven by particular patient medical characteristics nor unique to only a few Providence hospitals.  Relator eliminated the possibility that the excessive Misstated MCCs might be justified by or due to patient or demographic characteristics, attending physician preferences, or regional differences.  Based on this, Relator has demonstrated that the only plausible explanation as to the cause of the excessive rates of Misstated MCCs is that Providence, in consultation with JATA, has implemented practices to maximize the amount of revenue it can receive from Medicare by fraudulently upcoding, i.e., adding unsubstantiated MCC secondary diagnosis codes to its claims.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 143

### 3.   **Economic Damages**

122.   Relator employed a robust and conservative methodology to quantify the economic damages caused by the Defendants' fraudulent coding Encephalopathy, Respiratory Failure, and Severe Malnutrition.  Relator has limited this complaint to only the most extreme cases—*i.e.*, where Providence used a Misstated MCC code at two times the rate of comparable hospitals or at least three percentage points of its entire patient population higher than other hospitals.  Additionally, only principal diagnosis bins where the excessive MCC usage rate was statistically significant at a 99.9% rate—or almost certainly not random—were considered fraudulent.  The following describes Relator's methodology for aggregating the total dollar value of the fraud committed by Providence.

123.   Relator employs a principal diagnosis bin-based regression methodology for calculating damages.  For each principal diagnosis bin, Relator re-ran its fixed effect linear regression model discussed in Equation 1 but changed the dependent variable to represent the additional revenue due to upcoding.  For each claim, Relator calculated the difference in the DRG weight between claims with Misstated MCCs and claims without Misstated MCCs.[30]  Relator then multiplied this difference in weights by the average base rate from 2011 through 2017, which was $6,417.57.[31]  Within the regression for each principal diagnosis bin, the fixed

---

[30] For claims that could have been a complication or without complication, Relator took a weighted average of DRG weights for the two DRGs and weighted by Providence's historical distribution of severity levels. Approximately 16.3% of claims were without complication and 83.7% of claims were with complication. If Providence also upcodes using CC secondary diagnoses, the damage calculation would be even more conservative.

[31] The labor portion of the base rate was further adjusted by the average wage index among Providence hospitals from 2011 through 2017, and the capital portion was adjusted by the geographic adjustment factor over the same time period, to get a more accurate calculation of additional revenue.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    effect for Providence represents the additional revenue Providence receives for the

2    Misstated MCCs after controlling for possible differences in patient, regional, and

3    claim characteristics.  Relator further only attributed damages for the regression

4    results that were statistically significant at a 99.9% level, meaning there is a less in 1

5    in 1,000 chance the additional revenue received is due to random chance.

6        124.   Based on this bin-based regression, Relator's analysis shows that

7    Providence received an additional $188.1 million in false claims across all principal

8    diagnosis categories due to fraudulent MCC upcoding.  Table 17 demonstrates the

9    additional revenue Providence received for false claims across each of the Misstated

10   MCCs.

11

12   **Table 17. Damages by Specific Misstated MCCs.**

13

| Secondary MCC | Dollar Value of Fraud |
|---|---|
| Encephalopathy | $153,556,713 |
| Respiratory Failure | $29,012,041 |
| Severe Malnutrition | $5,519,441 |
| **Total** | **$188,088,196** |

17       125.   Relator's bin-based regression methodology represents a conservative

18   approach for a variety of reasons.  First, Relator only included principal diagnosis

19   bins where Providence used the Misstated MCC code at two times the rate of

20   comparable hospitals or at least three percentage points of the entire patient

21   population higher.  A lower threshold could have been used and would result in

22   higher damages.  Additionally, Relator only considered claim groupings where there

23   was less than a one-in-a-thousand chance that the difference in major complication

24   rate at Providence versus other hospitals was due to random causes.

25       126.   Second, Relator's damage calculation is based on comparing

26   Providence to all other inpatient hospitals.  To the extent other hospitals are

27   engaging in the same fraudulent activity, it would make Providence's actions seem

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ADDENDUM 145

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

relatively normal and would thus lead to a lower damage estimate.[32]  Indeed it is overly conservative to compare Providence's fraudulent behavior to other hospitals also engaging in the same fraudulent activity; therefore Relator also undertook a different methodology to identify hospital systems based on the amount of fraudulent activity they have among all of their claims.  If Relator were to remove from comparison the top third of hospital systems identified to have excessively billed Medicare and re-run the bin-based regression analysis, damages would total $237.5 million.

127.   Relator's consideration of other possible explanations, such as claim characteristics, patient characteristics, and doctor practices, demonstrates that the excessive coding of Misstated MCCs is due to system-wide practices in place at Providence, with the assistance of JATA.  Additionally, the extremely high levels of statistical significance of the analyses across a variety of comparative settings indicate a nearly impossible probability that the practices are due to random chance. Relator's damages estimate of $188.1 million due to Providence's fraudulent upcoding is conservative and the estimate is robust when controlling for a variety of factors.

128.   Through its proprietary research and analysis, Relator also uncovered that JATA's encouragement and enabling of hospitals to code at excessive rates of the Misstated MCCs extends beyond Providence hospitals.  While the full extent of JATA's fraudulent activity is likely much larger, Relator estimates that JATA assisted other hospitals to submit falsely inflated claims to Medicare of at least $337.0 million.

---

[32] As an example, the comparison set of hospitals includes Prime Healthcare Services, Inc., which is currently being sued by the US Department of Justice under the False Claims Act.  *See* https://goo.gl/rZcES9.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# CAUSES OF ACTION

## COUNT ONE

### Violation of the False Claims Act arising from
### falsifying patient diagnoses, complications, and comorbidities
### (Against All Defendants)

129.   Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

130.   As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare by falsifying material information concerning patient diagnoses, complications, and comorbidities; and by failing to report and return overpayments from Medicare.

131.   Defendants, by the conduct set forth herein, have violated:

a.   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

b.   31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

c.   31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

132.   Through use of Defendant JATA's services as described above, the Providence Defendants also conspired with JATA to defraud the federal government, in violation of 31 U.S.C. § 3729(a)(1)(C), by knowingly and systematically falsifying claims allowed or paid by the government.

ADDENDUM 147

133.   The United States has suffered and continues to suffer damages as a direct proximate result of Defendants' false or fraudulent claims.

**COUNT TWO**

**Violations of the Federal False Claims Act arising from the Defendants' violations of the Anti-Kickback Statute**

**(Against All Defendants)**

134.   Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

135.   By offering JATA financial incentives for upcoding and making all or some of JATA's compensation contingent on increases in Providence's Medicare revenue, Providence provided JATA with incentives to arrange for or recommend services for which payment may be made in whole or in part under Medicare, in violation of the 42 U.S.C. § 1320a-7b(b) (the "**Anti-Kickback Statute**").

136.   Defendant JATA's consulting engagement with Providence is not protected under the existing "safe harbor" provisions of the Anti-Kickback Statute.

137.   As a material prerequisite to any recovery or reimbursement from Medicare, the Providence Defendants expressly or impliedly certified their compliance with the Anti-Kickback Statute.

138.   The Providence Defendants violated the False Claims Act by submitting Medicare claims knowing or recklessly disregarding that the Providence Defendants were ineligible for reimbursement on such claims because of their violations of the Anti-Kickback Statute.

139.   Defendant JATA violated the False Claims Act by causing Medicare claims to be submitted by the Providence Defendants even though JATA knew or recklessly disregarded that the Providence Defendants were ineligible for the payments demanded because of their violations of the Anti-Kickback Statute.

140.   Each Medicare claim submitted by the Providence Defendants that was arranged or recommended by JATA is false and material because it is tainted by the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**ADDENDUM 148**

1    Defendants' violations of the Anti-Kickback Statute.

2        141.   Defendants conspired to defraud the federal government by getting

3 claims tainted by the Defendants' kickback scheme allowed or paid by the

4 government in violation of the False Claims Act.

5        142.   The United States has suffered and continues to suffer damages as a

6 direct proximate result of Defendants' violations of the Anti-Kickback Statute and

7 resulting violations of the False Claims Act.

8 **PRAYER FOR RELIEF**

9        WHEREFORE, Relator prays for relief and judgment, as follows:

10    (a)      Defendants pay an amount equal to three times the amount of damages

11            the United States has suffered because of Defendants' actions, plus a

12            civil penalty against Defendants of not less than $10,957 and not more

13            than $21,916 for each violation of 31 U.S.C. § 3729;

14    (b)      Relator be awarded the maximum amount allowed pursuant to 31

15            U.S.C. § 3729(d);

16    (c)      Relator be awarded all costs of this action, including attorneys' fees,

17            expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

18    (d)      Relator and the United States be granted all such other relief as the

19            Court deems just and proper.

20 **JURY TRIAL DEMANDED**

21    Relator hereby demands a trial by jury.

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   DATED:  August 7, 2018          Respectfully submitted,

2

3                                   By:  /s/ Jason H. Tokoro
                                         Jason H. Tokoro
4                                        MILLER BARONDESS, LLP

5                                        P. Jason Collins
                                         Jeremy H. Wells
6                                        REID COLLINS & TSAI LLP

7                                        Attorneys for Plaintiff/Relator
8                                        INTEGRA MED ANALYTICS LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ADDENDUM 150**

P. Jason Collins (TX Bar No. 24040711)
jcollins@rctlegal.com
Jeremy H. Wells (TX Bar No. 24098805)
jwells@rctlegal.com
Scotty G. Arbuckle, III (TX Bar No. 24089969)
tarbuckle@rctlegal.com
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy., Suite C300
Austin, TX 78746
T: 512.647.6100
F: 512.647.6129

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* INTEGRA MED ANALYTICS LLC,<br><br>    Plaintiff,<br><br>v.<br><br>1.  BAYLOR SCOTT & WHITE HEALTH,<br>2.  BAYLOR UNIVERSITY MEDICAL CENTER – DALLAS,<br>3.  HILLCREST BAPTIST MEDICAL CENTER,<br>4.  SCOTT & WHITE HOSPITAL – ROUND ROCK,<br>5.  SCOTT & WHITE MEMORIAL HOSPITAL – TEMPLE<br><br>    Defendants. | Case No.: 17-CV-0886-DAE<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

ADDENDUM 151

# TABLE OF CONTENTS

I.      INTRODUCTION .......................................................................................... 1

II.     JURISDICTION AND VENUE .................................................................... 2

III.    PARTIES ...................................................................................................... 3

IV.     SUBSTANTIVE ALLEGATIONS ............................................................... 4

        A.      Overview of Medicare Reimbursement and Upcoding ......................... 4

        B.      Relator has uncovered a culture of non-compliance at Baylor, whose
                leadership actively encouraged doctors to apply unnecessary MCCs .................. 6

                1.      Baylor trained its doctors and CDI staff to upcode MCCs ......................... 7

                2.      Baylor pressured doctors to change their diagnoses ................................ 10

                3.      Baylor provided unnecessary treatment, which enabled it to code
                        MCCs ...................................................................................................... 17

        C.      Relator's Methodology ...................................................................... 19

        D.      Defendants' False Claims ................................................................... 21

                1.      The False Claims made by Baylor ......................................................... 21

                2.      Alternative Hypotheses for Excessive Rates of Misstated MCCs
                        Do Not Stand and Confirm that Baylor Fraudulently Billed
                        Medicare ................................................................................................ 55

                3.      Economic Damages ............................................................................... 84

V.      CAUSES OF ACTION ................................................................................ 86

VI.     PRAYER FOR RELIEF .............................................................................. 87

VII.    JURY TRIAL DEMANDED ....................................................................... 88

ADDENDUM 152

This is an action brought by Plaintiff/Relator Integra Med Analytics LLC ("**Relator**") on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, et seq. In support thereof, Relator alleges as follows:

## I.    INTRODUCTION

1.    Through a proprietary analysis of all claims submitted to Medicare nationwide since 2011, Relator uncovered that Baylor Scott & White Health and its affiliated hospitals (collectively, "**Baylor**" or the "**Baylor Defendants**") routinely used unwarranted Major Complication and Comorbidity secondary codes, which falsely inflated claims submitted to Medicare. A multi-faceted investigation of Baylor and its leadership—which included interviewing former employees, reviewing training and marketing materials, and extensive econometric analysis—confirmed that Baylor's false Medicare claims were not only intentional, but were part of a systematic effort by Baylor management to boost its Medicare revenue. Relator now brings this action to recover over $61.8 million paid by the United States as a result of Baylor's fraud.

2.    Baylor was created from the combination of two Texas healthcare systems, Baylor Health Care System and Scott & White Healthcare. Together, these organizations formed one of the nation's largest health systems, operating approximately 20 inpatient short-term acute care hospitals with inpatient Medicare claims throughout central and north Texas. Baylor operates this system through a number of wholly-owned and/or controlled entities, including the defendant facilities. Baylor received approximately $639 million in Medicare reimbursements for inpatient stays at its short term acute care facilities in fiscal year 2015, accounting for approximately half of its gross revenue.

3.    To establish amounts billed to Medicare for patient services, hospital systems like

ADDENDUM 153

Baylor must properly code such services according to preapproved standards.  Baylor's Code of Conduct publicly espouses lofty coding standards through which it vows to implement "controls to prevent, detect and correct actions that do not comply with applicable federal and state laws," and "to submit claims to government … that reflect truth and accuracy."[1] In reality, Baylor's own corporate leadership disregarded these standards and created a systemwide culture that promoted increasing Medicare billing without regard for accuracy. Baylor's efforts ranged from extensive training on how to spike Medicare revenue, to pushing doctors to change their original diagnoses in ways that would lead to unwarranted MCCs.

4.      In addition to identifying the Defendants' false claims through its proprietary analysis—and then confirming its findings through exhaustive investigation—Relator also performed extensive econometric analysis designed to eliminate conceivable innocent explanations. Thus, for instance, Relator's analysis rules out the possibility that the Defendants' inflated Medicare billings arise from an issue with the treating doctors or the type of patient that Baylor treats. Moreover, to be conservative, only the most extreme, statistically significant cases of upcoding have been identified by the Relator as fraudulent.

5.      In short, Relator has determined that Baylor has submitted more than $61.8 million in false claims for Medicare reimbursement over the past seven years.

## II.      JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

7.      This Court has personal jurisdiction over each named Defendant because, inter alia,

---

[1] Compliance with Billing and Coding Laws and Regulations, Baylor Scott & White Health Code of Conduct (2017), *available at* https://goo.gl/KKhSaq.

ADDENDUM 154

the Defendants transacted business in this District; reside in this District; engaged in wrongdoing in this District; and/or caused the submission of false or fraudulent claims in this District. Moreover, 31 U.S.C. § 3732(a) provides for nationwide service of process, which is an independent ground for personal jurisdiction.

8.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c). During the relevant time period, a substantial portion of the events complained of that gave rise to Plaintiff's claims occurred in this District in violation of 31 U.S.C. § 3729 and § 3730.

9.    There has been no public disclosure of the allegations herein. To the extent that there has been a public disclosure unknown to Relator, Relator is an "original source" under 31 U.S.C. § 3730(e)(4). Relator has direct and independent knowledge of the information on which the allegations are based and voluntarily provided the information to the Government before filing this qui tam action based on that information. *See* 31 U.S.C. § 3730(e)(4).

### III.    PARTIES

10.    Relator Integra Med Analytics LLC is a Texas limited liability company with its principal place of business in Austin, Texas.

11.    Relator is an associated company of Integra Research Group LLC, which specializes in using statistical analysis to uncover and prove fraud. Integra Research Group LLC's sister company, Integra REC LLC, has extensive experience using statistical analysis to detect and prove fraud, specifically in mortgage-backed securities and other financial markets. Integra REC LLC has successfully initiated numerous cases under the False Claims Act.

12.    Defendant Baylor Scott & White Health is a Texas corporation with its principal place of business located at 3500 Gaston Avenue, Dallas, TX 75246, and its registered agent listed as CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

ADDENDUM 155

13.     Defendant Baylor University Medical Center – Dallas is a Texas corporation with its principal place of business located at 3500 Gaston Avenue, Dallas, TX 75246, and its registered agent listed as CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

14.     Defendant Hillcrest Baptist Medical Center is a Texas corporation with its principal place of business located at 100 Hillcrest Medical Boulevard, Waco, TX 76712, and its registered agent listed as CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

15.     Defendant Scott & White Hospital – Round Rock is a Texas corporation with its principal place of business located at 300 University Boulevard, Round Rock, TX 78665, and its registered agent listed as CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

16.     Defendant Scott & White Memorial Hospital – Temple is a Texas corporation with its principal place of business located at 2401 South 31st Street, Temple, TX 76508, and its registered agent listed as CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Overview of Medicare Reimbursement and Upcoding

17.     Medicare makes payments to hospitals on a per-discharge basis, *i.e.*, one payment for each inpatient hospital stay. The payment is designed to cover the average cost of resources needed to treat each patient's needs. To account for the patient's needs, Medicare assigns each discharge to a diagnosis related group (a "**DRG**"), which groups patients with similar clinical problems that are expected to require similar amounts of hospital resources.[2] The DRG is the single most impactful factor in determining the average payment for a claim, which can be further adjusted by hospital-specific factors such as market conditions in the hospital's city, indirect

---

[2] *See* Medpac, *Hospital Acute Inpatient Services Payment System Payment Basics*, Oct. 2014.

ADDENDUM 156

medical education payments, and disproportionate share payments.

18.     The DRG is primarily determined by three types of codes from a Medicare claim: the principal diagnosis code, surgical procedure codes, and secondary diagnosis codes. The principal diagnosis code is defined as the "condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care."[3] Surgical procedure codes represent surgical procedures performed in an operating room setting at the hospital. Secondary diagnoses represent "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or the length of stay."[4]

19.     There are more than 330 base DRGs, and each base DRG can have up to three severity levels: (i) without Complication or Major Complication, (ii) with Complication, and (iii) with Major Complication.[5] The secondary diagnoses on the claim determine the severity level of a DRG. The Centers for Medicare and Medicaid Services (the "**CMS**") publishes a list of codes each year that, when added to a claim, result in the claim being considered a Complication or Comorbidity (a "**CC**") or Major Complication or Comorbidity (an "**MCC**"). Adding a CC secondary code to a claim can increase the value of the claim from anywhere between approximately $1,000 and $10,000. Adding an MCC secondary code can increase the value $1,000 to $25,000. Hospitals are thus incentivized to add unwarranted secondary diagnosis codes to Medicare reimbursement claims.

---

[3] *See* Centers for Disease Control, *ICD-9-CM Official Guidelines for Coding and Reporting*, Oct. 1, 2011 at 88, *available at* https://goo.gl/DC55Wx.

[4] *Id.* at 91.

[5] *See* Medpac, *Hospital Acute Inpatient Services Payment System Payment Basics*, Oct. 2014.

ADDENDUM 157

**B.      Relator has uncovered a culture of non-compliance at Baylor, whose leadership actively encouraged doctors to apply unnecessary MCCs**

20.      Like most hospital groups, Baylor has a clinical documentation improvement ("**CDI**") program. These programs are typically designed to promote the accurate documentation of a patient's diagnoses and treatments such that they can be properly coded for reimbursement. At Baylor, however, CDI efforts are primarily geared toward inflating the hospital system's Medicare revenue. Indeed, the former head of Baylor's CDI program in Central Texas, Anthony Matejicka, boasts that he "add[ed] consistently to top line revenue" and brought about "improvement" in Baylor's Case Mix Index ("**CMI**"), which is influenced by a hospital's CC and MCC rates. Matejicka also boasted about "raising Quality metrics" through "enhanced patient severity," which is likewise increased through coding higher CC and MCC rates.



21.     Matejicka effectively executed his multifaceted scheme to improve revenue and quality metrics by increasing the coding of MCCs (including personally training CDI specialists and doctors), disseminating tip sheets to guide doctors towards coding MCCs, and deploying a team of CDI specialists whose job was to persuade doctors to change their documentation to reflect higher severity of illness than warranted.

22.     Medical coders also received pressure from Baylor HIM (Health Information Management) leadership to upcode. After Matejicka left Baylor in January 2014, the rate of MCCs declined slightly. But medical coders then began to increasingly receive pressure directly from HIM leadership to code unethically. According to a former medical coder, the HIM department at Baylor issued directives to her coding supervisor to code a certain way, even if it was not appropriate. This coder overheard her supervisor saying "that's not right" during conversations with Baylor HIM management. The medical coder received instructions that her supervisor forwarded to her from Baylor management with directives to code in a specific way, and eventually quit because she could no longer continue to work in an environment where she "was continually getting directives to compromise her integrity." Analysis by Relator is consistent with this behavior, with rates of misstated MCCs identified by Relator decreasing after Matejicka's departure, then increasing in recent years corresponding to increasing pressure from Baylor's HIM team to code unethically.

### 1.     Baylor trained its doctors and CDI staff to upcode MCCs

23.     Under Matejicka, Baylor's employee training was singularly focused on coding for MCCs. A former Baylor CDI employee confirmed that Matejicka personally trained staff on key words to increase Medicare reimbursements and received a list of MCCs to focus on. Similarly, a former medical coder disclosed that Matejicka trained CDI employees to walk around with a list of MCCs to look for opportunities to assign MCCs as secondary diagnoses.

ADDENDUM 159

24.     Baylor also made clear to its doctors how important their coding efforts were to both the Defendants' and the doctors' bottom line and quality metrics. Matejicka even gave presentations specifically training doctors on why and how they should upcode. In an August 20, 2012 presentation titled "Fundamentals of Hospital Medicine: What No One Taught Us!," Matejicka encouraged doctors to use "magic words" to "provide triggers for reimbursement," leading to higher paying CCs and MCCs. These "magic words" included "encephalopathy" and "acute respiratory failure," two of the MCCs that Relator's analysis identified as being misused by Baylor. Matejicka encouraged doctors to use these words even if they might not be clinically appropriate, arguing that "Coding Language Trumps Clinical Terminology."



8

25.     Matejicka made sure to emphasize that following his guidelines for coding would increase not only Baylor's revenue but also doctors' salary. Indeed, his presentation flatly states, "Your hospital data will determine your income!" He then closes the presentation by asking them, "Do you want to 'see one more patient' or take one minute to improve your documentation ???," suggesting that using "magic words" would generate equivalent revenue to seeing an additional patient. This presentation also described an example where adding an MCC would both increase hospital reimbursement by $8,444.94 as well as improve pay for performance ("**P4P**") metrics for doctors, resulting in "SO MUCH WIN."

26.     Matejicka's program openly steered doctors away from non-MCC diagnoses toward specific, higher-paying MCCs. This effect is seen in a doctor tip sheet called "Teal Quickies,"[6] which provided guidance for doctors to clinically document in a way that maximizes Medicare revenue. For instance, in training doctors on how to document altered mental status (or "**AMS**"), Baylor encouraged doctors to diagnose encephalopathy or acute delirium, explaining that doing so would allow coders to increase the patient's severity of illness (or "**SOI**"). Baylor blithely added that "there are Other causes of AMS, too ☺."

---

[6] Teal is the color of Scott & White Healthcare's logo.

ADDENDUM 161

**TEAL quickies:**

Teals remind and educate you on the specificity of language that allows accurate coding submission. Why? The quality of codes submitted affect jointly the Quality ratings of the Attending Physician & the Hospital, and reimbursement. *If not Treating a dx* – it doesn't count for Quality metrics. **_Treatment is Any Medication, Investigation or Monitoring of the Diagnosis._**

**WORDS CMS LOVES:** **Possibly, Suspected, Probably, Likely;** **Acute or Chronic**: ACUTE = < 8 Weeks in ICD 9.  **FAILURE (NOT dysfunction)!**
**WORDS THAT ARE *NOT CODABLE*:** Dysfunction, PMHX of, **History** of! **Versus**,… Suspicious, Worrisome, Concerning for… Presumed… Consistent with… Treating for… Covering for… Suggestive of… Differential Diagnoses are…

**A** – **Anything that is a *Symptom*, include "due to ___"** ( Abd pain, HA, Chest Pain, AMS, Syncope,  Dizziness, ……)
**Accelerated HTN** > 160/95 & requires IV med to control -in ER & on Ward.
**AKI** *> .3* rise in Creatinine Acutely   Or  ARFailure: *> .5* mg rise acutely
**AMS** – Encephalopathy due to___; or Acute Delirium due to___.
*Encephalopathy = Global dysfunction in absence of structural Brain disease. Delirum =confusion + sympathetic hyperactivity. ("Stupor", "Confusion" do not add SOI).* There are Other causes of AMS, too. ☺

### 2.     Baylor pressured doctors to change their diagnoses

27.     Baylor did not stop pushing doctors after their original diagnoses. If, despite training from Matejicka, a doctor's initial diagnosis did not warrant a CC or MCC, Baylor would often send the doctor a "query" encouraging doctors to amend the assessment. Baylor's queries would ask doctors to "specify" their diagnoses, and would suggest either specific revenue-increasing CCs or MCCs or provide options listing several possible CCs and MCCs—often including conditions wholly unrelated to the patient's primary diagnosis.

28.     Relator has obtained "documentation clarification sheets" used by Baylor CDIs to query physicians for additional documentation. These sheets reveal a clear intent towards influencing doctors to code higher-paying CCs and MCCs. In the query sheet for altered mental status, doctors are asked to document the underlying cause and are only provided with options which could yield a CC or MCC. Of the 11 options listed, 5 can directly be coded as MCCs (metabolic encephalopathy, toxic encephalopathy, hypertensive encephalopathy, sepsis and CVA) and 3 can directly be coded as CCs (acute delirium, dementia, and seizure). The remaining 3 (medication effect, electrolyte abnormalities and dehydration) can be used with altered mental status to code for toxic or metabolic encephalopathy.

| Altered mental status is a SYMPTOM and not a diagnosis. Please document the possible or probable underlying etiology of this symptom. | | |
|---|---|---|
| **Can the diagnosis be further specified as:** | | |
| **"Altered mental status likely due to** _____ ". | | |
| Metabolic Encephalopathy | Acute Delirium | CVA |
| Toxic Encephalopathy | Dementia | Dehydration |
| Hypertensive Encephalopathy | Medication effect | Seizure |
| Sepsis | Electrolyte abnormalities | Unable to be determined |
| Other _____ | | |

Please remember to document in the Progress Notes and Discharge Summary, as this note is NOT part of the permanent medical record.  Please leave this note on the chart.

☐   I disagree, see my comments.

In responding to this query, please exercise your independent professional judgment. The fact that a question is asked does not imply that any particular answer is desired or expected. We greatly appreciate your clarification on this issue.

This is **NOT** part of the permanent record, however, **PLEASE LEAVE ON THE CHART**.
This is a **PRIVILEGED and CONFIDENTIAL** document, not to be copied or distributed.

*#3  Altered Mental Status*
*Rev. 3/2013*

29.     There are other common causes for altered mental status *that do not yield an CC or MCC* and are not included in the Scott & White documentation clarification sheet. For example, in a documentation tip card issued by the Department of Veterans Affairs, other, non-CC or non-

MCC, causes for altered mental status are listed such as "Alzheimer's Disease," "Lewy body dementia," or "Psychiatric Illness."

| Documentation Tip Card: Documenting Altered Mental Status | |
|---|---|
| Documenting an alteration in mental status is vague and may not accurately represent the underlying condition or suspected cause. For the continuity of care of our Veterans it is important to be as precise as possible. The three things to consider when documenting an alteration in mental status are: | |
| **Chronicity** | Acute, Chronic, Acute on Chronic, Other, or Unable to determine |
| **Nature:** | Dementia, Delirium, Psychosis, Obtundation, Other, or Unable to Determine. |
| **Underlying Cause:** | Alzheimer's Disease, Encephalopathy (indicate the type and underlying cause), Lewy body dementia, Acute stroke, Late effect of stroke, Transient Ischemic Attack (TIA), Generalized cerebral edema, Seizure disorder (indicate its nature and whether status epilepticus is present or if symptoms are intractable), Normal pressure hydrocephalus, Psychiatric Illness (specify type if possible), Other, or Unable to Determine |
| If you don't know the cause, indicate what you are working up or ruling out. | |

30.     A similar bias towards coding MCCs is found in the Scott & White documentation clarification sheet for "Diseases of the Respiratory System," an excerpt of which is found in the following figure. Even the name Baylor gave to the document, "#35 Respiratory Failure" indicates that CDIs used this sheet in order to get doctors to document respiratory failure as opposed to other non-CC or non-MCC respiratory diseases. The sheet specifically defines acute respiratory failure, an MCC, and not any other respiratory disease. All of the options listed except for "Hypoxemia" are CCs or MCCs, and even Hypoxemia is simply a symptom that may indicate the patient has one of the other respiratory diagnoses listed. Notably, the list leaves off a number of other respiratory system diagnoses which are not CCs or MCCs, including "Postinflammatory pulmonary fibrosis," "Other emphysema," and "Allergic rhinitis."

12

Acute respiratory failure is a condition characterized by inadequate exchange of oxygen and carbon dioxide by the lungs. The diagnosis is generally used when the arterial Pa $0_2$ falls below 60 mm Hg and/or the arterial Pa $C0_2$ rises above 50 mm Hg or pulse ox <89%. The use of artificial ventilation such as **BiPAP** would also qualify.

Other possible clinical situations that might have acute respiratory failure include:

| | | |
|---|---|---|
| Agitation | Tachypnea | COPD |
| Tachycardia | Confusion | Asthma |
| Clinical fatigue | Somnolence | Restrictive Lung Disease |

Conditions where chronic respiratory failure may be present include continuous $0_2$, CPAP, BiPAP, or ventilation through a tracheostomy at home.

**Can the diagnosis be further specified as:**

| | | |
|---|---|---|
| Acute respiratory failure -------------- | Hypoxic | Hypercapnic |
| Acute on chronic respiratory failure | | |
| Chronic respiratory failure | Acute Pulmonary Edema | |
| Hypoxemia | Chronic Pulmonary Edema | |
| Acute respiratory  distress – lower than normal $O_2$ sats, pt dyspneic but not meeting Acute Resp. Failure guidelines above. | | |
| Not Clinically Determined | Present on Admission | |
| Other | _____ | |

Please remember to document in the Progress Notes and Discharge Summary, as this note is NOT part of the permanent medical record.  Please leave this note on the chart.

☐    I disagree, see my comments.

In responding to this query, please exercise your independent professional judgment. The fact that a question is asked does not imply that any particular answer is desired or expected. We greatly appreciate your clarification on this issue.

This is **NOT** part of the permanent record, however, **PLEASE LEAVE ON THE CHART**.
This is a **PRIVILEGED and CONFIDENTIAL** document, not to be copied or distributed.

*#35  Respiratory Failure*
*Rev. 3/2013*

31.     In another example, the documentation tip sheet for comorbidities contains completely unrelated CC or MCC inducing diagnoses, ranging from peritonitis (a gastrointestinal disorder) to UTI (urinary tract infection). Moreover, none of the options on the tip sheet have related and are thus designed to lead doctors to choose certain diagnoses. For example, the sheet mentions "pleural effusion," which is a CC or MCC, but fails to suggest "pleurisy without effusion," which is neither a CC nor an MCC.

ADDENDUM 165

**Can the diagnosis be further specified as:**

| | | |
|---|---|---|
| Peritonitis | Atelectasis | COPD with acute exacerbation |
| UTI | Ileus | Shock- and please specify type as (Cardiogenic, Hypovolemic, septic, etc.) |
| Pleural effusion | Unable to be determined | |
| Other | | |

Please remember to document in the Progress Notes and Discharge Summary, as this note is NOT part of the permanent medical record.  Please leave this note on the chart.

☐   I disagree, see my comments.

In responding to this query, please exercise your independent professional judgment. The fact that a question is asked does not imply that any particular answer is desired or expected. We greatly appreciate your clarification on this issue.

This is **NOT** part of the permanent record, however, **PLEASE LEAVE ON THE CHART.**
This is a **PRIVILEGED and CONFIDENTIAL** document, not to be copied or distributed.

32.     Baylor also prompted doctors to document CCs and MCCs with post-surgery progress notes, some with particularly uncommon pairings. For instance, in its progress notes for plastic surgery patients, Baylor gave doctors a multiple-choice option to include severe protein calorie malnutrition.

**Comorbid Conditions and General Description of Their Treatments:**

| (must state treatment) | ☐ protein calorie malnutrition- | ☐ acute/chronic respiratory failure- | ☐ acute/chronic renal failure- |
|---|---|---|---|
| ☐ hyponatremia- | ☐ severe protein calorie malnutrition- | ☐ COPD w/ acute exacerbation- | ☐ AKI with acute tubular necrosis- |
| ☐ hypernatremia- | ☐ protein calorie malnutrition&emaciation- | ☐ shock, cardiogenic, hypovolemic, septic | ☐ AKI- |
| ☐ acute blood loss anemia- | ☐ pathologic fracture due to- | ☐ BMI <19, cachectic- | ☐ ARF with specified lesion- |
| ☐ precipitous drop in hematocrit- | ☐ encephalopathy- | ☐ BMI >40, morbid obesity- | ☐ Major depressive affective disorder- |
| ☐ NSTEMI- | ☐ pleural effusion- | ☐ pancytopenia- | ☐ Bipolar disorder (type 1, type 2)- |
| ☐ pneumonia due to _____ organism- | ☐ atelectasis- | ☐ acidosis- | ☐ illicit drug use...continuous use- |
| ☐ decubitus stage___ location_____- | ☐ ileus- | ☐ alkalosis- | ☐ illicit drug use...dependence- |
| ☐ CVA- | ☐ atrial/ventricular flutter- | ☐ 2nd/3rd degree heart block- | ☐ acute/chronic systolic/diastolic CHF- |
| ☐ Other: | | | |

33.     Not surprisingly, Relator's analysis shows that the Baylor's rate of severe protein malnutrition in plastic surgery claims dwarfs the national rate. In fact, a staggering 6.56% of the

14

**ADDENDUM 166**

plastic surgery patients treated by three Baylor Defendants were given the secondary diagnosis of severe protein-calorie malnutrition, over 8 times the national average.[7]



34.     Leading queries and progress notes were only part of Baylor's strategy to influence doctors to inappropriately code CCs and MCCs. According to a former medical coder, CDIs were effectively "trained in sales" to generate revenue by convincing doctors to change their clinical documentation in inappropriate ways. This coder recalls Matejicka "telling CDIs things that were totally not true," and as a result of the deliberate effort to promote the coding of MCCs, some MCCs were inappropriately applied.

35.     According to another former coding and compliance staff member at Scott & White, CDIs pressured doctors to record MCCs in an effort to increase revenue. For example, CDIs influencing doctors to record acute respiratory failure (an MCC identified by Relator for excessive

---

[7] The 3 Baylor Hospitals in the chart refer to:  Hillcrest Baptist Medical Center, Scott & White Hospital—Round Rock and Scott & White Memorial Hospital—Temple. Relator's analysis is based on plastic surgery claims from 2011 through the third quarter of 2015.

use) instead of COPD exacerbation because that is what "[CDIs] want to hear…doctors have been told and told and told so they do." The staff member added, "CDIs should be questioning acute respiratory failure instead of insisting." He also observed the inappropriate documentation of other MCCs for patients with length of stay of two days or less, even though such diagnoses would require longer lengths of stay for treatment.

36.     These findings are consistent with Baylor's culture of pushing doctors to apply CCs and MCCs without regard for accuracy or necessity to boost the hospital's bottom line and improve its quality rating. Relator's analysis of Medicare claims shows that Baylor doctors complied with this encouragement, leading to the excessive coding of Misstated MCCs identified in this action. Indeed, Baylor carried out this targeted scheme to upcode Medicare claims (evidenced in part by Matejicka's focus on Medicare billing in his presentations to Baylor doctors), while avoiding detection by Medicare auditors. A former coding and compliance staff at Baylor recalls Medicare being the most lenient among health insurance payors, noting, "If [patients] stay here two days and you put acute respiratory failure on that chart I guarantee you, unless it's Medicare, you are going to get audited…you are least likely to get audited by traditional Medicare because RACs [recovery audit contractors] are not doing medical necessity reviews.  I don't think they have done those in several years." Indeed, Relator analyzed the rates of diagnoses for the three MCCs identified for excessive use, and found that Baylor coded them up to 3 times more than the national average for patients with length of stay of two days or less, as seen in Figure 1.

ADDENDUM 168

**Figure 1: Secondary Diagnosis Rates for Claims with Length of Stay 2 Days or less**



### 3.   Baylor provided unnecessary treatment, which enabled it to code MCCs

37.     Baylor's zeal to increase revenue through coding MCCs even included the provision of unnecessary treatment. Baylor purposefully placed and kept post-operative patients on ventilator support, thus enabling it to document one of the clinical indicators for acute respiratory failure, one of the MCCs identified by Relator for excessive usage. As an example, Relator found that Baylor patients undergoing major heart surgery were placed on mechanical ventilation over twice the national average. Correspondingly, for post-operative heart surgery patients Baylor coded acute respiratory failure (not present on admission) at 36.9% which is 2.75 times higher than the national average of 13.4%, as seen in Figure 2.

ADDENDUM 169

**Figure 2: Rates of Mechanical Ventilation and Respiratory Failure (Not Present on Admission) for Major Heart Surgery Claims**



38.     The high rate of post-operative respiratory failure at Baylor is even more dubious since according to clinical documentation expert Dr. Robert Gold, post-operative respiratory failure should be extremely rare and he cautions against coding it. Another CDI expert, Dr. Cesar Limjoco, notes, "patients being purposely maintained on the ventilator after heart surgery or any surgery because of weakness, chronic lung disease, massive trauma are NOT in acute respiratory failure." What is not dubious is that diagnosing post-operative acute respiratory failure can lead to large increases in reimbursement. According to another CDI expert, Dr. Richard Pinson, "'Postop'…respiratory failure is classified as one of the most severe, life-threatening reportable surgical complications a patient can have. The diagnosis of respiratory failure following surgery often results in a huge payment increase to the hospital—sometimes $20,000 to $30,000 or even more."

39.     Relator's analysis reveals that in spite of the high bar for accurately coding acute respiratory failure, Baylor was much more liberal in its application. In its documentation clarification sheet to doctors for "Diseases for the Respiratory System", doctors are told that "The

ADDENDUM 170

use of artificial ventilation such as BiPAP would also qualify" for diagnosing acute respiratory failure. To execute this scheme, Baylor trained its staff to code acute respiratory failure based on the use of a ventilator, even though other clinical indicators might have suggested otherwise.

### C.   Relator's Methodology

40.     Relator uncovered Baylor's fraud by employing unique algorithms and statistical processes to analyze inpatient claims data for short term acute care hospitals from 2011 through June 2017,[8] obtained from CMS. These proprietary methods have allowed Relator to identify with specificity the false claims made by Baylor to fraudulently inflate revenue on Medicare claims. Relator's analysis focused on identifying certain secondary diagnoses codes—MCCs—that were fraudulently added by Baylor to Medicare claims to increase reimbursements.

41.     Relator first formed groupings corresponding to 184 specific principal diagnosis codes. To control for the patient's principal diagnosis, Relator used these groupings as comparative "bins." Within each bin, Relator compared the usage rate of specific MCCs at hospitals in the Baylor system to usage rates in other acute care inpatient hospitals. In addition, to ensure that only the truly fraudulent claims were analyzed, Relator excluded any claims for which adding an MCC did not increase the value.[9] Similarly, Relator excluded any claims involving patients who died in the course of their treatment, as these claims tend to involve patients that are sicker and have higher rates of MCCs.

42.     Given that some natural variation in usage rates among hospitals is expected, Relator used two filters to further ensure that it identified truly abnormal usage. First, only

---

[8] Only claims through the second quarter of 2017 were analyzed by Relator. Claims after June 30, 2017 have not yet been made available to Relator.

[9] Some diagnosis related groups do not have an MCC severity level, and as such, adding an MCC does not increase the reimbursement amount.

ADDENDUM 171

instances where MCCs were used <u>more than twice the national rate</u> or were used at a rate <u>three percentage points higher than in the other hospitals</u> were considered false claims. Second, Relator validated the results of its analysis by determining the statistical significance of each fraudulent pattern used by Baylor. Relator only flagged claim groupings where there was less than a 1 in 1,000 chance of Relator's findings being due to chance. Under this approach, Relator identified 209 combinations of principal diagnosis codes and Misstated MCCs in which Baylor excessively upcodes. Relator included in this complaint only the principal diagnosis code groups that met these criteria and were used excessively by Baylor.

43.     For example, Baylor and other hospitals have a large number of claims involving a Nonrheumatic Aortic Valve Disorders. Relator has found that among Baylor's more than 838 claims involving a Nonrheumatic Aortic Valve Disorders, 59 had had an accompanying secondary MCC of encephalopathy,[10] representing 7.04 percent of their Nonrheumatic Aortic Valve Disorders claims. The other non-Baylor hospitals, used by Relator for benchmarking, had more than 200,000 Nonrheumatic Aortic Valve Disorders claims, but only 2.67 percent of those claims reported encephalopathy as an MCC. In other words, Baylor coded encephalopathy on these claims at a rate that is 2.64 times higher than comparable hospitals—and profited nearly $13,000 each time it did so.

44.     While Relator's precise benchmarking of medical billing is unique, experts have developed and applied similar benchmarks in financial return literature.[11] Benchmarking has the

---

[10] See section IV.D.1.A for a description of encephalopathy and the relevant codes that are included.

[11] See the widely-used methodology developed by Kent Daniel, Mark Grinblatt, Sheridan Titman, Russ Wermers, *Measuring Mutual Fund Performance with Characteristic-Based Benchmarks*, The Journal of Finance, vol. 52(3) (1997), at 1035–58. This methodology is first applied to measuring hedge-fund performance by, John M. Griffin and Jin Xu, *How Smart Are the Smart Guys? A Unique View from Hedge Fund Stock Holdings*, Review of Financial Studies, Vol. 22.7 (2009), at 2531–70.

advantage of allowing for very specific and comparative groupings. This avoids imposing specific linearity on the data, which in turn gives Relator's methodology more statistical power and precision.

45.     To further validate its conclusions and control for other explanations, Relator ran a bin-based fixed effect linear regression model. Separate regressions were run for claims under each principal diagnosis bin and Relator included variables to control for patient characteristics such as age, gender, and race, as well as county demographic factors such as the unemployment rate, median income, and urban-rural differences. Additionally, variables for the length of stay and discharge status were included to control for the patient's health and overall claim severity. Relator also tested for the potential impact that doctors, individual patients, and a hospital's region could have on MCC rates. Even when considering all of these factors, Baylor's MCC usage rate is significantly higher than at other hospitals.

**D.     Defendants' False Claims**

**1.     The False Claims made by Baylor**

46.     Relator has determined that Baylor primarily used three categories of secondary MCC codes to increase the value of its claims: encephalopathy (including toxic encephalopathy), respiratory failure (which also includes pulmonary insufficiency), and severe malnutrition (collectively, the "**Misstated MCCs**").[12] These will be discussed in more detail in the following sections.

---

[12] Three of Baylor's hospitals (Hillcrest Baptist Medical Center, Scott & White Hospital – Round Rock, and Scott & White Memorial Hospital) excessively used all three major complications. A fourth hospital (Baylor University Medical Center – Dallas) is only alleged in this complaint to have upcoded encephalopathy to make a false claim. Hence, Baylor University Medical Center – Dallas is only included in the encephalopathy analysis.

ADDENDUM 173

47.     As illustrated in Figure 3, Baylor used the Misstated MCCs at a significantly higher rate than other hospitals. Specifically, non-Baylor hospitals used one of these three codes on approximately 10.27 percent of claims from 2011 through June 2017, while Baylor hospitals used one of these three codes on 19.39 percent of such claims—or 1.89 times the rate at other hospitals.

**Figure 3. Rate of Misstated MCC Upcoding by Year for Baylor Versus Other Hospitals.**
This figure shows the rate at which Baylor is using one of the Misstated MCCs relative to other hospitals over time. This analysis is based on the principal diagnosis codes listed in each section for the specific fraudulent patterns.



48.     Figure 4 below shows that Baylor used a higher rate of Misstated MCC codes not just in the principal diagnosis categories analyzed by Relator, but across a large variety of principal diagnosis codes. Specifically, Figure 4 shows a dot for each principal diagnosis category, with the rate of Misstated MCC at Baylor on the x-axis and the rate of Misstated MCC at other non-Baylor hospitals on the y-axis. Dots to the right of the 45-degree line indicate a higher rate of Misstated MCCs at Baylor within that principal diagnosis category than at other non-Baylor hospitals. As the figure shows, Baylor has higher rates of Misstated MCCs across 176 of 184 (95.65%) principal

ADDENDUM 174

diagnosis categories. The extent to which Baylor excessively upcoded on the categories identified by Relator was not offset by a relative downcoding for other categories as Baylor consistently upcodes relative to other hospitals across a variety of principal diagnosis codes.

**Figure 4. Rate of Misstated MCCs by Principal Diagnosis Code at Baylor Versus Other Hospitals.**
For the 184 principal diagnoses with at least 100 claims at Baylor (each represented by a dot), this figure compares the rate of Misstated MCCs at Baylor versus non-Baylor hospitals. Red dots to the right of the 45-degree line indicate Baylor is coding the Misstated MCCs higher than average.



### A.   Encephalopathy

49.    The first Misstated MCC fraudulently used by Baylor to make false claims is encephalopathy. The codes included with encephalopathy are listed in Table 1. Encephalopathy is a term for brain disease or damage to the brain where the brain is regarded as "altered in its structure or function." The telltale symptom is an altered mental state, but altered mental state

23

alone is insufficient for diagnosing encephalopathy. Encephalopathy can be acute or chronic, so the related signs and symptoms can be varied as well. This condition commonly manifests as confusion, agitation, or lethargy, but may include aphasia (altered speech), ataxia (altered gait) and memory loss.

**Table 1. List of Encephalopathy ICD-9 and ICD-10 Diagnosis Codes.**

| ICD-9 Diagnosis Code | Description |
| --- | --- |
| 34830 | Encephalopathy, unspecified |
| 34831 | Metabolic encephalopathy |
| 34839 | Other encephalopathy |
| 34982 | Toxic encephalopathy |

| ICD-10 Diagnosis Code | Description |
| --- | --- |
| G92 | Toxic encephalopathy |
| G9340 | Encephalopathy, unspecified |
| G9341 | Metabolic encephalopathy |
| G9349 | Other encephalopathy |
| I6783 | Posterior reversible encephalopathy syndrome |

50.    The most common causes of encephalopathy are liver damage, cerebral anoxia (severe lack of oxygen to the brain) or kidney failure. Because the causes are extremely varied, no single lab test can prove the presence of encephalopathy. Therefore, in diagnosing the condition, a medical practitioner must keep multiple considerations in mind. The challenge is to properly identify the root cause of the symptoms observed and eliminate unlikely causes based on objective signs.

51.    Encephalopathy is distinguishable from conditions that have similar symptoms. In elderly hospital patients, for instance, temporary instances of lethargy, agitation and confusion are commonly observed, often right after an intense surgery or as the result of a urinary tract infection. These same signs can be observed in patients as "sundowning" or "late-day confusion" in the late afternoon or evening, but these effects are temporary and are actually related to chronic dementia, not encephalopathy.

ADDENDUM 176

52.     Between 2011 and June 2017, Baylor was 1.54 times more likely to code encephalopathy than other hospitals. During this period, Baylor coded encephalopathy on 15.50 percent of all its claims, compared to 10.10 percent at other hospitals. Baylor's usage of encephalopathy over time, relative to the nationwide average, is shown in Figure 5.

**Figure 5. Rate of Encephalopathy by Year for Baylor Versus Other Hospitals.**
This figure shows the rate of encephalopathy at Baylor and at other hospitals from 2011 through June 2017, when added to the relevant principal diagnosis codes listed in Table 2.



*i.      Specific Patterns of Fraud with Encephalopathy*

53.     Table 2 provides a list of the principal diagnosis codes used by Baylor to upcode with encephalopathy. Relator identified 37 principal diagnosis codes in conjunction with which Baylor coded encephalopathy at a rate at least two times and/or three percentage points higher than the nationwide average. Relator has included only patterns that were statistically significant at the 99.9% level, meaning it is virtually impossible the patterns are due to chance.

ADDENDUM 177

**Table 2. Patterns Used by Baylor to Upcode with Encephalopathy.**
The following table lists the principal diagnosis categories in which Baylor excessively upcodes with encephalopathy. 1 principal diagnosis category with fewer than 11 fraudulent claims at Baylor has been omitted from the table.

| Principal Diagnosis | % with MCC at Other Hospitals | % with MCC at Baylor | Baylor Rate Relative to Nationwide Average | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Unspecified Septicemia | 19.21% | 22.83% | 119% | 399 |
| Urinary Tract Infection; Site Not Specified | 18.17% | 28.82% | 159% | 347 |
| Occlusion of Cerebral Arteries | 8.50% | 14.00% | 165% | 301 |
| Epilepsy | 15.04% | 29.00% | 193% | 180 |
| Intracranial Hemorrhage | 14.20% | 23.58% | 166% | 119 |
| Other Intracranial Injury | 8.37% | 13.06% | 156% | 97 |
| Substance-related Disorders | 19.36% | 44.66% | 231% | 90 |
| Other Gram Negative Septicemia | 19.29% | 26.63% | 138% | 81 |
| Cystitis and Urethritis | 13.97% | 27.62% | 198% | 74 |
| Staphylococcal Septicemia | 20.81% | 29.72% | 143% | 71 |
| Poisoning by Other Medications and Drugs | 19.79% | 32.77% | 166% | 69 |
| Osteoarthritis; Localized | 0.56% | 1.38% | 247% | 68 |
| E. Coli Septicemia | 18.68% | 22.75% | 122% | 54 |
| Other Diseases of the Circulatory System | 3.32% | 6.43% | 194% | 50 |
| Coronary Atherosclerosis | 1.18% | 3.50% | 298% | 49 |
| Streptococcal Septicemia | 18.16% | 25.90% | 143% | 45 |
| Other Endocrine Disorders | 13.78% | 22.68% | 165% | 43 |
| Other Diseases of the Nervous System and Sense Organs | 7.87% | 13.45% | 171% | 43 |
| Poisoning by Psychotropic Agents | 26.71% | 49.47% | 185% | 43 |
| Convulsions | 12.45% | 22.14% | 178% | 37 |
| Nonrheumatic Aortic Valve Disorders | 2.67% | 7.04% | 264% | 37 |
| Secondary Malignancy of Brain/spine | 10.17% | 19.06% | 187% | 36 |
| Delirium Dementia and Amnestic and Other Cognitive Disorders | 15.02% | 29.71% | 198% | 35 |
| Other Fluid and Electrolyte Disorders | 8.40% | 12.77% | 152% | 31 |
| Disorders of Mineral Metabolism | 12.62% | 23.44% | 186% | 28 |
| Alcohol-related Disorders | 6.89% | 11.69% | 170% | 27 |
| Other Endocrine; Nutritional; and Metabolic Diseases and Immunity Disorders | 5.35% | 8.70% | 163% | 24 |
| Other and Unspecified Hereditary and Degenerative Nervous Conditions | 8.09% | 15.51% | 192% | 23 |
| Other Injuries and Conditions Due to External Causes | 6.14% | 12.84% | 209% | 22 |

26

| Principal Diagnosis | % with MCC at Other Hospitals | % with MCC at Baylor | Baylor Rate Relative to Nationwide Average | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Infective Arthritis and Osteomyelitis (except that Caused by TB or STD) | 3.39% | 6.75% | 199% | 21 |
| Diabetes with Circulatory Manifestations | 3.88% | 7.82% | 201% | 16 |
| Another Aneurysm | 3.84% | 7.86% | 205% | 15 |
| Spinal Stenosis; Lumbar Region | 1.68% | 3.54% | 211% | 15 |
| Fracture of Tibia and Fibula | 2.60% | 7.03% | 270% | 14 |
| Chemotherapy | 0.98% | 2.38% | 243% | 14 |
| Other Bone Disease and Musculoskeletal Deformities | 1.58% | 4.09% | 259% | 12 |

54.     Figure 6 below shows that Baylor not only used a higher rate of encephalopathy in the few categories listed above, but also across a large variety of principal diagnosis codes.  The red dots to the right of the 45-degree line indicate higher rates of encephalopathy at Baylor versus the nationwide average. This figure shows that Baylor has a higher rate of encephalopathy for 160 out of 184 (86.96%) principal diagnosis categories. In other words, the extent to which Baylor excessively upcoded encephalopathy on the categories listed in Table 2 above was not offset by relative downcoding in other principal diagnosis categories.

ADDENDUM 179

**Figure 6. Rate of Encephalopathy by Principal Diagnosis Code at Baylor Versus Other Hospitals.**
For the 184 principal diagnoses with at least 100 claims at Baylor (each represented by a dot), this figure compares the rate of encephalopathy at Baylor versus non-Baylor hospitals. Red dots to the right of the 45-degree line indicate Baylor is coding encephalopathy at a rate higher than the nationwide average.



*ii.    Specific False Claims with Encephalopathy*

55.    The Relator has identified many specific false Medicare claims submitted by Baylor involving encephalopathy. The following table includes 50 examples.

28

**Table 3. False Claims made by Baylor Using Encephalopathy.**
The following table presents specific examples of false claims made by Baylor using encephalopathy. The first six digits of the beneficiary ID has been removed to make it harder to identify the individual patients.

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

ADDENDUM 181



30

ADDENDUM 182

ADDENDUM 183

ADDENDUM 184



**B.    Respiratory Failure**

56.    The second Misstated MCC that Baylor used at an excessive rate is respiratory failure, which includes pulmonary insufficiency. The codes classified as respiratory failure are listed in Table 4 below. Respiratory failure is a syndrome characterized by poor gas transfer in the

ADDENDUM 185

lungs at the alveolar and capillary levels as a result of a problem making it difficult to breathe. It can be acute or chronic. There are two types: the first and most common is hypoxemia ("oxygenation failure"), and the second type demonstrates both hypoxemia and hypercapnia ("ventilatory failure"). Respiratory failure can be acute and life-threatening, or chronic and manageable with modifications.

**Table 4. List of Respiratory Failure ICD-9 and ICD-10 Diagnosis Codes.**

| ICD-9 Diagnosis Code | Description |
| --- | --- |
| 5184 | Acute edema of lung, unspecified |
| 5185 | Pulmonary insufficiency following trauma and surgery |
| 51851 | Acute respiratory failure following trauma and surgery |
| 51852 | Other pulmonary insufficiency not elsewhere classified following trauma/surgery |
| 51853 | Acute and chronic respiratory failure following trauma and surgery |
| 51881 | Acute respiratory failure |
| 51884 | Acute and chronic respiratory failure |

| ICD-10 Diagnosis Code | Description |
| --- | --- |
| J810 | Acute pulmonary edema |
| J951 | Acute pulmonary insufficiency following thoracic surgery |
| J952 | Acute pulmonary insufficiency following nonthoracic surgery |
| J953 | Chronic pulmonary insufficiency following surgery |
| J95821 | Acute postprocedural respiratory failure |
| J95822 | Acute and chronic postprocedural respiratory failure |
| J9600 | Acute respiratory failure, unspecified whether with hypoxia or hypercapnia |
| J9601 | Acute respiratory failure with hypoxia |
| J9602 | Acute respiratory failure with hypercapnia |
| J9620 | Acute and chronic respiratory failure, unspecified whether with hypoxia or hypercapnia |
| J9621 | Acute and chronic respiratory failure with hypoxia |
| J9622 | Acute and chronic respiratory failure with hypercapnia |
| J9690 | Respiratory failure, unspecified, unspecified whether with hypoxia or hypercapnia |
| J9691 | Respiratory failure, unspecified with hypoxia |
| J9692 | Respiratory failure, unspecified with hypercapnia |

57.     The possible root causes are myriad, and may include poor circulation, neuromuscular disease, chronic bronchitis, COPD, obesity or drug use, an obstructing object, or an injury to the brain or spinal cord. The signs and symptoms are bluish skin, shortness of breath, labored breathing and feeling unable to get enough air. The patient may also become very sleepy, lose consciousness, be confused, or have arrhythmia. After listening to the patient's heartbeat and

ADDENDUM 186

lungs, a pulse oximetry test, an arterial blood gas test from a blood draw, and a chest x-ray can together help determine a proper diagnosis.

58.     Respiratory failure is distinguishable from conditions that have similar symptoms. Elderly patients, for example, frequently breathe shallowly during sleep. Chronic conditions such as structural and neuromuscular issues can lead to slow decline in breathing quality. Also, elderly patients who have recently undergone surgery may experience symptoms that are similar to those of respiratory failure. Though they may necessitate mechanical oxygenation assistance, it is unlikely that these conditions are sufficient for an acute respiratory failure diagnosis.

59.     As shown in Figure 7, Baylor coded at a significantly higher rate of respiratory failure than other hospitals. From 2011 through June 2017, across the relevant codes, Baylor coded respiratory failure at 1.73 times the rate at other hospitals, using it on 20.54 percent of claims, versus 11.87 percent at other hospitals. Baylor's rate of respiratory failure increases again in 2017.

**Figure 7. Rate of Respiratory Failure by Year for Baylor Versus Other Hospitals.**
This figure shows the rate of respiratory failure at Baylor and at other hospitals from 2011 through June 2017, when added to the suspicious principal diagnosis codes listed in Table 5 below.



35

<em>i.      Specific Patterns of Fraud with Respiratory Failure</em>

60.      The following table provides a list of the principal diagnosis codes used by Baylor to upcode with respiratory failure. Relator identified 56 principal diagnosis codes in conjunction with which Baylor coded respiratory failure at a rate at least two times and/or three percentage points higher than the nationwide average. Only patterns that were statistically significant at the 99.9% level, meaning virtually impossible to be due to chance, are included.

**Table 5. Patterns Used by Baylor to Upcode with Respiratory Failure.**
The following table lists the principal diagnosis categories in which Baylor excessively upcodes with respiratory failure. One principal diagnosis category with fewer than 11 fraudulent claims at Baylor has been omitted from the table.

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Baylor | Baylor Rate Relative to Other Hospitals | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Congestive Heart Failure; Nonhypertensive | 21.97% | 39.51% | 180% | 835 |
| Unspecified Septicemia | 25.66% | 35.82% | 140% | 725 |
| Obstructive Chronic Bronchitis | 17.73% | 36.51% | 206% | 363 |
| Coronary Atherosclerosis | 5.24% | 23.81% | 454% | 230 |
| Acute Myocardial Infarction | 11.27% | 17.24% | 153% | 193 |
| Pneumonia; Organism Unspecified | 18.97% | 26.58% | 140% | 159 |
| Nonrheumatic Aortic Valve Disorders | 11.68% | 38.75% | 332% | 156 |
| Hypertensive Heart and/or Renal Disease | 18.27% | 26.35% | 144% | 133 |
| Pulmonary Heart Disease | 16.78% | 30.88% | 184% | 130 |
| Fracture of Neck of Femur (hip) | 4.72% | 8.57% | 182% | 123 |
| Other Gram Negative Septicemia | 18.04% | 33.25% | 184% | 118 |
| Staphylococcal Septicemia | 21.81% | 36.30% | 166% | 78 |
| Other Bacterial Pneumonia | 30.81% | 34.45% | 112% | 76 |
| Atrial Fibrillation | 3.07% | 6.40% | 208% | 73 |
| Other Diseases of the Circulatory System | 6.65% | 14.07% | 212% | 67 |
| Cancer of Bronchus; Lung | 14.22% | 23.99% | 169% | 65 |
| E. Coli Septicemia | 13.02% | 20.05% | 154% | 61 |
| Other Neoplasms | 6.38% | 11.94% | 187% | 58 |
| Osteoarthritis; Localized | 0.67% | 1.67% | 249% | 56 |
| Epilepsy | 7.69% | 15.31% | 199% | 54 |
| Aspiration Pneumonitis; Food/vomitus | 27.25% | 34.91% | 128% | 52 |
| Other Specified Septicemia | 27.54% | 42.86% | 156% | 43 |
| Streptococcal Septicemia | 17.73% | 27.55% | 155% | 41 |
| Influenza | 17.64% | 29.71% | 168% | 41 |
| Other Pneumonia | 22.40% | 41.26% | 184% | 39 |
| Chronic Obstructive Asthma with Acute Exacerbation | 11.59% | 28.77% | 248% | 38 |
| Other Diseases of the Respiratory System | 12.24% | 20.22% | 165% | 37 |

36

| Principal Diagnosis | % with MCC in Other Hospitals | % with MCC in Baylor | Baylor Rate Relative to Other Hospitals | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Other Central Nervous System Disorders | 7.85% | 11.51% | 147% | 36 |
| Other Injury and Poisoning | 4.35% | 8.85% | 203% | 35 |
| Other Aneurysm | 14.48% | 29.13% | 201% | 34 |
| Sickle Cell Anemia | 1.86% | 9.38% | 505% | 33 |
| Malfunction of Device; Implant; and Graft | 2.98% | 6.02% | 202% | 32 |
| Other Complications of Surgical and Medical Procedures | 6.40% | 11.67% | 182% | 32 |
| Congestive Heart Failure | 10.87% | 26.24% | 241% | 31 |
| Poisoning by Other Medications and Drugs | 14.55% | 24.42% | 168% | 30 |
| Substance-related Disorders | 15.22% | 27.46% | 180% | 30 |
| Urinary Tract Infection; Site Not Specified | 1.11% | 2.51% | 226% | 28 |
| Pleurisy; Pleural Effusion | 14.12% | 24.05% | 170% | 26 |
| Nonrheumatic Mitral Valve Disorders | 15.45% | 38.89% | 252% | 25 |
| Diabetes with Other Manifestations | 2.61% | 5.29% | 203% | 25 |
| Fracture of Vertebral Column without Mention of Spinal Cord Injury | 4.11% | 7.93% | 193% | 22 |
| Disorders of the Peripheral Nervous System | 5.70% | 18.90% | 331% | 22 |
| Empyema and Pneumothorax | 21.62% | 34.84% | 161% | 20 |
| Pathological Fracture | 3.87% | 7.72% | 200% | 18 |
| Other Endocrine; Nutritional; and Metabolic Diseases and Immunity Disorders | 3.13% | 8.11% | 259% | 18 |
| Other Complications of Internal Prosthetic Device; Implant; and Graft | 3.78% | 7.25% | 192% | 18 |
| Unstable Angina (Intermediate Coronary Syndrome) | 4.58% | 10.31% | 225% | 17 |
| Fracture of Pelvis | 2.71% | 6.79% | 250% | 16 |
| Other Diseases of the Nervous System and Sense Organs | 3.20% | 6.61% | 206% | 15 |
| Other Endocrine Disorders | 2.84% | 7.35% | 259% | 14 |
| Secondary Malignancy of Bone | 3.46% | 15.00% | 433% | 14 |
| Diabetes with Circulatory Manifestations | 3.08% | 7.66% | 248% | 13 |
| Other Cardiac Dysrhythmias | 1.96% | 4.32% | 220% | 12 |
| Hemorrhage or Hematoma Complicating a Procedure | 3.57% | 8.33% | 233% | 12 |
| Cancer of Pancreas | 4.38% | 9.66% | 220% | 11 |

61.     Figure 8 below shows that Baylor used a higher rate of respiratory failure not just in the few categories listed above, but across a large variety of principal diagnosis codes. The red dots to the right of the 45-degree line indicate higher rates of respiratory failure at Baylor versus

the nationwide average. This figure shows that Baylor has a higher rate of respiratory failure for 167 out of 184 (90.76%) principal diagnosis categories. In other words, the extent to which Baylor excessively upcoded respiratory failure on the categories listed in Table 5 above was not offset by relative downcoding in other principal diagnosis categories.

**Figure 8. Rate of Respiratory Failure by Principal Diagnosis Code at Baylor Versus Other Hospitals.**
For the 184 principal diagnoses with at least 100 claims at Baylor (each represented by a dot), this figure compares the rate of respiratory failure at Baylor versus non-Baylor hospitals. Red dots to the right of the 45-degree line indicate Baylor is coding respiratory failure at a rate higher than the nationwide average.



ADDENDUM 190

ii.     *Specific False Claims with Respiratory Failure*

62.     The Relator has identified many specific false Medicare claims submitted by Baylor involving respiratory failure. The following table includes 50 examples.

**Table 6. False Claims made by Baylor to Using Respiratory Failure.**
The following table presents specific examples of false claims made by Baylor using respiratory failure. The first six digits of the beneficiary ID has been removed to make it harder to identify the individual patients.

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |

39

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | █ | ▅ |
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | █ | ▅ |
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | █ | ▅ |
| ▅ | █ | ▅ | ▅ | █ | ▅ | █ | ▅ |
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | ▅ | ▅ |
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | ▅ | ▅ |
| ▅ | █ | ▅ | ▅ | █ | █ | █ | ▅ |
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | ▅ | ▅ |
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | ▅ | ▅ |
| ▅ | █ | ▅ | ▅ | ▅ | ▅ | █ | ▅ |

ADDENDUM 192

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |
| ██ | █ | ██ | █ | ██ | █ | █ | ██ |

41

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |

ADDENDUM 194

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ |

43

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ▆ | ▆ | ▆ | ▆ | ▆ | ▆ | ▆ | ▆ |
| ▆ | ▆ | ▆ | ▆ | ▆ | ▆ | ▆ | ▆ |
| ▆ | ▆ | ▆ | ▆ | ▆ | ▆ | ▆ | ▆ |

## C.    Severe Malnutrition

63.    The final Misstated MCC that Baylor used to commit fraud at a higher rate was severe malnutrition. There are three severe malnutrition codes, listed in Table 7, that are considered MCCs. Severe protein-calorie malnutrition in the elderly is a disorder of extreme lack of nutrition involving the highest level of protein-energy malnutrition and protein-calorie malnutrition. Another rare form, Kwashiorkor malnutrition, is common in Sub-Saharan Africa, and is unlikely to be present in the elderly in the United States. Nutritional marasmus is caused by insufficient nutrients and is most common in children. In the elderly, malnourishment can manifest for a variety of reasons including anorexia, dehydration, and malabsorption.

ADDENDUM 196

**Table 7. List of Severe Malnutrition ICD-9 and ICD-10 Diagnosis Codes.**

| ICD-9 Diagnosis Code | Description |
| --- | --- |
| 260 | Kwashiorkor |
| 261 | Nutritional Marasmus |
| 262 | Other Severe Protein-Calorie Malnutrition |

| ICD-10 Diagnosis Code | Description |
| --- | --- |
| E40 | Kwashiorkor |
| E41 | Nutritional marasmus |
| E42 | Marasmic kwashiorkor |
| E43 | Unspecified severe protein-calorie malnutrition |

64.    Patients may initially present malnutrition signs to a healthcare provider, but the patient may simply be underweight (and may not need to be coded as malnutrition at all), or the condition may not be severe. If so, other codes are available for malnutrition of a moderate degree (ICD-9 code 2630) and other protein-calorie malnutrition (ICD-9 code 2638). Kwashiorkor malnutrition has been overdiagnosed in the past and is now usually contra-indicated in American elderly.[13] Additionally, interventions for malnutrition can often be used that supply calories and ameliorate the issue at a low cost, alleviating the need for tremendous resources associated with MCC codes. Furthermore, certain emergency measures are now considered overused and often unhelpful.

65.    As shown in Figure 9, Baylor coded a significantly higher rate of severe malnutrition than other hospitals. The rate was highest during the time Anthony Matejicka worked at Baylor and is increasing again in 2017. From 2011 through June 2017, hospitals nationwide used severe malnutrition on 2.26 percent of claims, while Baylor used it on 7.07 percent of claims—or 3.14 times as often.

---

[13]  California Watch, *Prime Healthcare Reports Outsized Rates of Unusual Conditions*, *available at* https://goo.gl/9G8MW4 (last accessed Apr. 17, 2018). Dep't of Health and Human Servs., *Rex Hospital Incorrectly Billed Medicare Inpatient Claims with Kwashiorkor*, *available at* https://goo.gl/RbEWY7 (last accessed Apr. 17, 2018). HCPro, *News: OIG Fines Another Facility for Inappropriate Kwashiorkor Claims*, *available at* https://goo.gl/chCT3c (last accessed Apr. 17, 2018).

ADDENDUM 197

**Figure 9. Rate of Severe Malnutrition by Year for Baylor Versus Other Hospitals.**
This figure shows the rate of severe malnutrition at Baylor and at other hospitals from 2011 through June 2017, when added to the suspicious principal diagnosis codes listed in Table 8 below.



*i.     Specific Patterns of Fraud with Severe Malnutrition*

66.     The following table provides a list of the principal diagnosis codes used by Baylor to upcode with severe malnutrition. Relator identified 116 principal diagnosis codes in conjunction with which Baylor coded severe malnutrition at a rate at least two times and/or at three percentage points higher than the nationwide average. Only patterns that were statistically significant at the 99.9% level, meaning virtually impossible to be due to chance, are included.

**Table 8. Patterns Used by Baylor to Upcode with Severe Malnutrition.**
The following table lists the principal diagnosis categories in which Baylor excessively upcodes with severe malnutrition. 22 principal diagnosis categories with fewer than 11 fraudulent claims at Baylor have been omitted from the table.

| Principal Diagnosis Code | % with MCC Code in Other Hospitals | % with MCC Code at Baylor | Baylor Rate Relative to Other Hospitals | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Unspecified Septicemia | 5.68% | 13.99% | 246% | 594 |
| Fracture of Neck of Femur (hip) | 1.61% | 5.72% | 355% | 132 |
| Acute Renal Failure | 3.28% | 6.97% | 212% | 122 |
| Congestive Heart Failure; Nonhypertensive | 1.18% | 3.74% | 316% | 122 |

46

ADDENDUM 198

| Principal Diagnosis Code | % with MCC Code in Other Hospitals | % with MCC Code at Baylor | Baylor Rate Relative to Other Hospitals | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Infection and Inflammation--Internal Prosthetic Device; Implant; and Graft | 3.52% | 12.74% | 362% | 119 |
| Other Bacterial Pneumonia | 3.66% | 8.55% | 234% | 102 |
| Urinary Tract Infection; Site Not Specified | 1.62% | 6.66% | 411% | 102 |
| Other Diseases of the Digestive System | 2.24% | 8.97% | 401% | 100 |
| Other Gram Negative Septicemia | 6.27% | 17.98% | 287% | 91 |
| Other Neoplasms | 5.07% | 13.09% | 258% | 84 |
| Pneumonia; Organism Unspecified | 1.87% | 5.79% | 309% | 82 |
| Aspiration Pneumonitis; Food/vomitus | 5.82% | 17.31% | 297% | 78 |
| E. Coli Septicemia | 4.23% | 12.44% | 294% | 71 |
| Postoperative Infection | 3.21% | 13.18% | 410% | 71 |
| Intestinal Infection | 3.55% | 10.01% | 282% | 66 |
| Staphylococcal Septicemia | 7.53% | 19.26% | 256% | 63 |
| Occlusion of Cerebral Arteries | 0.81% | 2.73% | 338% | 62 |
| Acute Myocardial Infarction | 0.74% | 2.60% | 352% | 60 |
| Other Intestinal Obstruction | 2.78% | 7.19% | 258% | 51 |
| Acute Pancreatitis | 2.08% | 8.49% | 408% | 51 |
| Peritoneal or Intestinal Adhesions | 4.71% | 17.71% | 376% | 46 |
| Other Specified Septicemia | 7.59% | 22.50% | 296% | 42 |
| Other Complications of Surgical and Medical Procedures | 3.39% | 10.33% | 305% | 42 |
| Other and Unspecified Gastrointestinal Disorders | 3.55% | 10.41% | 294% | 42 |
| Other Disorders of Stomach and Duodenum | 3.80% | 12.86% | 339% | 41 |
| Other Infectious and Parasitic Diseases | 4.30% | 15.69% | 365% | 41 |
| Cancer of Colon | 4.22% | 12.12% | 287% | 38 |
| Streptococcal Septicemia | 5.13% | 14.01% | 273% | 37 |
| Malfunction of Device; Implant; and Graft | 1.13% | 4.49% | 399% | 35 |
| Hemorrhage from Gastrointestinal Ulcer | 2.52% | 8.18% | 325% | 35 |
| Other Secondary Malignancy | 6.77% | 21.55% | 318% | 34 |
| Pulmonary Heart Disease | 1.53% | 5.20% | 339% | 34 |
| Other Central Nervous System Disorders | 3.32% | 6.72% | 202% | 33 |
| Other Intracranial Injury | 1.20% | 4.27% | 355% | 32 |
| Atrial Fibrillation | 0.62% | 2.04% | 330% | 31 |
| Hyposmolality | 2.23% | 6.63% | 297% | 30 |
| Other Peripheral and Visceral Atherosclerosis | 2.88% | 10.92% | 379% | 29 |
| Cancer of Pancreas | 7.99% | 21.26% | 266% | 27 |
| Other Endocrine; Nutritional; and Metabolic Diseases and Immunity Disorders | 4.03% | 11.08% | 275% | 26 |
| Cancer of Bronchus; Lung | 3.46% | 7.35% | 212% | 26 |
| Liver Abscess and Sequelae of Chronic Liver Disease | 4.84% | 12.28% | 254% | 25 |
| Hypertensive Heart and/or Renal Disease | 1.27% | 2.80% | 220% | 25 |

| Principal Diagnosis Code | % with MCC Code in Other Hospitals | % with MCC Code at Baylor | Baylor Rate Relative to Other Hospitals | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Other Venous Embolism and Thrombosis | 1.32% | 5.85% | 444% | 25 |
| Pathological Fracture | 2.27% | 7.10% | 312% | 23 |
| Hypovolemia | 3.58% | 9.97% | 278% | 23 |
| Other Injury and Poisoning | 1.10% | 3.97% | 362% | 22 |
| Pleurisy; Pleural Effusion | 3.00% | 11.45% | 382% | 22 |
| Obstructive Chronic Bronchitis | 0.96% | 2.07% | 216% | 21 |
| Hemorrhage of Gastrointestinal Tract | 1.97% | 5.98% | 303% | 21 |
| Melena | 1.59% | 5.71% | 358% | 21 |
| Intracranial Hemorrhage | 1.13% | 4.11% | 365% | 20 |
| Other Diseases of the Circulatory System | 1.11% | 3.30% | 296% | 20 |
| Alcohol-related Disorders | 2.71% | 9.30% | 343% | 20 |
| Diverticulitis | 1.42% | 3.99% | 282% | 19 |
| Other Fluid and Electrolyte Disorders | 3.07% | 7.60% | 247% | 19 |
| Acute Posthemorrhagic Anemia | 2.18% | 6.65% | 305% | 19 |
| Respiratory Failure | 4.44% | 20.34% | 458% | 19 |
| Diverticulosis | 1.03% | 4.23% | 412% | 18 |
| Calculus of Bile Duct | 1.36% | 6.42% | 474% | 18 |
| Coronary Atherosclerosis | 0.21% | 1.61% | 758% | 17 |
| Nonrheumatic Aortic Valve Disorders | 0.64% | 3.63% | 568% | 17 |
| Diseases of White Blood Cells | 3.15% | 10.30% | 327% | 17 |
| Noninfectious Gastroenteritis | 1.34% | 6.92% | 516% | 16 |
| Other Connective Tissue Disease | 1.29% | 4.80% | 373% | 16 |
| Infective Arthritis and Osteomyelitis (except That Caused by TB or STD) | 3.02% | 7.72% | 256% | 16 |
| Other and Unspecified Liver Disorders | 4.16% | 17.39% | 418% | 15 |
| Diabetes with Ketoacidosis or Uncontrolled Diabetes | 1.43% | 4.16% | 291% | 15 |
| Other Complications of Internal Prosthetic Device; Implant; and Graft | 0.98% | 3.92% | 401% | 15 |
| Gastrointestinal Complications | 5.70% | 12.28% | 216% | 15 |
| Diabetes with Circulatory Manifestations | 2.31% | 7.66% | 331% | 15 |
| Cancer of Other GI Organs; Peritoneum | 6.49% | 19.13% | 295% | 15 |
| Epilepsy | 1.05% | 3.09% | 294% | 15 |
| Cellulitis and Abscess of Leg | 0.92% | 2.30% | 251% | 14 |
| Diabetes with Other Manifestations | 1.47% | 3.02% | 205% | 14 |
| Infections of Kidney | 1.07% | 5.06% | 474% | 14 |
| Other Diseases of the Nervous System and Sense Organs | 1.37% | 4.56% | 332% | 14 |
| Poisoning by Other Medications and Drugs | 1.21% | 5.61% | 463% | 13 |
| Decubitus Ulcer | 9.61% | 22.33% | 232% | 13 |
| Aplastic Anemia | 4.32% | 12.58% | 291% | 12 |
| Other Endocrine Disorders | 2.82% | 6.71% | 238% | 12 |
| Atherosclerosis of Arteries of Extremities | 0.86% | 4.42% | 516% | 12 |
| Other Nervous System Symptoms and Disorders | 2.04% | 5.00% | 246% | 12 |

| Principal Diagnosis Code | % with MCC Code in Other Hospitals | % with MCC Code at Baylor | Baylor Rate Relative to Other Hospitals | Num. of Fraud Claims at Baylor |
|---|---|---|---|---|
| Other Biliary Tract Disease | 2.98% | 11.27% | 378% | 12 |
| Other Esophageal Disorders | 3.62% | 7.72% | 213% | 12 |
| Crushing Injury or Internal Injury | 1.53% | 5.63% | 369% | 12 |
| Fracture of Pelvis | 1.14% | 4.18% | 366% | 12 |
| Anal and Rectal Conditions | 1.96% | 8.24% | 421% | 11 |
| Diabetes with Neurological Manifestations | 1.27% | 4.97% | 390% | 11 |
| Empyema and Pneumothorax | 5.71% | 12.90% | 226% | 11 |
| Peritonitis and Intestinal Abscess | 6.71% | 14.93% | 222% | 11 |
| Other Diseases of the Genitourinary System | 1.48% | 3.64% | 246% | 11 |
| Fracture of Vertebral Column without Mention of Spinal Cord Injury | 1.09% | 2.93% | 269% | 11 |
| Secondary Malignancy of Brain/Spine | 2.21% | 7.61% | 345% | 11 |
| Substance-related Disorders | 0.97% | 5.33% | 551% | 11 |

67.     Figure 10 below shows that Baylor used a higher rate of severe malnutrition not just in the few categories listed above, but across a large variety of principal diagnosis codes. The red dots to the right of the 45-degree line indicate higher rates of severe malnutrition at Baylor versus the nationwide average. This figure shows that Baylor has a higher rate of severe malnutrition for 173 out of 184 (94.02%) principal diagnosis categories. In other words, the extent to which Baylor excessively upcoded severe malnutrition on the categories listed in Table 8 above was not offset by relative downcoding in other principal diagnosis categories.

ADDENDUM 201

**Figure 10. Rate of Severe Malnutrition by Principal Diagnosis Code at Baylor Versus Other Hospitals.**
For the 184 principal diagnoses with at least 100 claims at Baylor (each represented by a dot), this figure compares the rate of severe malnutrition at Baylor versus non-Baylor hospitals. Red dots to the right of the 45-degree line indicate Baylor is coding severe malnutrition at a rate higher than the nationwide average.



*ii.     Specific False Claims with Severe Malnutrition*

68.     The Relator has identified many specific false Medicare claims submitted by Baylor involving severe malnutrition. The following table includes 50 examples.

ADDENDUM 202

**Table 9. False Claims Made by Baylor Using Severe Malnutrition.**
The following table presents specific examples of false claims made by Baylor using severe malnutrition. The first six digits of the beneficiary ID has been removed to make it harder to identify the individual patients.

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |

ADDENDUM 203

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ███ | ███ | ██ | ██ | ███ | █ | ██ | █ |
| ███ | ███ | ██ | █ | ██ | █ | ███ | █ |
| ███ | ███ | ██ | █ | ██ | █ | ██ | █ |
| ███ | ███ | ██ | █ | ███ | █ | ███ | █ |
| ███ | ███ | ██ | █ | ███ | █ | ██ | █ |
| ███ | ███ | ██ | █ | ██ | █ | ██ | █ |
| ███ | ███ | ██ | █ | ███ | █ | ███ | █ |
| ███ | ███ | ██ | █ | ███ | █ | ███ | █ |
| ███ | ███ | ██ | █ | ██ | █ | ███ | █ |
| ███ | ███ | ██ | █ | ███ | █ | ███ | █ |
| ███ | ███ | ██ | █ | ███ | █ | ██ | █ |

ADDENDUM 204

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

ADDENDUM 205

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

54

| Beneficiary ID/ Claim ID | Hospital | Discharge Date | Age/ Gender/ Race | Principal Diagnosis | MCC False Claim | DRG w/ False Claim | False Claim Amount |
|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |

**2.      Alternative Hypotheses for Excessive Rates of Misstated MCCs Do Not Stand and Confirm that Baylor Fraudulently Billed Medicare**

69.      To further demonstrate the Defendants' fraud and determine responsibility for the excessively high rates of Misstated MCCs, Relator has analyzed whether the statistically aberrant rates of Misstated MCCs described above could be attributed to a variety of other factors. First, Relator ran a fixed effect linear regression model to control for a variety of possible explanations for MCCs, including patient characteristics and county demographic data. Second, Relator considered whether the patient's attending physician is responsible for the excessive MCCs by analyzing a subset of claims where Baylor and other hospitals shared a common physician. Third,

55

ADDENDUM 207

Relator analyzed a subset of claims where Baylor and other hospitals shared common patients. Finally, Relator analyzed the upcoding rate for Baylor and other hospitals in the same metropolitan statistical area ("**MSA**") to determine whether the MCC upcoding is due to regional differences. As discussed further below, these analyses prove that the excessive rates of Misstated MCCs can be directly attributed to the Defendants' fraudulent activity as opposed to external factors, indicating that the fraud was known by the system and was intentional.

A.      **Patient Characteristics and Demographics do not Explain the Excessive Rates of Misstated MCCs at Baylor**

70.     The Relator developed a proprietary linear regression model to control for the possibility that there are certain patient characteristics which might indicate a higher likelihood a patient would have a MCC, allowing Relator to isolate and calculate the specific impact Defendants had on the abuse of a Misstated MCC code after controlling for other characteristics. These characteristics include basic patient characteristics, such as the age, gender, and race, as well as characteristics relating to the patient's inpatient stay, including principal diagnosis, length of stay, and discharge status. Relator also used county-level demographic data, such as unemployment rate, percent of population without a high school diploma, median income, and the rural-urban continuum codes from the Department of Agriculture as control variables.[14] These county demographic variables provided Relator with a proxy for the income levels, education levels, and access to care available to each patient. Regression analysis is well established and has been used to pinpoint actors behind misreporting in financial and economic contexts.[15] Relator's

---

[14] The Rural-Urban Continuum Codes measure whether each county is in a metro or non-metro area and reflect the overall size of the metropolitan area.

[15] *See, for example,* Tomasz Piskorski, Amit Seru, and James Witkin, *Asset Quality Misrepresentation by Financial Intermediaries: Evidence from the RMBS Market,* The Journal of Finance, Vol. 70.6 (2015), at 2635–2678; Griffin, John M., and Gonzalo Maturana, *Who Facilitated Misreporting in Securitized Loans?,* Review of Financial Studies, Vol. 29.2 (2016), at 384–419.

ADDENDUM 208

regression analysis analyzed millions of claims and thousands of possible fraudulent patterns to calculate the total fraud committed by Baylor.

71.     In this section, Relator employs three different regression analysis methodologies, each of which demonstrate how Defendant billed for the Misstated MCCs at fraudulently excessive rates. First, Relator uses a principal diagnosis bin-based fixed effect linear regression model to calculate the excessive Misstated MCCs in each principal diagnosis category. Second, Relator runs a fixed effect linear regression across all claims. Third, Relator calculates the residual for each system and hospital to determine the unexplained rate of Misstated MCCs across all systems and then across all hospitals.

*i.      Principal Diagnosis Bin-Based Fixed Effect Linear Regression*

72.     First, Relator continued with the principal diagnosis bin approach by running separate regressions for each principal diagnosis category. This approach provides a number of benefits. First, it allows for non-linear relationships so that the effect of each of the control variables can vary between principal diagnosis codes. For example, the impact length of stay has on the likelihood of an MCC might vary from one principal diagnosis code to another. Second, it allows for the specific quantification of the defendants' impact on MCC rates for claims within each principal diagnosis category.

73.     Lastly, Relator included a fixed effect control variable for Baylor in the regression model, which represents the incremental amount of excessive MCC rates at Baylor beyond what could be explained by other variables. Equation 1 shows the fixed effect linear regression model used by Relator.

ADDENDUM 209

**Equation 1. Relator's Fixed Effect Linear Regression Model.**

The following equation presents the fixed effect linear regression model used by Relator. The variable of interest is $\beta_1$, which is the coefficient for Baylor. Panel A provides the equation, and Panel B explains the variables included in the model. The $i$ refers to a specific claim and $j$ refers to the potential options for the categorical variables.

*Panel A: Fixed Effect Regression Model*

$$MCC_i = \beta_0 + \beta_1.Providence_i + \sum_{j=2}^{6}\beta_{2j}.Age_{ij} + \sum_{j=2}^{7}\beta_{3j}.Race_{ij} + \beta_4.Male_i + \beta_5.\log LOS_i$$

$$+ \sum_{j=2}^{3}\beta_{6j}.Discharge_{ij} + \sum_{j=2}^{4}\beta_{7j}.Season_{ij} + \sum_{j=2}^{9}\beta_{8j}.RUCC_{ij} + \beta_9.Pov_i + \beta_{10}.Unemp_i$$

$$+ \beta_{11}.Income_i + \varepsilon_i$$

*Panel B: Explanation of Regression Variables*

| Variable | Description |
|---|---|
| $\beta_0$ | Intercept |
| $MCC_i$ | Whether the claim included a MCC |
| $Providence_i$ | Whether the patient was treated at Baylor |
| $Age_{ij}$ | Patient's age on the claim (6 age groups) |
| $Race_{ij}$ | Patient's race on the claim (7 race categories) |
| $Male_i$ | Patient's gender |
| $LOS_i$ | The patient's log length of stay at the hospital for claim $i$ |
| $Discharge_i$ | The patient's discharge status |
| $Season_{ij}$ | Season control variable for the claim (Winter, Spring, Summer, Fall) |
| $RUCC_{ij}$ | Patient's rural urban continuum code based on the county |
| $Pov_i$ | County poverty rate in 2014 |
| $Unemp_i$ | County unemployment rate in 2014 |
| $Income_i$ | County log median income in 2014 |
| $\varepsilon_i$ | Error term |

74.     By controlling for these characteristics, the regression model allowed Relator to isolate the impact that being treated at a Baylor hospital would have on a patient's expected likelihood of being diagnosed with one of the Misstated MCCs. For example, given two patients with abdominal pain, with the same age and gender, from the same county, admitted during the same season, and with the same length of stay, the patient treated at Baylor would be 337.21% as likely to be diagnosed with encephalopathy.

75.     The results for the Misstated MCCs are shown in Figure 11. Each bar represents the marginal effect of Baylor on the MCC rate relative to other hospitals within each principal

diagnosis bin. As can be seen in Panel A for encephalopathy, the coefficients for each principle diagnosis bin are all above 100% which indicates that encephalopathy rates are higher at Baylor, even after controlling for other characteristics. Statistical significance of a coefficient that is less than one in a thousand is in orange, while if the rate is even more rare at one in a million or less it is in pink, and if the probability that the coefficient could happen by chance is even lower at less than one in a hundred million then the bar is in red. As can be seen in Panel A of Figure 11, 67.6% of the bars have a probability of being due to chance of less than 1 in 1 million. Notably, only two of the 37 patterns have a significance level less than 1 in 1 thousand.[16]

76.     Respiratory failure is shown in Panel B, and severe malnutrition is shown in Panel C. For respiratory failure, 69.6% of the 56 patterns are significant at less than 1 in 100 million, and all have a significance of at least 1 in 1 thousand. For severe malnutrition, 85.3% of the 116 patterns are significant at less than 1 in 1 million, and all 116 are significant at less than 1 in 1 thousand. There are fewer bars for encephalopathy and respiratory failure because there are fewer relevant patterns in which Baylor's coding of Misstated MCCs was deemed excessive. This evidence demonstrates the excessive coding of Misstated MCCs at Baylor, even after controlling for other characteristics.

---

[16] Even the principal diagnosis codes that were not statistically significant at less than 1 in 1,000 were still significant at a 99% confidence level.

**Figure 11. Regression-Adjusted Misstated MCC Usage at Baylor Relative to Non-Baylor Hospitals for Each Principle Diagnosis Bin.**
Relator used principal diagnosis bin-based fixed effect linear regressions to analyze approximately 50 million claims at Baylor and other hospitals. The results for each principal diagnosis bin are presented in the following figure. The vertical lines represent Baylor's marginal effect on the rate of Misstated MCCs relative to the rate at other hospitals nationwide, where values above 100% indicate excessive MCC upcoding. The bins are ordered from left to right consistent with the order of principal diagnosis codes in Table 2, Table 5, and Table 8. The statistical significance is denoted by the coloring described in the legend. All but 2 were statistically significant at less than 0.1% chance the difference is random, and most were significant at a probability of less than 1 in 100 million.

*Panel A: Encephalopathy Regression Results by Principal Diagnosis Bin*



60

ADDENDUM 212

*Panel B: Respiratory Failure Regression Results by Principal Diagnosis Bin*



*Panel C: Severe Malnutrition Regression Results by Principal Diagnosis Bin*



ii.      *Aggregate Fixed Effect Regression Model*

77.      Second, Relator also ran a regression to calculate the cumulative effect of Baylor's rate of Misstated MCCs across all claims in the relevant patterns. The same regression described in Equation 1 is used for this analysis, except relator runs one regression for all of the principal diagnosis codes in each MCC and adds a control variable for the inpatient principal diagnosis category. The length of stay variable is interacted with the principal diagnosis code to account for variation in the expected length of stay given a principal diagnosis code.

78.      As shown in Table 10, after controlling for other factors, the Baylor coefficient for the Misstated MCCs is 0.0885. This means that 8.85 percent of Baylor claims are coded with one of the Misstated MCCs when they would not have been coded as such at another hospital. Given the baseline usage rate of the Misstated MCCs at other hospitals is 10.27 percent, Baylor's calculated rate of Misstated MCCs is 19.12 percent. In other words, Baylor's usage rate of the Misstated MCCs is 186.17% that of other hospitals, even after controlling for patient, medical, and demographic characteristics. This result is statistically significant with more than 99.9999 percent confidence—*i.e.*, almost certainly not random.

79.      Not surprisingly, the individual coefficients for encephalopathy, respiratory failure, and severe malnutrition are also large in magnitude. Baylor's usage rate for encephalopathy was 151.88% of the rate at other hospitals, respiratory failure was 167.17%, and severe malnutrition was 315.56%.[17]

---

[17] For robustness analysis, Relator also considered the possibility that certain surgical procedure codes or admission sources (such as being admitted from the emergency room) might explain the higher rates of Misstated MCCs at Baylor. Relator ran the fixed-effect regression analysis while also including controls for surgical procedures and admission source. With these coefficients, Baylor's rate of Misstated MCCs was 168.27% relative to other non-Baylor hospitals. Similarly, the Baylor Systems' usage rate for encephalopathy was 148.24% of the rate at non-Baylor hospitals, respiratory failure was 138.69%, and severe malnutrition was 318.08%.

ADDENDUM 214

**Table 10. Results of Fixed Effect Linear Regression Model.**
Relator used the fixed effect linear regression discussed in Equation 1, except instead of running individual regressions for each principal diagnosis bin, Relator ran one regression for each Misstated MCC and included a control variable for the individual principal diagnosis categories. Relator analyzed approximately 50 million claims at Baylor and other hospitals. The results are presented in the following table. The coefficient is listed first and the p-value is in parenthesis, which represents the statistical significance of the coefficient. A lower p-value means the result is more statistically significant. Coefficients were not included for categorical variables. The Baylor coefficient is added to the rate at other hospitals to get the expected Baylor rate of excessive MCCs after including controls.

|  | Any of the MCCs | Encephalopathy | Respiratory Failure | Severe Malnutrition |
|---|---|---|---|---|
| Poverty Rate | -0.001 (<0.0001) | -0.0014 (<0.0001) | -0.0017 (<0.0001) | 0.0003 (<0.0001) |
| Unemployment Rate | -0.0014 (<0.0001) | 0.0011 (<0.0001) | -0.0019 (<0.0001) | -0.0006 (<0.0001) |
| Log (Median Income) | -0.0469 (<0.0001) | -0.0459 (<0.0001) | -0.0648 (<0.0001) | -0.0038 (<0.0001) |
| No High School Diploma Rate | -0.0008 (<0.0001) | -0.0006 (<0.0001) | -0.0009 (<0.0001) | -0.0001 (<0.0001) |
| Intercept | 0.363 (0.1956) | 0.4586 (0.1099) | 0.5006 (0.179) | -0.0059 (0.9772) |
| Principal Diagnosis | Yes | Yes | Yes | Yes |
| Principal Diagnosis X Log(LOS[18]) | Yes | Yes | Yes | Yes |
| Season Control Variables | Yes | Yes | Yes | Yes |
| Age Control Variables | Yes | Yes | Yes | Yes |
| Sex Control Variables | Yes | Yes | Yes | Yes |
| Race Control Variables | Yes | Yes | Yes | Yes |
| Discharge Status Control | Yes | Yes | Yes | Yes |
| Principal Diagnosis Category | Yes | Yes | Yes | Yes |
| RUCC Control | Yes | Yes | Yes | Yes |
| Baylor Coefficient | 0.0885 (<0.0001) | 0.0524 (<0.0001) | 0.0800 (<0.0001) | 0.0485 (<0.0001) |
| Nationwide Average | 10.27% | 10.10% | 11.91% | 2.25% |
| **Baylor Rate** | **19.12%** | **15.34%** | **19.91%** | **7.10%** |
| **Baylor Rate Relative to Other Hospitals** | **186.17%** | **151.88%** | **167.17%** | **315.56%** |

---

[18] LOS stands for length of stay.

63

### iii.   System and Hospital Residuals for Misstated MCCs

80.     Third, another regression method to analyze Baylor's coding of Misstated MCCs is to calculate the unexplained rate of Misstated MCCs attributed to Baylor claims. To calculate this, Relator ran the regression without the fixed effect control variable for Baylor and calculated the probability each claim would have one of the Misstated MCCs. For each hospital system and for each individual hospital, the average difference between the predicted probability (or rate) of Misstated MCCs is compared to the actual rate of Misstated MCCs, which is referred to as a residual. The difference between these two values represents the rate of Misstated MCCs that is caused by each hospital system, after controlling for the other characteristics previously described. Panel A of Figure 12 shows the average residual for rate of Misstated MCCs for each hospital system, with Baylor plotted in red. Baylor's average unexplained rate of Misstated MCCs by this measure is 8.80%, making it 7th highest out of 737 hospital systems with at least 10,000 claims in the relevant patterns. Panel B of Figure 12 shows the average residual of each individual hospital, with Baylor hospitals plotted in red. The average residual of the Baylor hospitals ranges from 6.56% to 9.72%, and the 3 Baylor hospitals[19] are in the top 90th percentile of hospitals for unexplained rate of Misstated MCCs.

---

[19] Relator only alleges that Baylor University Medical Center – Dallas has been excessively using encephalopathy, so this hospital has been left out of this analysis which is based on any of the three Misstated MCCs. However, it is among the highest hospitals by rate of encephalopathy and including it in this calculation would only further demonstrate Baylor's fraudulent activity.

ADDENDUM 216

**Figure 12. Average Unexplained Misstated MCC Rate for Each Hospital System and Individual Hospital.**

The following figure plots the results of the regression from Equation 1, except one regression was run for all principal diagnosis bins, the control variable for principal diagnosis code was added to the regression, and the Baylor fixed effect variable was removed. All other variables included are the same. The graph in Panel A is based on 737 hospital systems with at least 10,000 claims from 2011 through June 2017. The graph in Panel B is based on 3,220 hospitals with at least 500 claims during the same time period. The small vertical lines off of the points represent the confidence interval for each system's unexplained use of Misstated MCCs.

*Panel A: Average Residual of Any of the Misstated MCCs for Hospital Systems*



*Panel B: Average Residual of Any of the Misstated MCCs for Individual Hospitals*



65

ADDENDUM 217

81.     Taken together, Relator's regression analysis shows that the excessive rates of Misstated MCCs were not due to unique patient demographic or health characteristics, but were specifically caused by the Defendants' practices.

### B.     Attending Physicians are not Responsible for the Excessively High Rates of Misstated MCCs

82.     Relator also considered whether the excessively high rates of Misstated MCCs could be caused by the preferences or treatment decisions of physicians who work with patients at Baylor hospitals, as opposed to some system-wide decision or corporate directive. Could it be that the physicians who attended to Baylor's patients were more disposed to identifying encephalopathy, respiratory failure, and severe malnutrition than other physicians? To address this question, Relator analyzed a subset of claims involving doctors that treated patients at both Baylor and other hospitals.

83.     As shown in Figure 13, when considering only claims for doctors with at least 10 claims at both Baylor and other hospitals, the use of encephalopathy, respiratory failure, and malnutrition was still significantly higher at Baylor. Between 2011 and 2017, doctors used one of the Misstated MCCs on 19.57 percent of claims while treating patients at Baylor, but on only 11.80 percent of claims when treating patients at other hospitals.

ADDENDUM 218

**Figure 13. Rate of Any of The Misstated MCCs at Baylor Relative to Other Hospitals for Claims with Common Doctors.**

The following figure includes any claims for common doctors between Baylor and another hospital from 2011 through 2017. Even with doctors that work at both hospitals, Baylor used one of the Misstated MCCs on 19.57 percent of claims, while those same doctors only use one of the Misstated MCCs on 11.80 percent of claims while at other hospitals. The analysis is based on 195 doctors with 10 claims at Baylor and 10 claims at a non-Baylor hospital. In total these doctors had more than 25,000 claims at Baylor and more than 47,000 claims at other hospitals.



84.      Figure 14 shows that this tendency to have higher rates of Misstated MCCs at Baylor is not limited to a few doctors but is systemic. In the following figure, doctors with the same rate of Misstated MCCs at Baylor and other hospitals would be clustered along the 45-degree line, whereas doctors with higher rates of Misstated MCCs at Baylor would be to the right of the 45-degree line. As shown in Figure 14, 147 out of 195 doctors (or 75.4 percent) had a higher coding rate of the Misstated MCCs at Baylor than at other hospitals.

**Figure 14. Rate of Any of the Misstated MCCs for Common Doctors at Baylor Versus Other Hospitals.**
The following figure compares the rate of Misstated MCCs for common doctors at Baylor versus other hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have higher upcoding at Baylor and the blue circles represent doctors who have higher upcoding at other non-Baylor hospitals. Only doctors with at least 11 claims at Baylor and 11 claims at a non-Baylor hospitals are represented in this figure.



85.     This result still holds when looking just at the individual Misstated MCCs. For doctors that serve at both Baylor and other hospitals, the rate of encephalopathy at Baylor was 13.23 percent, while the rate of encephalopathy at other hospitals was 9.97 percent, as demonstrated in Figure 15 below. This indicates that a doctor was 132.7% as likely to diagnosis a

ADDENDUM 220

patient with encephalopathy when treating the patient at Baylor than when the same doctor was

treating a patient at another hospital.[20]

**Figure 15. Rate of Encephalopathy at Baylor Relative to Other Hospitals for Claims with Common Doctors.**
The following figure includes any claims for doctors with at least 10 claims at Baylor and 10 claims at a non-Baylor hospital from 2011 through June 2017. Even with doctors that work at both hospitals, Baylor had an encephalopathy rate of 13.23 percent, while those same doctors only use encephalopathy on 9.97 percent of claims while at other hospitals. The analysis is based on 162 doctors with 10 claims at Baylor and 10 claims at a non-Baylor hospital. In total these doctors had more than 12,000 claims at Baylor and more than 16,000 claims at other hospitals.



86.     Figure 16 shows that a significant number of doctors had higher rates of encephalopathy when they worked at Baylor than at other hospitals. Specifically, it shows that 115 doctors out of 162 doctors considered (or 71 percent) had a higher rate at Baylor.

---

[20] This general trend still holds when looking at any doctor that has at least one claim at Baylor and one claim at a non-Baylor hospital. Specifically, the rate of encephalopathy is 14.23% at Baylor and 11.06% at other hospitals.

**Figure 16. Rate of Encephalopathy for Common Doctors at Baylor Versus Other Hospitals.**
The following figure compares the rate of encephalopathy for common doctors at Baylor versus other hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have higher upcoding of encephalopathy at Baylor and the blue circles represent doctors who have higher upcoding at other non-Baylor hospitals. Only doctors with at least 11 claims at Baylor and 11 claims at a non-Baylor hospitals are represented in this figure.



87.    For doctors that serve at both hospitals, the rate of respiratory failure at Baylor was 21.9 percent, while the rate of respiratory failure at other hospitals was 14.0 percent, as demonstrated in Figure 17 below. This suggests that a doctor was 156.4% as likely to diagnosis a

70

patient with respiratory failure when treating the patient at Baylor than when the same doctor was

treating a patient at a non-Baylor hospital.[21]

**Figure 17. Rate of Respiratory Failure at Baylor Relative to Other Hospitals for Claims with Common Doctors.**
The following figure includes any claims for doctors with at least 10 claims at Baylor and 10 claims at a non-Baylor hospital from 2011 through June 2017. Even with doctors that work at both hospitals, Baylor had a respiratory failure rate of 21.9 percent, while those same doctors only use respiratory failure on 14.0 percent of claims while at other hospitals. The analysis is based on 154 doctors with 10 claims at Baylor and 10 claims at a non-Baylor hospital. In total these doctors had more than 16,000 claims at Baylor and more than 27,000 claims at other hospitals.



■ Non-Baylor Hospitals ■ Baylor

88.     Figure 18 shows that a significant number of doctors had higher rates of respiratory

failure when they worked at Baylor than at other hospitals. Specifically, the figure shows that 110

out of 154 doctors considered (or 71.4 percent) had a higher rate at Baylor.

---

[21] This general trend still holds when looking at any doctor that has at least one claim at Baylor and one claim at a non-Baylor hospital. Specifically, the rate of respiratory failure is 21.83% at Baylor and 13.41% at other hospitals.

**Figure 18. Rate of Respiratory Failure for Common Doctors at Baylor Versus Other Hospitals.**
The following figure compares the rate of respiratory failure for common doctors at Baylor versus other hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have higher upcoding of respiratory failure at Baylor and the blue circles represent doctors who have higher upcoding at other non-Baylor hospitals. Only doctors with at least 11 claims at Baylor and 11 claims at a non-Baylor hospitals are represented in this figure.



89.     For doctors that serve at both hospitals, the rate of severe malnutrition at Baylor

was 6.32 percent, while the rate of severe malnutrition at other hospitals was 2.73 percent, as

demonstrated in Figure 19 below. This indicates that a doctor was 231.5% as likely to diagnosis a

72

patient with severe malnutrition when treating the patient at Baylor than when the same doctor was

treating a patient at a non-Baylor hospital.[22]

**Figure 19. Rate of Severe Malnutrition at Baylor Relative to Other Hospitals for Claims with Common Doctors.**
The following figure includes any claims for doctors with at least 10 claims at Baylor and 10 claims at a non-Baylor hospital from 2011 through June 2017. Even with doctors that work at both hospitals, Baylor had a severe malnutrition rate of 6.32 percent, while those same doctors only use severe malnutrition on 2.73 percent of claims while at other hospitals. The analysis is based on 161 doctors with 10 claims at Baylor and 10 claims at a non-Baylor hospital. In total these doctors had 23,541 claims at Baylor and 40,096 claims at other hospitals.



■ Non-Baylor Hospitals   ■ Baylor

90.     Figure 20 shows that a significant number of doctors had higher rates of severe

malnutrition when they worked at Baylor than at other hospitals. For example, the figure shows

that 123 doctors out of 161 doctors considered (or 76.4 percent) used a higher rate at Baylor.

---

[22] This general trend still holds when looking at any doctor that has at least one claim at Baylor and one claim at a non-Baylor hospital. Specifically, the rate of severe malnutrition is 6.81% at Baylor and 2.64% at other hospitals.

ADDENDUM 225

**Figure 20. Rate of Severe Malnutrition for Common Doctors at Baylor Versus Other Hospitals.**
The following figure compares the rate of severe malnutrition for common doctors at Baylor versus other hospitals. In the graph, the red circles to the right of the 45-degree line represent doctors who have higher upcoding of severe malnutrition at Baylor and the blue circles represent doctors who have higher upcoding at other non-Baylor hospitals. Only doctors with at least 11 claims at Baylor and 11 claims at a non-Baylor hospitals are represented in this figure.



91.    Relator identified the specific doctors that had higher rates of severe malnutrition at Baylor relative to other hospitals. Table 11 below lists the ten doctors with the largest disparity in severe malnutrition rates when they worked at Baylor compared to when they worked at other

hospitals. Each of these doctors coded severe malnutrition at a rate at least six times higher when at Baylor.[23]

**Table 11. Doctors with the Most Excessive Rates of Severe Malnutrition at Baylor Versus Other Hospitals.**
This table shows the difference in severe malnutrition usage for the ten doctors with the highest difference in severe malnutrition usage at Baylor versus other hospitals. The first seven digits of the physician ID have been hidden by Relator so the specific physician will not be identifiable directly from this complaint. Only doctors with at least 11 claims at Baylor and 11 claims at a non-Baylor hospitals are represented in this table.

| Physician ID | Percent of Claims w/ Severe Malnutrition at Baylor | Percent of Claims w/ Severe Malnutrition at Other Hospitals | Difference in Percent | Baylor Rate Relative to Other Hospitals | P-Value |
|---|---|---|---|---|---|
| XXXXXXX031 | 23.08% | 3.12% | 19.95% | 738% | 0.0069 |
| XXXXXXX184 | 17.39% | 0.00% | 17.39% | Infinity | <0.0001 |
| XXXXXXX940 | 17.53% | 0.94% | 16.59% | 1,858% | <0.0001 |
| XXXXXXX494 | 17.42% | 1.53% | 15.89% | 1,142% | <0.0001 |
| XXXXXXX278 | 16.00% | 1.19% | 14.81% | 1,345% | 0.0002 |
| XXXXXXX253 | 16.81% | 2.34% | 14.47% | 720% | <0.0001 |
| XXXXXXX159 | 16.15% | 2.63% | 13.52% | 614% | <0.0001 |
| XXXXXXX569 | 13.48% | 0.00% | 13.48% | Infinity | <0.0001 |
| XXXXXXX301 | 15.38% | 2.13% | 13.26% | 723% | 0.0302 |
| XXXXXXX723 | 16.67% | 3.61% | 13.05% | 461% | 0.0102 |

92.     Relator also re-ran the regression analysis for the subset of claims that have at least 10 claims by a doctor at Baylor and a non-Baylor hospital.[24] Relator used the same controls from the regression described in section IV.D.2.A above, along with a control for the doctor that treated the patient. This allows Relator to quantify the marginal impact a patient being treated at Baylor has on a patient being diagnosed with a Misstated MCC, beyond what can be explained by patient characteristics, demographic characteristics, as well as the individual doctor. As shown in Table

---

[23] Relator only included the results for severe malnutrition because it has the most claims among the Misstated MCCs, providing the most thorough comparison.

[24] More than 63,000 claims for severe malnutrition and more than 73,000 claims for Misstated MCC were included in this regression. Severe malnutrition was the only specific Misstated MCC in which Relator ran the regression because it had the largest number of claims.

ADDENDUM 227

12, Baylor's rate of any MCC, after these controls, was 155.93 percent of the rate at other hospitals, and Baylor's severe malnutrition rate was 231.14 percent of the rate at other hospitals.[25]

**Table 12. Fixed Effect Regression Results After Controlling for Attending Physician.**
Relator used a linear regression to analyze approximately 73,000 claims with common doctors at Baylor and other hospitals. The results are presented in the following table. The coefficient is listed first and the p-value is in parenthesis, which represents the statistical significance of the coefficient. A lower p-value means the result is more statistically significant. Coefficients were not included for categorical variables.

|  | **Any Misstated MCC** | **Severe Malnutrition** |
|---|---|---|
| Poverty Rate | -0.002 (0.003) | 0 (0.9365) |
| Unemployment Rate | -0.0041 (0.0111) | -0.0019 (0.0776) |
| Log (Median Income) | -0.0466 (0.0216) | -0.0221 (0.092) |
| No High School Diploma Rate | 0.0006 (0.1692) | -0.0004 (0.1403) |
| Intercept | 0.5243 (0.0299) | 0.2651 (0.0883) |
| Principal Diagnosis | Yes | Yes |
| Principal Diagnosis X Log (LOS[26]) | Yes | Yes |
| Season Control Variables | Yes | Yes |
| Age Control Variables | Yes | Yes |
| Sex Control Variables | Yes | Yes |
| Race Control Variables | Yes | Yes |
| Discharge Status Group Controls | Yes | Yes |
| Principal Diagnosis Category Controls | Yes | Yes |
| RUCC Control | Yes | Yes |
| Doctor Control Variables | Yes | Yes |
| Baylor Coefficient | 0.0660 (<0.0001) | 0.0358 (<0.0001) |
| Nationwide Average | 11.80% | 2.73% |
| **Baylor Rate** | **18.40%** | **6.31%** |
| **Baylor Relative Effect** | **155.93%** | **231.14%** |

---

[25] Relator also considered whether the behavior of these doctors is due to their tendency to provide certain procedures at certain hospitals. To do this, Relator also added control variables for the procedure codes and the admission status to identify admissions as from the emergency room, elective, or urgent. For any Misstated MCC and for severe malnutrition, the coefficients were 0.0505 and 0.0358 respectively. In other words, Baylor's rate of Misstated MCC was 142.80 percent of other hospitals, and rate of severe malnutrition was 231.14 percent of other hospitals among claims with common doctors.

[26] LOS stands for length of stay.

93.     This analysis shows that the fraudulent upcoding was not caused by tendencies of certain doctors that treat patients at Baylor but was instead caused by clinical documentation and coding practices that were implemented specifically at Baylor.

### C.     Unique Characteristics of Baylor's Patients do not Account for the Excessively High Rates of Misstated MCCs

94.     Relator also considered whether it might be something else about Baylor patients that would justify the higher rates of MCCs. Although Relator already considered a variety of patient characteristics in the fixed effect linear regression model, Relator also analyzed the subset of patients that attended both Baylor and at least one other hospital between 2011 and 2017, and then compared the rate of the MCC codes used when these patients were treated at Baylor versus when treated at other hospitals.

95.     As shown in Figure 21, when only analyzing patients that have at least 5 claims at both Baylor and other hospitals, the use of encephalopathy, respiratory failure, and malnutrition was still significantly higher at Baylor. Between 2011 and 2017, patients were diagnosed with one of the Misstated MCCs on 25.38 percent of claims while being treated at Baylor, but on only 13.38 percent of claims at other hospitals. A patient being treated at Baylor was coded with the Misstated MCCs at a rate that was 189.7% the rate at other non-Baylor hospitals.

ADDENDUM 229

**Figure 21. Rate of Any of The Misstated MCCs at Baylor Relative to Other Hospitals for Claims with Common Patients.**

The following figure includes any claims for common patients between Baylor and a non-Baylor hospital from 2011 through June 2017. Even with patients at both hospitals, Baylor used one of the Misstated MCCs on 25.38 percent of claims, while those same patients only have one of the Misstated MCCs on 13.38 percent of claims while at other hospitals. The analysis is based on 155 patients with 5 claims at Baylor and 5 claims at a non-Baylor hospital. In total these patients had 1,430 claims at Baylor and 1,547 claims at other hospitals.



96.    Figure 22 shows a significant number of patients had higher rates of Misstated MCCs when treated at Baylor. Dots to the right of the 45-degree line indicate the patient was coded with higher rates of the Misstated MCCs at Baylor than at other hospitals. The graph shows that 107 out of 155 patients considered (or 69.0 percent) had a higher usage rate of the Misstated MCCs at Baylor than at other hospitals. This indicates the behavior is not limited to a few patients but is systemic.

ADDENDUM 230

**Figure 22. Rate of Any of the Misstated MCCs for Common Patients.**
The following figure compares the rate of Misstated MCCs for common patients at Baylor versus other hospitals. The red dots to the right of the 45-degree line represent patients who have higher rates of Misstated MCCs at Baylor and the blue dots represent patients who have lower rates of Misstated MCCs at Baylor. The size of the dot corresponds to the number of claims the patient had at Baylor.



97.     This result still holds when looking at just severe malnutrition.[27] For patients that were at both hospitals, the rate of severe malnutrition at Baylor was 21.36 percent, while the rate of severe malnutrition at other hospitals was 7.91 percent, as demonstrated in Figure 23 below.

---

[27] Relator only included the results for severe malnutrition as it was the only Misstated MCC with a sufficient number of claims and common patients to conduct this analysis.

This suggests that a patient was 270% as likely to diagnosis a patient with severe malnutrition when treating the patient at Baylor than when the same patient was treating a patient at a non-Baylor hospital.[28]

**Figure 23. Rate of Severe Malnutrition at Baylor Relative to Other Hospitals for Claims with Common Patients**
The following figure includes any claims for patients with at least 5 claims at Baylor and 5 claims at a non-Baylor hospital from 2011 through June 2017. Even with patients that are treated at both hospitals, Baylor had a severe malnutrition rate of 21.36 percent, while those same patients only use severe malnutrition on 7.91 percent of claims while at other hospitals. The analysis is based on 71 patients with 5 claims at Baylor and 5 claims at a non-Baylor hospital. In total these patients had 618 claims at Baylor and 746 claims at other hospitals.



98.     Figure 24 shows that a significant number of patients had higher rates of severe malnutrition when they worked at Baylor than at other hospitals. For example, Panel A shows that 54 patients out of 71 patients considered (or 76.1 percent) used a higher rate at Baylor.

---

[28] This general trend still holds when looking at any patient that has at least one claim at Baylor and one claim at a non-Baylor hospital. Specifically, the rate of severe malnutrition is 38.1% at Baylor and 12.3% at other hospitals.

ADDENDUM 232

**Figure 24. Rate of Severe Malnutrition for Common Patients**
The following figure compares the rate of Severe Malnutrition for common patients at Baylor versus other hospitals. The red dots to the right of the 45-degree line represent patients who have a higher rate of Severe Malnutrition at Baylor and the blue dots represent patients who have lower rates of Severe Malnutrition at Baylor. The size of the dot corresponds to the number of claims the patient had at Baylor.



99.     As this analysis shows, even when looking at the same patient, Baylor has significantly higher rates of Misstated MCCs than other hospitals.  This shows that the upcoding behavior cannot be attributable to patient differences.

81

ADDENDUM 233

### D. Regional Factors do not Explain Why Baylor Has Higher Rates of MCCs

100.    Relator also considered whether the high rates of MCC upcoding at Baylor hospitals might be due to the region in which Baylor's hospitals are located. Although Relator has already controlled for a variety of county demographic factors through the regression, Relator now compares the rate of Misstated MCCs between Baylor and other hospitals within each MSA.

101.    As shown in Table 13, Baylor had a significantly higher rate of Misstated MCCs in each MSA, with one MSA showing a rate more than twice as high at Baylor. As shown in Table 14, Baylor had a higher rate of encephalopathy than other hospitals in each MSA, with only one region (Killeen-Temple, TX) having a difference of less than seven percentage points. Table 15 and Table 16 show that Baylor had higher rates of respiratory failure and severe malnutrition, respectively, in each of the MSAs.

**Table 13. Rate of Misstated MCCs at Baylor Versus Other Hospitals in the Same MSA.**
This table compares the rate of Misstated MCCs in the suspicious patterns for the hospitals in Baylor and other hospitals within the same geographic region.

| MSA | Baylor MCC Rate | Nationwide MCC Rate | Baylor Rate Relative to Other Hospitals | Probability |
|---|---|---|---|---|
| Austin-Round Rock, TX | 15.93% | 9.35% | 170% | <0.0001 |
| Killeen-Temple, TX | 20.73% | 14.75% | 141% | <0.0001 |
| Waco, TX | 18.00% | 8.85% | 203% | <0.0001 |

**Table 14. Rate of Encephalopathy at Baylor Versus Other Hospitals in the Same MSA.**
This table compares the encephalopathy rate of the suspicious patterns for the hospitals in Baylor and other hospitals within the same geographic region.

| MSA | Baylor Encephalopa-thy Rate | Nationwide Encephalopathy Rate | Baylor Rate Relative to Other Hospitals | Probability |
|---|---|---|---|---|
| Austin-Round Rock, TX | 13.75% | 7.41% | 186% | <0.0001 |
| Dallas-Fort Worth-Arlington, TX | 17.59% | 11.47% | 153% | <0.0001 |
| Killeen-Temple, TX | 14.78% | 14.69% | 101% | 0.3573 |
| Waco, TX | 12.20% | 1.29% | 944% | <0.0001 |

ADDENDUM 234

**Table 15. Rate of Respiratory Failure at Baylor Versus Other Hospitals in the Same MSA.**
This table compares the respiratory failure rate of the suspicious patterns for the Baylor hospitals and other hospitals within the same geographic region.

| MSA | Baylor Respiratory Failure Rate | Nationwide Respiratory Failure Rate | Baylor Rate Relative to Other Hospitals | Probability |
|---|---|---|---|---|
| Austin-Round Rock, TX | 16.62% | 10.64% | 156% | <0.0001 |
| Killeen-Temple, TX | 22.04% | 18.44% | 120% | <0.0001 |
| Waco, TX | 18.94% | 11.91% | 159% | <0.0001 |

**Table 16. Rate of Severe Malnutrition at Baylor Versus Other Hospitals in the Same MSA.**
This table compares the severe malnutrition rate of the suspicious patterns for the Baylor hospitals other hospitals within the same geographic region.

| MSA | Baylor Malnutrition Rate | Nationwide Malnutrition Rate | Baylor Rate Relative to Other Hospitals | P-value |
|---|---|---|---|---|
| Austin-Round Rock, TX | 5.12% | 2.42% | 212% | <0.0001 |
| Killeen-Temple, TX | 7.59% | 2.15% | 353% | <0.0001 |
| Waco, TX | 7.07% | 1.47% | 482% | <0.0001 |

102.    Based on this regional analysis, Relator has shown that the fraudulent upcoding cannot be attributed to geographic factors unique to Baylor.

### E.    Summary of Determining What Caused Excessively High Rates of Misstated MCCs at Baylor

103.    Relator has considered a number of potential explanations above to determine what phenomenon or which actor could be responsible for the excessively high rates of Misstated MCCs at Baylor. The excessively high rates are highly significant across 133 principal diagnosis categories and 4 Baylor hospitals, indicating that it is not driven by particular patient medical characteristics nor unique to only a few Baylor hospitals. Relator eliminated the possibility that the high Misstated MCC rates might be justified by or due to patient or demographic characteristics, attending physician preferences, or regional differences. Based on this, Relator has demonstrated that the only plausible explanation as to the cause of the excessively high rates of Misstated MCCs is that Baylor has implemented practices to maximize the amount of revenue it

ADDENDUM 235

can receive from Medicare by fraudulently upcoding, i.e., adding unsubstantiated MCC secondary diagnosis codes to its claims.

### 3.    Economic Damages

104.    Relator employed a robust and conservative methodology to quantify the economic damages caused by the Defendants' fraudulent coding encephalopathy, respiratory failure, and severe malnutrition. Relator has limited this complaint to only the most extreme cases—*i.e.*, where Baylor used a Misstated MCC code at two times the rate of comparable hospitals or at least three percentage points of its entire patient population higher than other hospitals. Additionally, only principal diagnosis bins where the excessive MCC usage rate was statistically significant at a 99.9% rate—or almost certainly not random—were considered fraudulent. The following describes Relator's methodology for aggregating the total dollar value of the fraud committed by Baylor.

105.    Relator employs a principal diagnosis bin-based regression methodology for calculating damages. For each principal diagnosis bin, Relator re-ran its fixed effect linear regression model discussed in Equation 1 but changed the dependent variable to represent the additional revenue due to upcoding. For each claim, Relator calculated the difference in the DRG weight between claims with Misstated MCCs and claims without Misstated MCCs.[29] Relator then multiplied this difference in weights by Baylor's average base rate from 2011 through 2017, which was $5,554.01.[30] Within the regression for each principal diagnosis bin, the fixed effect for Baylor

---

[29] For claims that could have been a complication or without complication, Relator took a weighted average of DRG weights for the two DRGs and was weighted by Baylor's historical distribution of severity levels. Approximately 14.1% of claims were without complication and 85.9% of claims were with complication. If Baylor also upcodes using CC secondary diagnoses, the damage calculation would be even more conservative.

[30] The labor portion of the base rate was adjusted by the average wage index among Baylor hospitals from 2011 through 2017, and the capital portion was adjusted by the geographic adjustment factor over the same time period, to get a more accurate calculation of additional revenue.

ADDENDUM 236

represents the additional revenue Baylor receives for the misstated MCCs after controlling for possible differences in patient, regional, and claim characteristics. Relator further only attributed damages for the regression results that were statistically significant at a 99.9% level, meaning there is a less in 1 in 1,000 chance the additional revenue received is due to random chance.

106.    Based on this bin-based regression, Relator's analysis shows that Baylor received an additional $61.8 million in false claims across all principal diagnosis categories due to fraudulent MCC upcoding. Table 17 demonstrates the additional revenue Baylor received for false claims across each of the Misstated MCCs.

**Table 17. Damages by Specific Misstated MCCs.**

| Hospitals | Secondary MCC | Dollar Value of Fraud |
|:---:|:---:|:---:|
| Temple, Round Rock, Waco, and Dallas | Encephalopathy | $11,538,368 |
| Temple, Round Rock, and Waco | Respiratory Failure | $26,998,225 |
| Temple, Round Rock, and Waco | Severe Malnutrition | $23,258,777 |
| | **Total** | **$61,795,370** |

107.    Relator's bin-based regression methodology represents a conservative approach for a variety of reasons. First, Relator only included principal diagnosis bins where Baylor used the Misstated MCC code at two times the rate of comparable hospitals or at least three percentage points of the entire patient population higher. A lower threshold could have been used and would result in higher damages. Additionally, Relator only considered claim groupings where there was less than a one-in-a-thousand chance that the difference in major complication rate at Baylor versus other hospitals was due to random causes.

108.    Second, Relator's damage calculation is based on comparing Baylor to all other inpatient hospitals. To the extent other hospitals are engaging in the same fraudulent activity, it would make Baylor's actions seem relatively normal and would thus lead to a lower damage

ADDENDUM 237

estimate.[31] Indeed it is overly conservative to compare Baylor's fraudulent behavior to other hospitals also engaging in the same fraudulent activity; therefore Relator also undertook a different methodology to identify hospital systems based on the amount of fraudulent activity they have among all of their claims. If Relator were to remove from comparison the top third of hospital systems identified to have excessively billed Medicare and re-run the bin-based regression analysis, damages would total $72 million.

109.    Relator's consideration of other possible explanations, such as claim characteristics, patient characteristics, and doctor practices, demonstrates that the excessive coding of Misstated MCCs is due to system-wide practices in place at Baylor. Additionally, the extremely high levels of statistical significance of the analyses across a variety of comparative settings indicate a nearly impossible probability that the practices are due to random chance. Relator's damages estimate of $61.8 million due to Baylor's fraudulent upcoding is conservative and the estimate is robust when controlling for a variety of factors.

## V.    CAUSES OF ACTION

### COUNT ONE
**Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)**
**(Against All Defendants)**

110.    Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

111.    As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare by falsifying material information concerning patient diagnoses,

---

[31] As an example, the comparison set of hospitals includes Prime Healthcare Services, Inc., which is currently being sued by the US Department of Justice under the False Claims Act. *See* https://www.justice.gov/opa/pr/united-states-intervenes-false-claims-act-lawsuit-against-prime-healthcare-services-inc-and.

ADDENDUM 238

complications, and comorbidities; and by failing to report and return overpayments from Medicare within the required time period.

112.    Defendants, by the conduct set forth herein, have violated:

a.    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

b.    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

c.    31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

113.    The United States has suffered and continues to suffer damages as a direct proximate result of Defendants' false or fraudulent claims.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Relator prays for relief and judgment, as follows:

(a)    Defendants pay an amount equal to three times the amount of damages the United States has suffered because of Defendants' actions, plus a civil penalty against Defendants of not less than $10,957 and not more than $21,916 for each violation of 31 U.S.C. § 3729;

(b)    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d);

(c)    Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

ADDENDUM 239

(d)     Relator and the United States be granted all such other relief as the Court deems

just and proper.

## VII.   JURY TRIAL DEMANDED

Relator hereby demands a trial by jury.


DATED:  August 7, 2018                    Respectfully submitted,


                                          */s/ P. Jason Collins*
                                          P. Jason Collins
                                          jcollins@rctlegal.com
                                          Jeremy H. Wells
                                          jwells@rctlegal.com
                                          Scotty G. Arbuckle, III
                                          tarbuckle@rctlegal.com
                                          **REID COLLINS & TSAI LLP**
                                          1301 S Capital of Texas Hwy
                                          Building C, Suite 300
                                          Austin, Texas 78746
                                          T: 512.647.6100
                                          F: 512.647.6129

                                          *Counsel for Relator*
                                          *Integra Med Analytics LLC*

ADDENDUM 240



## Details for title: 0001 - Inpatient Hospital MS - DRG Coding Validation

**Issue Number - Name**            0001 - Inpatient Hospital MS - DRG Coding Validation

**Review Type**            Complex

**Claim Type**            Inpatient Hospital

**Region and State**            RAC 1-4
All States

**Date Approved**            2017-02-01

**Description**

Coding requirements: MS-DRG Coding requires that diagnostic and procedural information and the discharge status of
the beneficiary, as coded and reported by the hospital on its claim, matches both the attending physician description
and the information contained in the beneficiary's medical record. Reviewers will validate MS-DRGs for principal and
secondary diagnosis and procedures affecting or potentially affecting the MS-DRG assignment. Clinical Validation is not
permitted.

**Affected Codes**

- All MS-DRG's (001-999)

**Applicable Policy References**

- CMS Pub. 100-08, Medicare Program Integrity Manual, Chapter 6.5.3 A-C
- CMS QIO Manual, Section 4130
- ICD-9 & 10 CM Coding Manual
- ICD-9 & 10 CM Addendums
- ICD-9 & 10 CM Official Guidelines for Coding and Reporting, and Addendums
- ICD-10 Procedural Coding System (PCS) Coding Manual,  Official Guidelines for Coding and Reporting, and
  Addendums
- Coding Clinic for ICD-10-CM and ICD-10-PCS



A federal government website managed and paid for by the U.S. Centers for Medicare &
Medicaid Services. 7500 Security Boulevard, Baltimore, MD 21244



**ADDENDUM 241**

**ADDENDUM 242**

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 18, 2019. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/S/ David W. Skaar